UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

LARYSSA JOCK, et al.,

      Plaintiffs,

    v.

STERLING JEWELERS INC.,

      Defendant.

-------------------------------------------------------- x

Index No. 1:08 CV 2875 (JSR)

U.S. District Judge Jed S. Rakoff

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE COUNTERCLAIMS PURSUANT TO RULE 12(f), OR, IN THE ALTERNATIVE, MOTION TO DISMISS COUNTERCLAIMS PURSUANT TO RULE 12(b)(6)

SEYFARTH SHAW, LLP
620 Eighth Avenue, 32nd Floor
New York, New York 10018
Telephone: (212) 218-5500
Facsimile: (212) 218-5526
Gerald L. Maatman, Jr. (GM-3201)
gmaatman@seyfarth.com
Lorie E. Almon (LA-4937)
lalmon@seyfarth.com
David Bennet Ross (DR-8613)
dross@seyfarth.com
Richard I. Scharlat (RS-5127)
rscharlat@seyfarth.com

ZASHIN & RICH CO., L.P.A.
55 Public Square, 4th Floor
Cleveland, Ohio 44113
Telephone: (216) 696-4441
Facsimile: (216) 696-1618
Stephen S. Zashin (SZ7589)
ssz@zrlaw.com

*Attorneys for Defendant Sterling Jewelers Inc.*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................... 1

FACTUAL AND PROCEDURAL HISTORY ............................................................... 2

LEGAL ARGUMENT ................................................................................................... 4

    A.    As A Matter Of Law, Sterling's Counterclaims Are Properly  Before This Court And Are Not Redundant Of Sterling's Affirmative Defenses Or Otherwise Immaterial Or Impertinent ....................................................................... 4

    B.    Sterling's Counterclaims State A Claim And Plaintiffs Have Presented No Valid Ground For Dismissal Under Rule 12(b)(6), And Hall Street Associates, LLC v. Mattel Is Inapposite ................................................................. 8

CONCLUSION ............................................................................................................. 15

## TABLE OF AUTHORITIES

## CASES

*Bank of New York Trust, N.A. v. Franklin Advisors, Inc.*,
  522 F. Supp. 2d 632 (S.D.N.Y. 2007) ................................................................. 7

*Bell. Atl. Corp. v. Twombly*,
  127 S. Ct. 1955 (U.S. 2007) ............................................................................... 9

*Champ v. Siegel Trading Co.*,
  55 F.3d 269 (7th Cir. 1995) ............................................................................... 7

*Conley v. Gibson*,
  355 U.S. 41 (1957) ............................................................................................ 11

*Emmpresa Cubana Del Tabaco v. Culbro Corp.*,
  213 F.R.D. 151 (S.D.N.Y. 2003) ........................................................................ 4

*Great American Insurance Co. v. Houston General Insurance Co., Inc.*,
  735 F. Supp. 581 (S.D.N.Y. 1991) ................................................................ 11, 12

*Green Tree Fin. Corp. v. Bazzle*,
  539 U.S. 444 (2003) ........................................................................ 5, 6, 7, 8, 10

*Gregory v. Daly*,
  243 F.3d 687 (2d Cir.2001) ............................................................................... 9

*Hall Street Associates v. Mattel, Inc.*,
  128 S. Ct. 1396 (2008) ............................................................................. 9, 10, 11

*Howsam v. Dean Witter Reynolds, Inc.*,
  537 U.S. 79 (2002) ....................................................................... 6, 7, 8, 10

*Iqbal v. Hasty*,
  490 F.3d 143 (2d Cir. 2007) ............................................................................... 9

*John Wiley & Sons v. Livingston*,
  376 U.S. 543 (1964) ........................................................................................... 5

*Karas v. Katten Muchin Zavis Rosenman*,
  No. 04-CV-9570 (SHS), 2006 WL 20507 (S.D.N.Y. Jan. 3, 2006) ................... 7

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*,
  906 F.2d 884 (2d Cir. 1990) ............................................................................... 7

*Preston v. Ferrer,*
    128 S.Ct. 978 (2008)..........................................................................................................11

*Public Service Commission of Utah v. Wyckoff Co.,*
    344 U.S. 237 (1952) ...................................................................................................12, 13

*Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.,*
    No. 06-CV-4624 (PKL), 2008 WL 1910503 (S.D.N.Y. Apr. 30, 2008)...................4, 9, 13

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974) ........................................................................................................11

*Sturge v. Diversified Transport Corporation, Berman Enterprises, Inc.,*
    772 F. Supp. 183 (S.D.N.Y. 1991) .................................................................................13

*Twinlab Corp. v. Signature Media Servs.,*
    No. 99-CV-169 (AGS), 1999 U.S. Dist. LEXIS 18973 (S.D.N.Y. Dec. 7, 1999) ..............9

*United States v. Int'l Bhd. of Teamsters,*
    970 F.2d 1132 (2d Cir. 1992) ...........................................................................................6

*United Steel Workers of America v. St. Gobain Ceramics & Plastics, Inc.,*
    505 F.3d 417 (6th Cir. 2007) ...................................................................................6, 8, 11

## PRELIMINARY STATEMENT

Sterling Jewelers Inc. respectfully submits this memorandum of law in opposition to plaintiffs' motion to strike the counterclaims of Sterling as redundant, immaterial, and impertinent pursuant to Rule 12(f) of the Federal Rules of Civil Procedure or, in the alternative, dismiss Sterling's counterclaims for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

After a flurry of motion practice, now pending before this Court are:

1.     Sterling's motion pursuant to Rule 16 (Dkt. 21);

2.     Plaintiffs' motion to stay litigation and refer to arbitration (Dkt. 25);

3.     Plaintiffs' motion to strike counterclaims, or, in the alternative, motion to dismiss counterclaims pursuant to Rule 12(b)(6) (Dkt. 37).

The eye in this storm of motions is certain terms of the alternative dispute resolution program between Sterling and its employees, known as RESOLVE. Specifically, the parties' dispute centers around terms which provide for this Court, and not an arbitrator, to resolve "procedural questions" where one party has already initiated litigation in Court:

> Questions of arbitrability (that is whether an issue is subject to arbitration under this Agreement) shall be decided by the arbitrator. Likewise, procedural questions, which grow out of the dispute and bear on the final disposition, are also matters for the arbitrator. However, where a party already has initiated a judicial proceeding, a court may decide procedural questions that grow out of the dispute and bear on the final disposition of the matter (e.g., one (1) year for filing a claim).

Dkt. 36, Def. Answer and Amended Counterclaim Exs. A & S; Dkt. 26, Pl. Mem., Ex. C. (emphasis added). Plaintiffs in this case "initiated a judicial proceeding" by filing their complaint and amended complaint, thereby triggering Sterling's contractual right to seek resolution of certain procedural matters by way of the Court in its counterclaims.

In this motion, plaintiffs repeatedly take the myopic view that because the parties have "agreed to arbitrate," all procedural matters related to the arbitration necessarily must be decided by an arbitrator and not this Court. Plaintiffs' contentions ignore the key contractual RESOLVE language. In addition, plaintiffs' contentions distract from the unique contractual provision that places the real issues before the Court: (a) plaintiffs' repudiation of the RESOLVE agreement and their attendant loss of their right to arbitrate; and (b) Sterling's right to have this Court decide the procedural questions set forth in Sterling's counterclaims for declaratory relief before Sterling decides whether to move this matter to arbitration.

As a direct result of plaintiffs' decision to initiate this litigation in this Court, Sterling's counterclaims seek legitimate and ripe relief as a matter of law. Plaintiffs cannot meet their burden under Rules 12(f) or 12(c). This Court should deny Plaintiffs' motion in its entirety.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiffs filed their initial complaint against Sterling for damages pursuant to Title VII and the Equal Pay Act on March 18, 2008. Dkt. 1. On or about April 25, 2008, plaintiffs consented to an extension of time for Sterling to answer or otherwise move in response to plaintiffs' complaint, through and including April 30, 2008. Dkt. 43 at 6. Before the expiration of the extension of time for Sterling to respond, plaintiffs filed an amended complaint on April 24, 2008. Dkt. 11.

In both the complaint and the amended complaint, plaintiffs pleaded without caveat that RESOLVE was unenforceable.[1] Dkt. 1; Dkt. 11, ¶ 9. Despite their unequivocal pleading admissions, plaintiffs claim in this motion (and, in sum or substance, in previous submissions)

---

[1] Indeed, to the extent that plaintiffs questioned the enforceability of RESOLVE, they certainly could have filed a declaratory judgment action. However, plaintiffs filed no such action and instead plead, without limitation, that RESOLVE was unenforceable.

2

that they filed the complaint because they purportedly questioned the enforceability of RESOLVE because of provisions concerning injunctive relief and costs associated with processing a claim under RESOLVE. Dkt. 26; Dkt. 46 at 5-6. Plaintiffs have never explained these claims of ignorance in the face of RESOLVE documents which they filed as exhibits to *their* motions and which demonstrate that these purported concerns had no basis in reality. Dkt. 34 at 12-16.

On April 30, 2008, and as required by plaintiffs' initiation of judicial proceedings, Sterling filed its answer and counterclaims[2] which sought declaratory relief as to certain "procedural questions," as follows:

(a)      that counterclaim defendants' claims must be adjudicated under RESOLVE on an individual basis (Counterclaim, Dkt. 36 ¶ 51(b));

(b)      that counterclaim defendants are precluded from bringing or participating in any action under RESOLVE on behalf of a putative class pursuant to the terms of RESOLVE (Counterclaim, Dkt. 36 ¶ 51(c));

(c)      that the Court should decide whether counterclaim defendants Contreras, House, Maddox, McConnell and Pagan's claims are time barred pursuant to RESOLVE (Counterclaim, Dkt. 36 ¶ 58(a)); and

(d)      that the limitations period for plaintiffs' Equal Pay Act claims does not begin on February 27, 2003, but rather 2 or 3 years (depending on alleged willfulness) from the date each employee filed an opt-in notice of consent (Counterclaim, Dkt. 36 ¶ 60(a)).

---

[2] Sterling filed an answer and amended counterclaim as of right on May 20, 2008. Dkt. 36. The amended counterclaim seeks the same relief sought in Sterling's original counterclaim.

Sterling's counterclaims are properly filed as a matter of law and are ripe for determination because by filing their complaint and Amended Complaint, plaintiffs triggered the provisions of RESOLVE which: (a) proscribed initiating litigation in court; and (b) provided that, in such an event, the court which presides over the case can make certain determinations which might otherwise be within the purview of an arbitrator. Accordingly, this Court should deny plaintiffs' motion, as there are no grounds sufficient to support dismissal under either Rule 12(f) and Rule 12(b)(6).

## LEGAL ARGUMENT

A.    **As A Matter Of Law, Sterling's Counterclaims Are Properly Before This Court And Are Not Redundant Of Sterling's Affirmative Defenses Or Otherwise Immaterial Or Impertinent**

Rule 12(f) of the Federal Rules of Civil Procedure provides for a court to "order stricken from any pleading ... any redundant, immaterial, impertinent, or scandalous matter." *See Emmpresa Cubana Del Tabaco v. Culbro Corp.,* 213 F.R.D. 151, 155 (S.D.N.Y. 2003). Courts should generally allow claims to survive motions to strike under Rule 12(f) and "should not tamper with pleadings unless there is a strong reason for so doing." *Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*, No. 06-CV-4624 (PKL), 2008 WL 1910503 at *4 (S.D.N.Y. April 30, 2008)(internal citation omitted). Accordingly, motions to strike are "generally disfavored" and should be denied, "unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation." *Id.* (internal citation omitted).

In their motion, plaintiffs contend that simply because Sterling asserts certain affirmative defenses in its answer and counterclaim which indicate that RESOLVE is generally enforceable, Sterling's counterclaims are therefore "redundant, immaterial, and impertinent" and should be dismissed. Plaintiffs' conclusory statement that "the parties now agree that there is a valid agreement to arbitrate, Sterling's purported counterclaims, which are in fact defenses to

4

Plaintiffs' claims, are issues for an arbitrator to decide and the court need only address the threshold issue of the enforceability of the agreement," fundamentally misconstrues Sterling's claims and their proper presentation to this Court. Dkt. 39 at 5.

First, the fact that RESOLVE is enforceable does not mean that Sterling's counterclaims are automatically issues for the arbitrator to decide. To the contrary, the parties' bilateral agreement to have a Court decide certain "procedural questions" where one party has initiated litigation in Court creates an independent basis for the relief sought in Sterling's counterclaims. As a result of plaintiffs' decision to file the complaint and amended complaint (for whatever reason), this Court should decide these questions because the parties contracted for this right.

Second, plaintiffs' continued reliance on the notion that *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444 (2003), and *John Wiley & Sons v. Livingston*, 376 U.S. 543 (1964), mandate that all procedural decisions in connection with an arbitration must be decided by an arbitrator in all cases turns a blind eye to the reality of the RESOLVE provision to which plaintiffs agreed.[3] In their motion, much as they did in opposition to Sterling's Rule 16 motion, plaintiffs ignore the RESOLVE provisions which were designed to have a court decide certain procedural questions under certain circumstances. Sterling agrees that without this unique provision in RESOLVE, these procedural matters will be the purview of an arbitrator. However, this unique language in

---

[3] Plaintiffs incorrectly contend that only one plaintiff has the unique language in their signed agreement. Putting aside that RESOLVE employees are bound by the RESOLVE rules which contain this language, as a result of additional plaintiffs attempting to join in this litigation, to date, the following plaintiffs have the key "procedural questions" language in their signed RESOLVE agreements: Noreen Arena; Susan Lee Bailey; Erica Caldwell; Darlene Cerlanek; Lisa Follet; Michele Guyer; Maria House; Ashley Kalemba; Vicki Osborn; Jennifer Molina; Gloria Pagan and Khristina Rodrigues. True and accurate copies of their RESOLVE agreements are attached as Exhibit A to the Declaration of Gerald L. Maatman, Jr. dated June 2, 2008 submitted herewith. Critically, even if only one plaintiff had the provision in their signed agreement, Sterling is contractually entitled under RESOLVE to have this Court decide the procedural questions.

RESOLVE was crafted within the parameters of *Green Tree* and *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002), to move these procedural questions to the purview of the Court under the circumstances brought about by plaintiffs.

Despite plaintiffs' protestations, parties to a contract may agree to have certain matters typically decided by an arbitrator decided, instead, by a court. *See United Steel Workers of America v. St. Gobain Ceramics & Plastics, Inc.*, 505 F.3d 417, 424 (6th Cir. 2007) ("We do not establish a bright-line rule that timeliness questions must inexorably go to the arbitrator. As with all arbitration matters, the matter is one of contract: Just as two parties need not enter an arbitration contract in the first place, they need not enter an arbitration agreement that submits questions of timeliness to arbitration. Parties who wish to steer timeliness disputes to the courts remain free to do so, and nothing in this opinion is to the contrary."). The unique RESOLVE language steers the procedural matters set forth in Sterling's counterclaims to a court for determination. As such, the counterclaims seek relief independent of any affirmative defenses which Sterling asserts and should not be dismissed under Rule 12(f).

This is also true despite plaintiffs' desire to have this Court nullify the unique RESOLVE provision because it states that "a court may decide procedural questions." Dkt. 39 at 7. The provision manifests the parties' intent to have a court, as opposed to arbitrator, decide these procedural questions (*i.e.* "a court [and not an arbitrator] may decide procedural questions ...") under certain circumstances. Relevant case law does not support plaintiffs' "permissive" misreading of this provision, which would render the provision meaningless and superfluous. A court cannot assume contractual language is superfluous, and must give meaning to all of the contractual terms and the parties' intent. *United States v. Int'l Bhd. of Teamsters,* 970 F.2d 1132, 1136 (2d Cir. 1992) (noting that courts "must avoid an interpretation of an agreement that

renders one of its provisions superfluous"); *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906

F.2d 884, 889-890 (2d Cir. 1990) ("In a contract action, the court's general objective should be to

give effect to the intentions of the parties entering into the agreements....Where the parties have

expressly agreed that the availability of a cure period shall be temporally limited, the court does

not give effect to the parties' intention by removing the time limitation.") (citations omitted);

*Bank of New York Trust, N.A. v. Franklin Advisors, Inc.*, 522 F. Supp. 2d 632, 635 (S.D.N.Y.

2007) ("Where a written agreement clearly and unambiguously sets forth the parties' intent, a

court called upon to interpret the contract must give effect to the intent as indicated by the

language used."); *Karas v. Katten Muchin Zavis Rosenman*, No. 04-CV-9570 (SHS), 2006 WL

20507, at *8 (S.D.N.Y. Jan. 3, 2006) (same).

As detailed in Sterling's opposition to plaintiffs' motion to stay this litigation and refer to

arbitration (Dkt. 34 at 17), prior to *Green Tree*, courts decided the permissibility of class

arbitrations where an arbitration agreement, like RESOLVE, was silent as to class arbitrability.

*See, e.g., Champ v. Siegel Trading Co.*, 55 F.3d 269, 276 (7th Cir. 1995) (holding that "'[w]hen

contracting parties stipulate that disputes will be submitted to arbitration, they relinquish the

right to certain procedural niceties which are normally associated with a formal trial'") (citation

omitted). The Supreme Court in *Green Tree*, 539 U.S. at 452, held that, *absent* other contractual

provisions, an arbitrator should decide "procedural" questions of "what *kind of arbitration

proceeding* the parties agreed to." (emphasis in original).

The Supreme Court in *Green Tree* relied on *Howsam*'s notion of "procedural" questions

for the arbitrator to decide. *Howsam*, 537 U.S. at 84-85 (finding that, although the issue of

"arbitrability" is for the court to decide, the threshold issue of the "applicability of the NASD

time limit rule" was a procedural matter "which grow[s] out of the dispute and bear[s] on its final

disposition . . . [is] presumptively not for the judge, but for an arbitrator to decide"). Pertinent to

the case at bar, the Supreme Court's holding in *Howsam* as to whether an arbitrator or court

decides certain procedural matters *depends* on the terms of the parties' arbitration agreement:

whether the question to be decided is one that, *from the face of the arbitration agreement*, the

parties "intended to have a court, rather than an arbitrator" interpret. *Id.* at 86 (emphasis in

original).

Taking this direction from *Green Tree* and *Howsam,* RESOLVE clearly sets forth the

intent to have the Court and not an arbitrator decide these "procedural" matters where one party,

as plaintiffs have, initiated a judicial proceeding to enforce their rights. *See* Answer, Ex. A (Dkt.

36). Pursuant to the express terms of RESOLVE, the parties have demonstrated their intent to

have "procedural" questions -- including, without limitation, the "kind" of arbitration proceeding

which may occur -- determined by this Court. Because of this unique language, this Court

should decide those issues. *Howsam*, 537 U.S. at 86; *see also St. Gobain*, 505 F.3d at 424. It is

the determination of these matters -- which must be resolved even if RESOLVE is generally

enforceable -- by the Court which Sterling seeks in its counterclaim. Sterling is contractually

entitled to this declaratory relief before deciding whether to exercise its right to arbitrate

plaintiffs' claims. Accordingly, this Court should deny plaintiffs' motion to strike pursuant to

Rule 12(f).

**B.    Sterling's Counterclaims State A Claim And Plaintiffs Have Presented No Valid
Ground For Dismissal Under Rule 12(b)(6), And *Hall Street Associates, LLC v.
Mattel* Is Inapposite**

Plaintiffs also seek to have Sterling's counterclaims dismissed pursuant to Rule 12(b)(6),

again relying on their same argument (which ignores the unique language discussed above) that

because RESOLVE is enforceable the Court should have no role in deciding the procedural

matters which are the subject of Sterling's counterclaims. In light of the parties' indisputable

right to return certain decision-making authority to the Court by contract -- and Sterling's right to

have certain procedural matters determined by declaratory relief -- Sterling's counterclaims state

claims upon which relief can be granted and are not subject to dismissal pursuant to Rule

12(b)(6).

In deciding whether to grant a motion to dismiss for failure to state a claim upon which

relief may be granted, a court "must accept as true all of the factual allegations set out in

plaintiff's complaint, draw inferences from those allegations in the light most favorable to

plaintiff, and construe the complaint liberally." *Quanta Specialty Lines Ins. Co.* 2008 WL

1910503, at *3, quoting *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001) (internal citation

omitted). The court must consider the material facts alleged as true for purposes of the motion

and must also construe all reasonable inferences in favor of the non-movant. *See Twinlab Corp.*

*v. Signature Media Servs.* No. 99-CV-169 (AGS), 1999 U.S. Dist. LEXIS 18973, at *10

(S.D.N.Y. Dec. 7, 1999). The critical analysis is whether the complaint contains "enough facts

to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955,

1960 (U.S. 2007). The *Twombly* standard in the Second Circuit has been interpreted as requiring

a flexible "plausibility standard" which requires some amplification of claims, but only where

the amplification is needed to demonstrate the claim is plausible. *Iqbal v. Hasty,* 490 F.3d 143,

157-158 (2d Cir. 2007). Sterling has satisfied this pleading requirement, and plaintiffs are not

entitled to a Rule 12(b)(6) dismissal.

To buttress their incorrect contention that once the parties have acknowledged

RESOLVE's general enforceability the Court may have no further role in this matter, plaintiffs

rely heavily on the Supreme Court's ruling in *Hall Street Associates v. Mattel, Inc.*, 128 S. Ct.

1396 (2008), for the proposition that parties may not expand judicial review under the Federal

Arbitration Act ("FAA") by contract. Plaintiffs' reliance on *Hall Street Associates* is entirely misplaced and actually highlights the lack of support for plaintiffs' position in connection with the unique provisions set forth in RESOLVE.

First, the Supreme Court in *Hall Street Associates* specifically limited its holding to sections 9, 10, and 11 of the FAA -- relating to limitations on expanding judicial review of *arbitration awards*. *Hall St. Assocs.*, 128 S. Ct. at 1406 ("In holding that §§ 10 and 11 provide exclusive regimes for the review provided by the statute, we do not purport to say that they exclude more searching review based on authority outside the statute as well. The FAA is not the only way into court for parties wanting review of arbitration awards: they may contemplate enforcement under state statutory or common law, for example, where judicial review of different scope is arguable. But here we speak only to the scope of the expeditious judicial review under §§ 9, 10, and 11, deciding nothing about other possible avenues for judicial enforcement of arbitration awards."). The case at bar does not implicate potential expanded judicial review of an arbitration award and centers not on sections 9, 10, and 11 of the FAA, but rather on Sections 3 and 4 of the FAA, which were not the subject of the Supreme Court's holding in *Hall Street Associates*.

Second, Sterling does not seek any expanded judicial review of the FAA by way of RESOLVE in any event. The FAA does not require that an arbitrator decide procedural matters. Indeed, before the Supreme Court's decisions in *Green Tree* and *Howsam*, courts did resolve such matters, depending on the specific provisions of the parties' arbitration agreement. The unique language in RESOLVE does nothing more than follow the guidelines for demonstrating contractual intent delineated in *Green Tree* and *Howsam* and returns certain decision-making authority to the Court, under certain circumstances. This contractual construction is valid and

enforceable in connection with procedural matters, as distinct from review of arbitration awards as per *Hall Street Associates*. *See St. Gobain*, 505 F.3d at 424 ("We do not establish a bright-line rule that timeliness questions must inexorably go to the arbitrator. As with all arbitration matters, the matter is one of contract: Just as two parties need not enter an arbitration contract in the first place, they need not enter an arbitration agreement that submits questions of timeliness to arbitration. Parties who wish to steer timeliness disputes to the courts remain free to do so, and nothing in this opinion is to the contrary.").

Plaintiffs also improvidently cite to *Preston v. Ferrer*, 128 S.Ct. 978 (2008), for the proposition that by agreeing under RESOLVE to resolve the merits of employee claims via arbitration, Sterling has lost the right to have "procedural questions" decided by this Court pursuant to the parties' bilateral agreement. To the contrary, *Preston* actually supports Sterling's right to have this Court decide procedural matters precisely because Sterling and plaintiffs did *not* agree "to arbitrate *all* questions" under all circumstances; rather the parties expressly agreed that if a party initiated a suit, such "procedural questions" become the purview of the Court and not an arbitrator. *Id.* at 981 (emphasis added).

Additionally, Sterling does not seek "to prematurely obtain rulings on procedural issues . . . which would otherwise be directed to an arbitrator" as plaintiffs claim. Dkt. 39 at 13-14. In support of this contention, plaintiffs rely on case law which stands for the proposition that requests for "preliminary findings and conclusions intended to fortify [it] against future litigation" are not typically granted as declaratory relief. Dkt. 39 at 13. In this regard, plaintiffs' reliance on *Great American Insurance Co. v. Houston General Insurance Co., Inc.*, 735 F. Supp. 581 (S.D.N.Y. 1991), is particularly misplaced.

The Court in *Great American* addressed a case which was a "classic example of a race to the courthouse," with one party seeking declaratory relief knowing that if it did not file in New York first, its adversary would file in Texas by a date certain. *Id.* at 586. On those facts, which are materially distinct from the case at bar, the Court opined that there was a "misuse of the Declaratory Judgment Act to gain a procedural advantage and preempt the forum choice of plaintiff ..." *Id.* In this case, there is no race to the courthouse to be "first-filed;" Sterling's counterclaims seek relief which plaintiffs knew, or should have known, would be a direct consequence under RESOLVE of their decision to initiate a judicial proceeding.[4] Indeed, the Court's ruling in *Great American* itself *supports* the fact that Sterling's counterclaims are properly before this Court. Opining about the proper use of declaratory judgments, the Court in *Great American* wrote that:

> A declaratory judgment is an opportunity for a party to a ripe legal controversy to have that controversy resolved by a Court promptly rather than waiting for the opposing party, with the ripe substantive right to sue, to choose to exercise its rights to judicial intervention, particularly where the delay in seeking judicial intervention will cause substantial prejudice to the declaratory judgment plaintiff. The intent is to allow a party to be free from the whim of its opponent in deciding when to resolve the legal dispute between them.

*Id.* at 585. Sterling's counterclaims for declaratory relief are ripe for adjudication as a result of plaintiffs' court filings and are precisely the type of relief for which the Declaratory Judgment Act was enacted.

Plaintiffs' reliance on *Public Service Commission of Utah v. Wyckoff Co.*, 344 U.S. 237 (1952), also misses the mark. Dkt. 39 at 13. In *Wycoff*, the Supreme Court denied declaratory

---

[4] Plaintiffs had possession of the RESOLVE rules which likewise contained the unique language set forth in RESOLVE. In fact, plaintiffs attached those rules to their memorandum of law in support of their motion to compel arbitration and stay litigation. Dkt 26, Ex. C.

relief to the complainant because the only purpose to be served by the judgment was "to guard against the possibility that the Commission would attempt to prevent complainant from operating under its certificate from the Interstate Commerce Commission." *Id.* at 241. In contrast to the facts in *Wycoff*, the declaratory relief sought by Sterling would not prevent plaintiffs from any course of action -- plaintiffs' have already foreclosed their own ability to arbitrate under RESOLVE by breaching and repudiating RESOLVE by, *inter alia*, filing their complaint (and amended complaint). Instead, Sterling's counterclaims seek relief as to procedural matters, relief to which Sterling is now entitled under RESOLVE by force of plaintiffs' initiation of judicial proceedings.

Sterling's counterclaims are not "in essence a defense to an impending action [arbitration] in another forum" as plaintiffs argue based on *Sturge v. Diversified Transport Corporation, Berman Enterprises, Inc.,* 772 F. Supp. 183 (S.D.N.Y. 1991), and *Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*, No. 06-CV-4624 (PKL), 2008 WL 1910503 (S.D.N.Y. April 30, 2008). As set forth in previous submissions, by asserting its counterclaims seeking affirmative declaratory relief on certain procedural matters, Sterling has not ruled out use of RESOLVE for the ultimate resolution of the merits of plaintiffs' claims. Instead, following plaintiffs' repudiation of RESOLVE, Sterling is the only party with the contractual right to utilize RESOLVE and seeks this Court's resolution of procedural matters – as it is presently contractually entitled – before deciding to move the case to RESOLVE or leave it in plaintiffs' first-chosen forum, i.e., this Court.

Sterling's counterclaims are ripe for adjudication as a result of plaintiffs' filing of this lawsuit and state a claim upon which relief can be granted as a matter of law. The counterclaims seek to enforce a contractual right to have this Court make certain decisions once it has been

involved in the dispute. Dismissal of Sterling's counterclaims as a result of plaintiffs' questionable about-face decision to arbitrate would allow the whim of one party to defeat the proper use of the Declaratory Judgment Act by another party to enforce its rights. As such, this Court should deny plaintiffs' motion to dismiss under Rule 12(b) (6).

## **CONCLUSION**

For the foregoing reasons, this Court should deny plaintiffs' motion to strike the

counterclaims of Sterling as redundant, immaterial, and impertinent pursuant to Rule 12(f) of the

Federal Rules of Civil Procedure or, in the alternative, dismiss Sterling's counterclaims for

failure to state a claim upon which relief can be granted pursuant to Rule 12(b) (6) of the Federal

Rules of Civil Procedure.

Dated: New York, New York
       June 2, 2008

<div style="margin-left:40%;">

Respectfully submitted,

SEYFARTH SHAW LLP

By: /s/ Gerald L. Maatman, Jr.
    Gerald L. Maatman, Jr. (GM-3201)
    gmaatman@seyfarth.com
    Lorie E. Almon (LA-4937)
    lalmon@seyfarth.com
    David Bennet Ross (DR-8613)
    dross@seyfarth.com
    Richard I. Scharlat (RS-5127)
    rscharlat@seyfarth.com
620 Eighth Avenue, 32nd Floor
New York, New York 10018-1405
Telephone: (212) 218-5500
Facsimile: (212) 218-5526

ZASHIN & RICH CO., L.P.A.
    Stephen S. Zashin (SZ7589)
    ssz@zrlaw.com
55 Public Square, 4th Floor
Cleveland, Ohio 44113
Telephone: (216) 696-4441
Facsimile: (216) 696-1618

*Attorneys for Defendant Sterling Jewelers Inc.*

</div>

Westlaw.

Slip Copy
Slip Copy, 2008 WL 1910503 (S.D.N.Y.)
**(Cite as: 2008 WL 1910503 (S.D.N.Y.))**

Page 1

**QuantaSpecialty** Lines Ins. Co. v. **Investors** Capital Corp.
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
**QUANTASPECIALTY** LINES INSURANCE COMPANY, Plaintiff,
v.
**INVESTORS** CAPITAL CORPORATION, Defendant.
No. 06 CIV. 4624(PKL).

April 30, 2008.

traub Lieberman Straus & Shrewsberry LLP, Lisa L. Shrewsberry, Esq., Richard J. Rogers, Esq., Hawthorne, NY, for Plaintiff.
hitchcock & Cummings, LLP, Terence P. Cummings, Esq., Carolyn Comparato, Esq., New York, NY, for Defendant.

### OPINION AND ORDER

LEISURE, District Judge.
**\*1** Plaintiff Quanta Specialty Lines Insurance Company ("Quanta") brings this action seeking declaratory judgment that its insured, defendant Investors Capital Corporation ("ICC"), is not entitled to coverage for defense and indemnity with respect to arbitrations brought against ICC. Along with its answer, ICC asserts several counterclaims against Quanta, which seek rescission of Quanta's insurance policies or, alternatively, judgment that ICC is entitled to coverage under those policies. Three motions related to ICC's pleading are now before the Court.[FN1] First, Quanta moves to dismiss or strike ICC's counterclaims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f), and to strike certain of ICC's affirmative defenses under Rule 12(f). Second, ICC seeks pre-answer security from Quanta under New York Insurance Law § 1213(c). Third, ICC seeks leave to amend its answer to add an affirmative defense pursuant to Rule 15(a). For

the reasons set forth below, Quanta's motion is GRANTED IN PART and DENIED IN PART and ICC's motions are DENIED.

> FN1. Discovery proceeded in this action despite the pending motions. At the close of discovery, each party moved for summary judgment; these motions will not be addressed by the Court in this Opinion and Order.

### Background

ICC, a Delaware corporation with its principal place of business in Massachusetts, "is a nationally recognized securities broker/dealer licensed by the NASD [which] does business through licensed registered representatives."(Counterclaims ¶ 5.) Through William Gallagher Associates Insurance Broker of Boston, Massachusetts ("Gallagher"), ICC procured from Quanta, an Indiana corporation with its principal place of business in New York, (Counterclaims ¶ 9; Compl. ¶ 1), a "Broker/Dealer and Registered Representatives Professional Liability Policy", which provided coverage to ICC from December 31, 2004 to December 31, 2005 (the "Original Policy"). (Compl. ¶ 5, Ex. A; Counterclaims ¶ 7.) Thereafter, the policy was renewed for the period of December 31, 2005 to December 31, 2006 (the "Renewal Policy"). (Counterclaims Ex. 2.) Section 1 of the Original Policy and the Renewal Policy (collectively, the "Policies") states, in relevant part, that:

> [Quanta] shall pay, on behalf of [ICC], Damages which [ICC] becomes legally obligated to pay because of a Claim that is both made against [ICC] and reported to [Quanta] in writing during the Policy Period or Discovery Period, if applicable, for a Wrongful Act committed solely in the rendering or failing to render Professional Services for a Client ....

(Compl. Ex. A; Counterclaims Ex. 2.) The Policies

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2
Slip Copy, 2008 WL 1910503 (S.D.N.Y.)
(Cite as: 2008 WL 1910503 (S.D.N.Y.))

define "Claim" as "a demand received by [ICC] for Damages (including pleadings received in a civil litigation or arbitration) for an actual or alleged Wrongful Act."(Compl. Ex. A; Counterclaims Ex. 2.) A "Wrongful Act" is "a negligent act or omission ... committed by [ICC] in the rendering of Professional Services."(Compl. Ex. A; Counterclaims Ex. 2.) Further, "Interrelated Wrongful Acts" are any Wrongful Acts that are "similar, repeated, or continuous" or "connected by reason of any common fact, circumstance, situation, transaction, casualty, event, decision or policy or one or more series of facts, circumstances, situations, transactions, casualties, events, decisions or policies."(Compl. Ex. A; Counterclaims Ex. 2.) Section 6 of the Policies, entitled "Single Claim/Interrelated Wrongful Acts," states that:

*2 All Claims based upon or arising out the [sic] same Wrongful Act or Interrelated Wrongful Acts shall be considered a single Claim and each such single Claim shall be deemed to have been made on the earlier of the following:

A. when the earliest Claim arising out of such Wrongful Act or Interrelated Wrongful Acts was first made; or

B. when notice was provided to [Quanta] pursuant to Section 12 herein concerning a Wrongful Act giving rise to such Claim.

(Compl. Ex. A; Counterclaims Ex. 2.)

On August 12, 2005, ICC was served with a Statement of Claim in a National Association of Securities Dealers, Inc. ("NASD") arbitration commenced by Lillie H. Green and other unsophisticated retirees (the "Green Arbitration"), all of whom claim to have lost most of their life savings as a result of the actions of Joseph Lionel Jones ("Jones"), a licensed registered representative associated with ICC. (Compl. Ex. B at 1-2; Compl. ¶ 8; Counterclaims ¶ 15.) Specifically, the Statement of Claim alleges that, in 2002, Jones was operating a Ponzi Scheme, whereby he was "engaged in the practice of 'selling away' investment contracts issued by BAB Produc-

tions which were not registered securities."(Compl. Ex. B at 2.) The claimants, who were induced by Jones to invest in BAB Productions, assert, inter alia, that ICC failed to supervise Jones. (Id. Ex. B at 9-10.) Consequently, claimants lost the funds they had invested and seek "compensatory damages of up to $1,000,000, including lost profits if their monies had been prudently invested, pre judgment interest, post-judgment interest, attorneys' fees, punitive damages, a return of all fees, management charges and commissions, plus interest, and the costs of the action."(Id. ¶ 9, Ex. B. at 10.) On August 15, 2005, ICC provided notice to Quanta of the Green Arbitration and requested from Quanta defense and indemnity coverage related thereto. (Id. ¶¶ 8, 12.)In response, Quanta agreed to pay for ICC's requested defense counsel, but purported to reserve its rights to deny coverage for the Green Arbitration. (Id. ¶¶ 12-13; Counterclaims ¶ 26; Compl. Ex. C.)

In April 2006, ICC was served with a substantially similar Statement of Claim in another NASD arbitration (the "Mitchell Arbitration").[FN2] (Compl. ¶ 16, Ex. E; Counterclaims ¶ 18.) Once again, claimants allege that ICC failed to supervise Jones, who "sold fraudulent investments in an enterprise known as BAB Productions to hundreds of mostly-minority investors ...." (Compl.Ex. E.) On April 16, 2006, ICC provided notice to Quanta of the Mitchell Arbitration and again requested defense and indemnity coverage. (Compl.¶¶ 16, 19.)

FN2. Other similar underlying actions have come to light since the initial pleadings in this case. A specific discussion of each of these actions is unnecessary at this junc- ture.

Quanta ultimately disclaimed coverage for both the Green and Mitchell Arbitrations, (id. ¶ 25; Counterclaims ¶ 27), maintaining that it need not provide coverage to ICC because ICC was aware of an investigation conducted and a claim made concerning Jones's alleged Ponzi Scheme prior to the December 31, 2004 inception date of the Original Policy.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 1910503 (S.D.N.Y.)
(Cite as: 2008 WL 1910503 (S.D.N.Y.))

On June 9, 2004, a securities investigator from the State of North Carolina, Department of the Secretary of State, Securities Division had contacted ICC and requested documentation related to an ongoing investigation of Jones. (Compl.¶ 20, Ex. F.) ICC provided the necessary information to the investigator, (*Id.* 21, Ex. G), and soon thereafter, a cease-and-desist order was issued against Jones. (*Id.* 122, Ex. H.) Relying upon this order, one of Jones's clients, Patricia Alston, contacted ICC through her attorney on October 21, 2004, requesting reimbursement from ICC for her investments in BAB Productions. (*Id.* Ex. I.) Because ICC had advanced knowledge of an investigation and claim relating to Jones's conduct, Quanta now seeks declaratory judgment that, under the terms of the Policies, coverage should not be afforded to ICC for the Green and Mitchell Arbitrations.

**\*3** In its first three counterclaims, ICC contends that the Policies should be rescinded for violating New York statutes and regulations governing insurance policies. Alternatively, ICC maintains that it did not anticipate and had no advanced knowledge of any Claims, Wrongful Acts, or Interrelated Wrongful Acts as defined by the Policies. Accordingly, ICC asserts three additional counterclaims against Quanta-for declaratory judgment, specific performance, and breach of contract-seeking coverage under the policies for defense and indemnity in the Green and Mitchell Arbitrations. Quanta moves to dismiss each of ICC's counterclaims. ICC not only opposes Quanta's motion, but also moves to compel Quanta to provide pre-answer security and to amend its pleading to add an affirmative defense.

*Discussion*

I. *Quanta's Motion to Dismiss and/or Strike ICC's Counterclaims and to Strike Certain Affirmative Defenses*

**A. Rule 12(b)(6) Standard**

When determining whether to dismiss a claim on a motion for failure to state a claim upon which relief may be granted, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally."*Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001) (quoting *Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000)); *see also Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738, 740 (1976); *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992). Similarly, when considering a motion to dismiss a counterclaim for failure to state a claim, the Court must accept the material facts alleged in defendant's answer and counterclaim as true and construe all reasonable inferences in favor of defendant. *See Twinlab Corp. v. Signature Media Servs.,* No. 99 Civ. 169, 1999 U.S. Dist. LEXIS 18973, at \*10 (S.D.N.Y. Dec. 7, 1999). Thus, "[t]he issue is not whether [the claimant] will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."*Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.,* 128 F.3d 59, 62-63 (2d Cir.1997). A party's claim should not be dismissed in this instance "unless it appears beyond doubt that the [movant] can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 894-95 (2d Cir.1976). Nevertheless, the claim "must contain allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory."*Huntington Dental & Med. Co. v. Minnesota Mining & Mfg. Co.,* No. 95 Civ. 10959, 1998 U.S. Dist. LEXIS 1526, at \*9 (S.D.N.Y. Feb. 13, 1998). Lastly, although the Court must accept as true the factual allegations set out in a complaint or counterclaim, a complaint or counterclaim "which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b) (6)."*DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996) (internal quotation marks omitted).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 4
Slip Copy, 2008 WL 1910503 (S.D.N.Y.)
(Cite as: 2008 WL 1910503 (S.D.N.Y.))

## B. Rule 12(f) Standard

**\*4** Rule 12(f) of the Federal Rules of Civil Procedure provides that "the court may order stricken from any pleading ... any redundant, immaterial, impertinent, or scandalous matter."*See Emmpresa Cubana Del Tabaco v. Culbro Corp.,* 213 F.R.D. 151, 155 (S .D.N.Y.2003)." 'The courts should not tamper with pleadings unless there is a strong reason for so doing.' " *Pena v. Guzman,* No. 03 Civ. 5130, 2004 U.S. Dist. LEXIS 1844, at \*10 (S.D.N.Y. Feb. 11, 2004) (quoting *Lipsky,* 551 F.2d at 893). As such, motions to strike are "generally disfavored." *Emmpresa Cubana Del Tabaco,* 213 F.R.D. at 155 (internal quotation marks and citations omitted). Moreover, " 'unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation,' " motions to strike allegations in the pleadings should be denied. *Id.* (quoting *Ulla-Maija, Inc. v. Ulla-Maija Kivimaki,* No. 02 Civ. 3640, 2003 U.S. Dist. LEXIS 977, at \*13 (S.D.N.Y. Jan. 23, 2003)).

## C. ICC's Counterclaims Seeking Rescission of the Policies

The first set of ICC's counterclaims seek rescission because the Policies are unlawful group insurance policies,[FN3] do not comply with various New York excess line requirements, and are *malum in se* due to Quanta's doing insurance business in New York without a license, in violation of New York Insurance Law § 1102. Quanta's principal argument in moving to dismiss these claims is that, in the absence of express language to the contrary, violations of New York Insurance Law do not afford an insured with a private right of action. ICC maintains that because the agreement was made in contravention of New York Insurance Law, it may avoid enforcement of the contract as a member of the class-i.e., the insured-that the statute was meant to protect.

> FN3. In the absence of statutory permission, liability policies issued on a group

basis are unlawful. *See* N.Y. Ins. Dep't Circular Ltr. Rul. No. 14 (July 24, 1981) (ICC Memo. of Law Appx. A) ("All excess line brokers are advised that the Insurance Law does not provide for property and casualty insurance to be written on a group basis in New York."); *see also* N.Y. Ins. Dep't Circular Ltr. No. 6 (Apr. 19, 2005) (ICC Ans. Ex. 6) ("A policy that insures an insurance company, and its insurance agents and/or the representatives of the insurer's affiliate, a securities broker/dealer, may not be issued as a group personal excess insurance policy under N.Y. Ins. Law § 3445 (McKinney 2000).").

ICC contends that it may proceed against Quanta and seek rescission, stating that "for centuries it has been the case that an innocent party to an unlawful contract may seek rescission."[FN4](Def.'s Memo. of Law at 5.) In support of this general proposition, ICC relies heavily upon *Dornberger v. Metropolitan Life Insurance,* 961 F.Supp. 506, 532-33 (S.D.N.Y.1997). There, plaintiff claimed it was entitled to rescission because the insurer had violated various European insurance laws. *Id.* at 535-36.The Court determined that rescission was an appropriate remedy because "[d]efendants allegedly violated laws designed to regulate the merits and subject matter of insurance transactions."*Id.* at 535.In so doing, it contrasted a seminal New York case, *John E. Rosasco Creameries, Inc. v. Cohen,* 276 N.Y. 274, 11 N.E.2d 908 (1937), which held that:

> FN4. Construing all reasonable inferences in favor of ICC, the Court accepts ICC's characterization of itself as an innocent party. ICC claims that it has yet to receive any benefit from the Policies (Def's Memo. of Law at 11 n. 10), while Quanta counters that it has paid significant funds under the Policies on claims unrelated to the Green and Mitchell Arbitrations. (Pl.'s Memo. of Law at 3 n. 3.)

Where contracts which violate statutory provi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 5
Slip Copy, 2008 WL 1910503 (S.D.N.Y.)
(Cite as: 2008 WL 1910503 (S.D.N.Y.))

sions are merely *malum prohibitum,* the general rule [that illegal contracts are unenforceable] does not always apply. If the statute does not provide expressly that its violation will deprive the parties of their right to sue on the contract, and the denial of relief is wholly out of proportion to the requirements of public policy or appropriate individual punishment, the right to [enforce the contract] will not be denied.

**\*5** *Dornberger,* 961 F.Supp. at 534 (quoting *Rosasco,* 276 N.Y. at 278, 11 N.E.2d at 909) (alterations in original). Applying this principle, the New York Court of Appeals held that rescinding an unlicensed milk dealer's contract was wholly out of proportion to public policy and legislative intent.*Rosasco,* 276 N.Y. at 280, 11 N.E.2d at 910 ("We have here a statute which provides that milk dealers shall not sell milk unless duly licensed. The statute imposes penalties for its violation by way of fine and imprisonment, but it does not expressly provide that contracts made by milk dealers shall be unenforcible. Nothing in this statute reveals an implied intent to deprive unlicensed dealers of the right to recover the reasonable value of the milk sold by them, and .... such additional punishment should not be imposed unless the legislative intent is expressed or appears by clear implication."); *see Atkin v. Hill, Darlington, & Grimm,* 15 A.D.2d 362, 224 N.Y.S.2d 553 (1st Dep't 1962) ("In none of [*Rosasco* and its progeny] would compliance with the applicable statute have halted the transaction; noncompliance had not in any manner entered into, affected or tainted it.") (internal quotations omitted). Thus, this Court must determine, based upon legislative intent and public policy considerations, whether Quanta's alleged Insurance Law violations relate to the merits of its transaction with ICC.

Beginning with ICC's second counterclaim, which seeks rescission because the Policies violate New York's excess line requirements, *see*N.Y. Ins. Law §§ 2105, 2118, 2130, ICC maintains that such requirements are intended to govern the substance of insurance transactions. According to the New York legislature:

> [A] principal goal of effective insurance regulation must be to allow citizens of this state reasonable access to financially sound and reliable insurers for their insurance coverage needs .... The legislature hereby declares that certain ... insurers should be allowed to provide coverage to citizens of this state, either as licensed insurers or as eligible excess line insurers, provided certain conditions and safeguards are met.

Assembly Bill No. 4139-A, 1993 N.Y. ALS 663, § 1 (1993). Moreover, while recognizing that regulation of the excess line market was necessary, the legislature emphasized the importance of providing access to unauthorized, excess line insurers. To that end, the excess line requirements serve as a procedural mechanism whereby unauthorized insurers are able to enter the New York insurance market upon complying with certain conditions. This process is monitored by the Superintendent of the Insurance Department (the "Superintendent"), who is given "broad regulatory powers over excess line brokers."*Polly Esther's South, Inc. v. Setnor Byer Bogdanoff, Inc.,* 10 Misc.3d 375, 387, 807 N.Y.S.2d 799, 811 (N.Y.Sup.Ct.2005). Indeed, the sections relied upon by ICC empower the Superintendent to regulate the excess line brokers: § 2105 relates to the Superintendent's issuing, suspending, and revoking excess line brokers' licenses; § 2118 imposes a duty on licensed excess line brokers to use due care, compliance of which is monitored by the Superintendent; and § 2130 creates an excess line association of New York, to be supervised by the Superintendent.[FN5]These rules do not affect the substance of the underlying insurance contract between an unauthorized insurer and its insured. For example, if the Superintendent had compelled Quanta to comply with the Insurance Law, the transaction between Quanta and ICC would not have been halted. Thus, to allow ICC a private cause of action would be incompatible with the clearly defined procedural mechanism provided by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the legislature. *See Certain Underwriters at Lloyd's, London v. Plasmanet Inc.,* No. 01 Civ. 6023, 2002 U.S. Dist. LEXIS 14190, at \*9-10 (S.D.N.Y. Aug. 1, 2002) (" 'Typically, courts do not construe the Insurance Law as providing for a private right of action, in the absence of express language authorizing such enforcement.' 'A private right of action should not be judicially sanctioned where it is incompatible with the enforcement mechanism chosen by the legislature or discordant with some other aspect of the overall statutory scheme.' ") (internal citation omitted) (quoting *Bauer v. Mellon Mortgage Co.,* 178 Misc.2d 234, 237, 680 N.Y.S.2d 397, 400 (N.Y.Sup.Ct.1998)); *3405 Putnam Realty Corp.,* 14 A.D.3d at 311-12, 788 N.Y.S .2d at 66-67 (choosing not to invalidate an insurance policy due to an insurer's failure to comply with excess line requirements); *Polly Esther's South, Inc.,* 10 Misc.3d at 387, 807 N.Y.S.2d at 811 ("[I]mplying a private right of action for violation of the relevant provisions of the Insurance Law and regulations would interfere with the legislative scheme that already provides for review and penalty by the Superintendent of the Insurance Department ...."); *City of New York v. Britestarr Homes, Inc.,* 150 Misc. .2d 820, 826, 570 N.Y.S.2d 882, 887 (N.Y.Sup.Ct.1991) (finding that "there is nothing which invalidates a policy issued by an insurer in violation of the Insurance Law").[FN6] Therefore, ICC's second counterclaim is dismissed.

> FN5. Though these requirements appear to apply to excess line brokers, ICC argues that "[i]t is not persuasive for Quanta to argue that the insurance broker was responsible for ensuring that the policies carried the notice and otherwise complied with the requirements of New York excess line requirements."(Def.'s Memo. of Law at 8 n. 6.) ICC instead attempts to create out of whole cloth "a duty to disclose to [ICC] and to Gallagher that the Policies were considered by Quanta to be New York transactions subject to compliance with New York's regulatory require-

ments."(Counterclaims ¶ 56.) With no support for this assertion, the Court is disinclined to hold Quanta liable under the excess line requirements. *See 3405 Putnam Realty Corp. v. Chubb Custom Ins. Co.,* 14 A.D.3d 311, 788 N.Y.S.2d 66 (1st Dep't 2005) (finding that an insurer should not be penalized under § 2105 despite evidence submitted by the insured that neither the insurer nor the broker were licensed to do insurance business in New York).

> FN6. ICC summarily rejects the significance of some of these cases. For example, in *3405 Putnam Realty Co rp.,* ICC argues that "the underlying insurance contract was otherwise a lawful contract[, while i]n this case, not only are the policies illegal group pol icies, they suffer from other defects, such as the 'claims made and reported' provision."(Def.'s Memo. of Law at 7.) With respect to *Plasmanet,* ICC states that unlike the instant action, the insured in that case "received at least one notice that the pol icy was a New York excess line placement, and being a New York resident, had obtained policies from unlicensed insurers in compliance with the New York excess line requirements on previous occasions."(*Id.* at 11 n. 11.)ICC's attempts to distinguish these cases are unpersuasive. Essentially, ICC argues that the cases are inapplicable because the insurers there were less culpable than Quanta under New York Insurance Law. This assertion ignores, however, the predicate question of whether ICC can maintain a private cause of action against Quanta premised upon violations of the Insurance Law.

\*6 With these principles in mind, ICC s first counterclaim, seeking rescission because the Policies are unlawful group insurance policies, must also be dismissed. Assuming, *arguendo,* that the Policies constitute unlawful group policies, the Superintendent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 1910503 (S.D.N.Y.)
(Cite as: 2008 WL 1910503 (S.D.N.Y.))

Page 7

is tasked with redressing such a problem. ICC provides the Court with no reason to infer a private cause of action, but rather offers up documents that confirm the Superintendent's broad supervisory powers under the Insurance Law. *See* N.Y. Ins. Dep't Circular Ltr. No. 6 (Apr. 19, 2005) ("If any policy is found to have been issued in violation, the insurer must restructure the program and make appropriate filings to be in compliance with the laws and regulations. Any illegal policy must be nonrenewed as of its next renewal date."); N.Y. Ins. Dep't Office of General Counsel, Informal Opinion (Jan. 21, 2004) (stating that a company agreed to revise its policy in accordance with advice received from the Superintendent that it had issued an illegal group insurance policy). Voiding the contract at issue here would not be commensurate with Quanta's alleged Insurance Law violation, which, if true, is most suitably remedied by the Superintendent. Thus, ICC's second counterclaim is dismissed.

Finally, ICC's third counterclaim alleges that Quanta was an unauthorized insurer doing business in New York, in violation of Insurance Law § 1102. The court's analysis in *3405 Putnam Realty Corp.* disposes of this claim:

> Insurance Law § 1102(a) specifically sets forth the penalties to be imposed with respect to each violation of the licensing requirements of the Insurance Law, and those penalties consist of a fine of $1,000 for the first violation and $2,500 for each subsequent violation. Although section 1102(a) further provides that these penalties shall be imposed "in addition to any other penalty provided by law," it can hardly be assumed that the Legislature's mention of "any other penalty provided by law" was a reference to a judicially created penalty ....

14 A.D.3d at 311-12, 788 N.Y.S.2d at 66 (internal quotations and citations omitted). Accordingly, ICC's third counterclaim is also dismissed.

**D. ICC's Counterclaims Seeking Coverage Un-**

**der the Policies**

Quanta moves to dismiss or strike ICC's fourth, fifth, and sixth counterclaims because they are redundant, raising "the same exact issues" as the complaint. (Pl.'s Memo. of Law at 9.) Quanta's complaint seeks a declaration that ICC is not entitled to coverage for the Green and Mitchell Arbitrations. ICC's counterclaims, however, seek affirmative relief, namely that ICC is entitled to coverage under the Policies.[FN7] In declaratory judgment actions brought by insurers, courts in this district routinely allow an insured to assert counterclaims for declaratory judgment or breach of contract. *See, e.g., Guideone Speciality Mut. Ins. Co. v. Congregation Bais Yisroel,* 381 F.Supp.2d 267, 282 (S.D.N.Y.2005) (allowing an insured's breach of contract claim to proceed to trial where the claim was "simply the converse of [insurer's] claim seeking a declaration of non-coverage"); *Liberty Surplus Ins. Corp. v. Segal Co.,* No. 03 Civ. 2194, 2004 U.S. Dist. LEXIS 18886, at *2, 5 (S.D.N.Y. Sept. 21, 2004) (Jones, J.). Moreover, Quanta fails to support its assertion that ICC's counterclaims will result in confusion, delay, or wasted resources. To the contrary, the Court will be able to construe the relevant policy provisions and, whether at the summary judgment stage or at trial, grant complete relief to either Quanta or ICC. Accordingly, Quanta's motion to dismiss or strike ICC s fourth, fifth, and sixth counterclaims is denied.

> FN7. To the extent that ICC's counterclaim for declaratory judgment may prove to be identical to its counterclaims for specific performance or breach of contract, the Court nevertheless will not dismiss it. In *Zurich American Insurance Co. v. Paxson Communications Corp.,* under similar circumstances, the Court held:
>
>> While the facts underlying both the [breach of contract] and [declaratory judgment] counterclaims may be identical and while both claims may ultimately prove to be coextensive, it is undisputed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that the declaratory judgment counter-claim properly states a claim under Fed.R.Civ.P. 12(b)(6). It is well established that declaratory relief is alternative or cumulative and not exclusive or extraordinary.

No. 03 Civ. 1503, 2004 U.S. Dist. LEXIS 9093, at *5-6 (S.D.N.Y. May 19, 2004) (internal quotations removed).

### E. ICC's Affirmative Defenses

*7 Finally, Quanta moves to strike several of ICC's affirmative defenses. ICC's first affirmative defense-failure to properly state a claim upon which relief can be granted as a matter of law-is appropriate and will not be struck. *See Sec. Exch. Comm'n v. Toomey,* 866 F.Supp. 719, 723 (S.D.N.Y.1992) ("[I]t is well settled that the failure to state-a-claim defense is a perfectly appropriate affirmative defense to include in the answer."). ICC's fourth and fifth affirmative defenses are struck because, as described above, they are improperly premised upon claims that the Policies were issued in contravention of New York Insurance Law. *See supra* at 9-16.ICC's seventh affirmative defense states that "Section 6 of the policy does not preclude coverage .... " (Ans.¶ 64.) Quanta believes that this is merely a restatement of ICC's answer, thereby causing confusion. At this point, the Court does not find a compelling reason, as required under Rule 12(f), to strike this affirmative defense. *See Walsh v. Cook,* No. 96 Civ. 9356, 1997 U.S. Dist. LEXIS 8178, at *1-2 (S.D.N.Y. June 12, 1997) ("[T]he inclusion of affirmative defenses in an answer is a statement of position by a defendant in the same way that a complaint is a statement of position by a plaintiff. The existence of these pleadings does not require any court to make a determination of the merits of the parties' respective claims at this stage of the proceeding."). Therefore, ICC's fourth and fifth affirmative defenses are struck, however, its first and seventh affirmative defenses remain.

### II. *ICC's Motion to Compel Pre-Answer Security*

ICC moves to compel Quanta to post pre-answer security. In New York, unauthorized foreign insurers generally are required to post security before filing responsive pleadings in proceedings brought against it. *See*N.Y. Ins. Law § 1213(c)(1); *see also Gravatt v. Gen. Star Indem. Co.,* No. 98 Civ. 6670, 1998 U.S. Dist. LEXIS 18827, at *9 (S.D.N.Y. Dec. 2, 1998); *Skandia An. Reinsurance Corp. v. Caja Nacional de Ahorro y Segoro,* No. 96 Civ. 2301, 1997 U.S. Dist. LEXIS 7221, at *6-7 (S.D.N.Y. May 23, 1997). Under § 1213(e), however, "the bond requirement of 1213(c)(1) does not apply to unauthorized insurers who issue certain policies pursuant to § 2105 or § 2117(b) or (c) of New York Insurance Law."*Gravatt,* 1998 U.S. Dist. LEXIS 18827, at *10. Quanta and ICC dedicate their respective briefs to the issue of whether § 1213(e) applies to Quanta.

The Court need not consider these arguments because a threshold issue is dispositive of ICC's motion. Specifically, ICC, a non-resident, may not avail itself of the protections of § 1213.[FN8]The purpose of § 1213 is to:

> FN8. Quanta notes, without elaborating, that "[i]t is questionable whether a non-New York resident ... can resort to New York Insurance Law Section 1213."(Pl.'s Memo. of Law at 3.)

subject certain insurers to the jurisdiction of the courts of this state in suits by or on behalf of insureds or beneficiaries under certain insurance contracts. The legislature declares that it is a subject of concern that many *residents of this state* hold policies of insurance issued or delivered in this state by insurers while not authorized to do business in this state, thus presenting to *such residents* the often insuperable obstacle of resorting to distant forums for the purpose of asserting legal rights under such policies.
*8 N.Y. Ins. Law. § 1213(a) (emphasis added). It thus serves as a long-arm statute, "subject[ing]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unauthorized foreign and alien insurers who have transacted business in the state to the jurisdiction of the New York courts."*Morgan v. Am. Risk Mgmt., Inc.,* No. 89 Civ. 2999, 1990 U.S. Dist. LEXIS 9037, at *17 (S.D.N.Y. July 20, 1990). A provision such as § 1213(c)(1) helps to ensure that a New York resident will be able to proceed against an out-of-state insurer in New York. *See British Int'l Ins. Co. Ltd. v. Seguros La Republica,* 212 F.3d 138, 140 (2d Cir.2000).

In seeking pre-answer security from Quanta, ICC ignores the underlying premise of § 1213, namely that the statute is intended to allow New York residents to assert their legal rights in New York courts. *See Signal Mut. Indem. Ass'n v. Rice Mohawk U.S. Constr., Co., Ltd.,* No. 95 Civ. 3721, 1997 U.S. Dist. LEXIS 3615, at *6-7 (S.D.N.Y. Mar. 28, 1997) ("[T]he New York legislature created Insurance Law § 1213(c) for the protection of its residents.Insurance Law § 1213(c) ensures that New York residents can readily access a foreign insurer's funds to satisfy judgments against that insurer.") (internal citations omitted); *Allstate Ins. Co. v. Administratia Asigurarilor de Stat,* 875 F.Supp. 1022, 1025 (S.D.N .Y.1995) ("[S]ection 1213 was enacted to aid New York residents who are insured by foreign insurance companies that are not authorized to do business in New York."). While Quanta is an unauthorized insurance company, ICC is a Delaware corporation with its principal place of business in Massachusetts. (Counterclaims ¶ 4; Def.'s Memo. of Law at 7). Thus, ICC may not invoke § 1213 for its benefit. *See Allstate Ins. Co.,* 875 F.Supp. at 1025-26 (deeming § 1213 inapplicable to plaintiff, which was an assignee and successor-in-interest to two foreign corporations) (citing *Food Fair Stores v. Gen. Excess Ins. Co., Ltd.,* 21 A.D.2d 684, 684, 250 N.Y.S.2d 458, 459-60 (2d Dep't 1964)); *Morgan,* 1990 U.S. Dist. LEXIS 9037, at *21 (stating that § 1213 only may be invoked by residents of New York or corporations authorized to do business in New York) (citing *Clifton Prods., Inc. v. Am. Universal Ins. Co.,* 169 F.Supp. 842, 845

(S.D.N.Y.1959)). ICC's motion to compel pre-answer security from Quanta is therefore denied.

### III. *ICC's Motion to Amend Its Answer*

ICC also moves, under Federal Rule of Civil Procedure 15(a), for leave of Court to add an affirmative defense to its answer pursuant to New York Business Corporation Law § 1312. Under Rule 15(a), a court "should freely give leave when justice so requires."Fed.R.Civ.P. 15(a)(2). The Second Circuit has followed the U.S. Supreme Court's direction that permission to amend a claim "should be freely granted." *Oliver Schs., Inc. v. Foley,* 930 F.2d 248, 252 (2d Cir.1991) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)). Notwithstanding this liberal standard, a court may deny leave to amend where there has been undue delay or bad faith on the moving party's part, prejudice to the non-movant, or where leave would be futile. *See Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 283 (2d Cir.2000) (citing *Foman,* 371 U.S. at 182). Despite Quanta's arguments to the contrary, the Court perceives no dilatory conduct by ICC. Rather, ICC sought leave to amend less than one month after serving its answer, and as such, Quanta's claim of prejudice is dubious. A more extensive analysis of the proposed affirmative defense is warranted, however, to determine whether granting ICC leave to amend would be a futile exercise.

**\*9** New York Business Corporation Law § 1312 is designed to "regulate foreign corporations doing business within the state and to put them on equal footing with domestic corporations in court proceedings."[FN9]*Posadas de Mexico, S.A. de C.V. v. Dukes,* 757 F.Supp. 297, 300 (S.D.N.Y.1991); *see Storwal Int'l, Inc. v. Thorn Rock Realty Co., L.P.,* 784 F.Supp. 1141, 1145 (S.D.N.Y.1992) (Sweet, J.). The statute "was never intended to serve as a shield to protect defendants from legitimate claims by foreign companies."*Dukes,* 757 F.Supp. at 300. If a foreign corporation's New York-based activities are " 'merely incidental to its business in interstate and international commerce,' " § 1312 will not pre-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                     Page 10
Slip Copy, 2008 WL 1910503 (S.D.N.Y.)
(Cite as: 2008 WL 1910503 (S.D.N.Y.))

clude it from bringing suit in New York, *id.* at 301 (quoting *Alicanto, S.A. v. Woolverton,* 129 A.D.2d 601, 603, 514 N.Y.S.2d 96, 98 (2d Dep't 1987)); systematic activity in New York is necessary in order to apply § 1312, *id.* at 300."No neat standard exists for § 1312. Instead, courts conduct inherently fact-bound analyses, focusing on whether the foreign corporation's activities are permanent, continuous, and regular." *Storwal Int'l, Inc.,* 784 F.Supp. at 1144. Further, a foreign corporation is presumed to be doing business where it is incorporated; the party invoking § 1312 has the burden to prove that the foreign corporation is engaged in regular, systematic activities in New York.*Id.* This burden is heavier than it would be under a jurisdictional analysis "[b]ecause of the possibility of an unconstitutional infringement of interstate commerce ...." *Id.; see Colonial Mortgage Co. v. First Federal Sav. & Loan Ass'n of Rochester,* 57 A .D.2d 1046, 1047, 395 N.Y.S.2d 798, 798 (4th Dep't 1977) ("The incidents of business transacted in New York by a foreign corporation may be sufficient to subject it to service of New York process (CPLR 302) and yet insufficient to require it to take out a certificate authorizing it to do business in New York.").

FN9.Section 1312(a) states:

> A foreign corporation doing business in this state without authority shall not maintain any action or special proceeding in this state unless and until such corporation has been authorized to do business in this state and it has paid to the state all fees and taxes imposed under the tax law or any related statute, as defined in section eighteen hundred of such law, as well as penalties and interest charges related thereto, accrued against the corporation. This prohibition shall apply to any successor in interest of such foreign corporation.

> N.Y. Bus. Corp. Law § 1312(a). The statute is applicable to actions brought in both state courts and federal courts sit-

ting in diversity. *See Netherlands Shipmortgage Corp., Ltd. v. Madias,* 717 F.2d 731, 735 (2d Cir.1983) ("Because jurisdiction rests on diversity, B.C.L. § 1312 precludes the maintaining of an action by an unauthorized foreign corporation not only in the state courts of New York but also in the federal courts located in that state.").

Against the backdrop of this strict standard, granting ICC leave to amend its answer would be futile. That Quanta maintains its principal place of business in New York is not enough to constitute systematic intrastate activity under § 1312. *See Stafford-Higgins Indus., Inc. v. Gaytone Fabrics, Inc.,* 300 F.Supp. 65, 67 (S.D.N.Y.1969) (Weinfeld, J.) (finding that the maintenance of a New York office, *inter alia,* is not enough to preclude a foreign entity's actions under § 1312). ICC offers no further information to satisfy its burden of showing that Quanta is engaged in systematic intrastate activities.[FN10] Indeed, ICC effectively concedes the interstate nature of Quanta's business, stating that Quanta "has issued insurance policies from that headquarters to residents of multiple states, including [ICC], a resident of Massachusetts."(Def.'s Reply Memo. of Law at 4; *see also id.* at 5.) Additionally, Quanta, as an excess line insurer, does not require New York licensing. *See Dukes,* 757 F.Supp. at 302 (considering that a foreign company did not need to obtain a license in New York as one factor germane to whether a company's intrastate activity was regular and continuous).

> FN10. ICC apparently misconstrues § 1312 as an absolute prohibition against foreign companies from bringing suit in New York. (Def.'s Reply Memo. of Law at 5.) The case law relied upon by Quanta, and cited by the Court above, reveals other- wise.

**\*10** Section 1312 is meant to protect New York companies, which must comply with onerous state regulations, from foreign companies that attempt to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 1910503 (S.D.N.Y.)
**(Cite as: 2008 WL 1910503 (S.D.N.Y.))**

shirk those requirements yet still avail themselves of the benefits of conducting largely intrastate business activities. Because Quanta is an interstate company with incidental ties to New York, the purposes of § 1312 would not be furthered by precluding it from proceeding in this action. *See Colonial Mortgage Co.,* 57 A .D.2d at 1047, 395 N.Y.S.2d at 798 ("Section 1312 may not, under the protections afforded by the commerce clause of the United States Constitution, deny a foreign corporation access to New York courts where the foreign corporation is engaged solely in interstate commerce.") (internal citation omitted). Accordingly, ICC's affirmative defense under § 1312 would be futile and its motion for leave to amend its answer is denied.

### *Conclusion*

For the foregoing reasons, Quanta's motion to dismiss and/or strike ICC's counterclaims and certain affirmative defenses is GRANTED IN PART and DENIED IN PART. ICC's motions to compel pre-answer security from Quanta and for leave to amend its answer to add an affirmative defense are DENIED.

**SO ORDERED.**

S.D.N.Y.,2008.
Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.
Slip Copy, 2008 WL 1910503 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1 of 1 DOCUMENT



Cited
As of: Jun 02, 2008

### TWINLAB CORPORATION and CHANGES INTERNATIONAL OF FORT WALTON BEACH, INC., Plaintiffs, -against- SIGNATURE MEDIA SERVICES, INC., ERIK R. VAN ALSTINE, and MARK BEEKSMA, Defendants.

#### 99 Civ. 169 (AGS)

#### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*1999 U.S. Dist. LEXIS 18973*

#### December 6, 1999, Decided
#### December 7, 1999, Filed

**DISPOSITION:** [*1] Plaintiffs' motion to dismiss the counterclaims in defendants' Second Amended Answer GRANTED in part and DENIED in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs that had contracted for services of defendant moved to dismiss defendant's two counterclaims, one for breach of contract and one for copyright infringement, pursuant to *Fed. R. Civ. P. 12(b)(6)*.

**OVERVIEW:** Plaintiffs commenced action alleging trademark infringement and false designation of origin pursuant to *15 U.S.C.S. § 1051 et seq.*; breach of contract under New York law; and trademark infringement, unfair competition, and unfair trade practices under New York statutory and common law. The court, in considering defendants' counterclaims, noted that the agreements did not contain a specific provision of duration and therefore the contract was terminable at will, and that plaintiffs were entirely within their rights in terminating the agreement. The series of agreements between the parties underscored the "at-will" nature of the relationship. Defendants' claim for copyright infringement, however,

stated a prima facie claim for relief, stating defendants had ownership and had registered the rights. Plaintiffs maintained their possession of the rights were authorized, but that raised a factual issue which would not be considered on a *Fed. R. Civ. P. 12(b)(6)* motion.

**OUTCOME:** Plaintiffs' motion to dismiss the counterclaims was granted as to the breach of contract claim because there was no evidence that plaintiffs expressly agreed to any limitation and therefore could terminate the agreement at will, and denied as to the copyright infringement claim, because defendant sufficiently pleaded all the elements.

**COUNSEL:** For TWINLAB CORPORATION, CHANGES INTERNATIONAL OF FORT WALTON BEACH, INC., plaintiffs: Francis Xavier Dehn, Arthur J. Jacobs, Jacobs, deBrauwere & Dehn, L.L.P., New York, NY.

For SIGNATURE MEDIA SERVICES, INC., ERIK R. VAN ALSTINE, MARK BEEKSMA, defendants: John J. O'Donnell, Peltz & Walker, New York, NY.

For SIGNATURE MEDIA SERVICES, INC., ERIK R. VAN ALSTINE, MARK BEEKSMA, counter-claimants:

1999 U.S. Dist. LEXIS 18973, *1

John J. O'Donnell, Peltz & Walker, New York, NY.

For TWINLAB CORPORATION, CHANGES INTERNATIONAL OF FORT WALTON BEACH, INC., counter-defendants: Francis Xavier Dehn, Arthur J. Jacobs, Jacobs, deBrauwere & Dehn, L.L.P., New York, NY.

**JUDGES:** ALLEN G. SCHWARTZ, U.S.D.J.

**OPINION BY:** ALLEN G. SCHWARTZ

**OPINION**

*OPINION AND ORDER*

ALLEN G. SCHWARTZ, DISTRICT JUDGE:

Plaintiffs Twinlab Corporation ("Twinlab") and Changes International of Fort Walton Beach, Inc. ("Changes") (collectively: "plaintiffs"), commenced this action alleging (i) trademark infringement and false designation of origin pursuant to *15 U.S.C. § 1051, et seq.*; (ii) breach of [*2] contract under New York law; and (iii) trademark infringement, unfair competition, and unfair trade practices under New York statutory and common law. Defendants assert counterclaims in their Second Amended Verified Answer and Counterclaim ("Second Amended Answer") for breach of contract and copyright infringement. [1] The case is before the Court on plaintiffs' motion to dismiss defendants' counterclaims pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6). For the reasons stated below, plaintiffs' motion is GRANTED in part and DENIED in part.

1    Defendants' counterclaim for unfair competition was withdrawn on May 26, 1999.

**FACTUAL BACKGROUND** [2]

2    On a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)* the Court is required to accept the allegations stated by the non-moving party as true. *See Gant v. Wallingford Board of Educ., 69 F.3d 669, 673 (2d Cir. 1995).*

[*3] Plaintiff Twinlab is the parent company of Twin Laboratories, Inc., which in turn is the parent company of Changes. [3] Changes, like Twinlab, distributes and sells nutritional supplements through a network of independent distributors. (Beeksma Aff. P 5.) Defendants are: (i) Signature Media Services, Inc. ("Signature"), a corporation that designs and prepares marketing materials for businesses and absorbs the development costs in return for the right to sell the materials to the clients and the clients' distributors, (Beeksma Aff. P 4); (ii) Erik R. Van Alstine ("Van Alstine"), Chief Executive Officer and a principal shareholder of Signature, (Complaint P 5; Second Amended Answer P 5); and (iii) Mark Beeksma ("Beeksma"), President and a principal shareholder of Signature, (Complaint P 6; Second Amended Answer P 6) (collectively: "defendants").

3    Twinlab acquired Changes in or about November 1997. (Affidavit of Mark Beeksma ("Beeksma Aff.") P 5.)

**1. The May 7, 1997 Document**

On May 7, 1997, before Changes [*4] was acquired by Twinlab, Signature and Changes signed a document ("May Document") providing that Signature would, at its own expense, design artwork and develop promotional materials for Changes, in exchange for Changes granting to Signature the exclusive right to produce distribution packets for Changes called "starter kits". (Second Amended Answer PP 103-105; Exh. 1 to Second Amended Answer ("Because of your decision to let Signature Media have exclusive rights to produce Changes International's starter kits, we have performed the following work at our own expense . . . .").)

The starter kits were redesigned distribution packages that utilized Signature's artwork and promotional materials and were meant to be sold to Changes' distributors. (Second Amended Answer PP 94, 95, 104.) The 1997 starter kits included brochures identified by Changes via stock numbers 8020, 8030, 8040, and 8080. (Second Amended Answer P 114.) The 1998 starter kits included two brochures, "Your Plan Your Business" (Exh. 2 to Second Amended Answer) and "Your Company Your Products" (Exh. 3 to Second Amended Answer), an audiotape entitled "You Can Do It", and a videotape entitled "New Ways to Feel Better, Work [*5] Smoother, and Dream Bigger". (Second Amended Answer P 113.) Defendants assert a U.S. copyright registration for both the 1997 and 1998 starter kits. (Second Amended Answer P 99.) Signature submits that its design and development outlay for these materials was approximately $ 250,000. (Beeksma Aff. P 8.)

1999 U.S. Dist. LEXIS 18973, *5

The May Document also provided that a printer other than Signature could be used by Changes to print Signature's artwork as long as Signature had the exclusive right to produce the starter kits for Changes. (Exh. 1 to Second Amended Answer; Second Amended Answer P 98.) The May Document stated:

> We [Signature] are willing to allow the artwork that we developed to be printed through another printer without collecting a usage royalty, for as long as we have the exclusive rights to produce Changes International starter kits.

Signature sold the starter kits both to Changes itself, who would then resell them to its distributors at cost, and directly to Changes' distributors. (Beeksma Aff. P 12; Second Amended Answer P 19; Complaint P 18.) Changes facilitated Signature's sales to distributors by providing Signature with a list of distributors and allowing Signature to solicit [*6] the distributors directly. (Complaint P 19.) By November 1997, Changes had become Signature's largest account. (Beeksma Aff. P 5.)

**2. The November Agreement**

In November 1997, Twinlab was contemplating acquiring Changes. In order to facilitate this transaction, plaintiffs and Signature signed a document entitled "Non-Competition Agreement" ("Agreement"), on November 12, 1997. (Exh. D to Complaint; Second Amended Answer PP 21, 22.) That Agreement provided *inter alia*, that: (i) Signature would not use confidential information, such as Changes' distributor list, without Twinlab's consent; (ii) Signature would return this information at Twinlab's demand; (iii) Signature would not interfere with Changes' relationship with its distributors; and (iv) Signature would not compete with Changes. (Complaint PP 19, 21.)

**3. Events After November 1997**

Defendants allege that, in December 1997, Signature and Changes agreed to a continuation of Signature's exclusive right to produce the starter kits, in exchange for Signature's obligation to provide an additional monetary investment in developing Changes' promotional material. (Second Amended Answer P 106.) Defendants also [*7] allege that, in July 1998, Signature and Changes agreed

to a further continuation of the contract granting to Signature the right to produce the starter kits, provided that the price Signature would charge would not exceed a competitor's price for the starter kits by more than 5%. (Second Amended Answer P 107.) Changes ordered promotional materials from Signature on a regular basis, and in 1997 and 1998 paid Signature approximately $ 700,000 for such items. (Second Amended Answer P 18.)

Signature alleges that in or about August 1998, Changes, in breach of its agreements, denied Signature the right to sell starter kits to Changes' distributors. (Second Amended Answer P 109; Beeksma Aff. P 28.) Changes does not dispute that by August 1998 it had informed Signature that its services were no longer required and that it should not henceforth ship materials to Changes' distributors. (Complaint PP 24, 25, 27.)

In December 1998 and February 1999, Changes distributed starter kits to its distributors entitled "Executive Planners" that defendants allege were identical in form, language, and appearance to certain pages of the brochures included in the 1998 starter kits produced by Signature. [*8] (Second Amended Answer PP 118, 121; Exhs. 4, 6 to Second Amended Answer; Beeksma Aff. PP 16, 17.) Defendants allege that plaintiffs had not purchased the Executive Planners from defendants. (Beeksma Aff. P 31.) On or about January 7, 1999, Changes offered for sale brochures 8020, 8030, 8040, and 8080 and the audiovisual tapes that were included in the 1997 and 1998 starter kits. (Second Amended Answer P 119.) Defendants allege that these tapes were not the original tapes manufactured by or through Signature. (Beeksma Aff. P 32.) On June 4, 1999 (and also in or about November 1998), Changes' website contained pages that defendants allege were identical in form, language, and appearance to pages in one of the 1998 starter kit brochures. (Exh. 5 to Second Amended Answer; Second Amended Answer PP 120, 123.) Defendants assert that they owned the copyrights of the relevant items at the time of the alleged infringements, and that defendants still own those copyrights. (Second Amended Answer P 126.)

**4. Procedural History**

On January 9, 1999, plaintiffs filed this action seeking, *inter alia*, injunctive relief and damages with respect to defendants' alleged use of plaintiffs' [*9] trademarks. Defendants' Verified Answer and Counterclaim ("Answer") and Amended Verified Answer

and Counterclaim ("Amended Answer") asserted counterclaims for unfair competition, breach of contract, and copyright infringement.

On March 29, 1999, plaintiffs moved to dismiss defendants' amended counterclaims and defendants cross-moved to further amend their counterclaims. By Order dated May 26, 1999 ("Order"), the Court dismissed the unfair competition counterclaim and all copyright counterclaims except those involving the 1997 and 1998 distributor starter kits. By the same Order, leave was granted to defendants: (i) to amend the starter kit copyright counterclaim to reflect registrations received and to provide additional detail; and (ii) to amend the contract counterclaim to provide additional detail. Any claim for statutory damages, costs or attorneys' fees in regard to the copyright counterclaim, under *17 U.S.C. § 412*, was stricken.

On June 8, 1999, defendants filed their Second Amended Answer, which included counterclaims for breach of contract and copyright infringement ("counterclaims"). On September 3, 1999, plaintiffs filed the instant motion to dismiss [*10] those counterclaims.

### DISCUSSION

#### I. Legal Standard Governing Motion to Dismiss

Plaintiffs move to dismiss defendants' counterclaims "for failure to state a claim upon which relief can be granted" pursuant to *Fed. R. Civ. P. 12(b)(6)*. On such a motion, the Court is required to accept the material facts alleged in defendants' answer and counterclaims as true and to construe all reasonable inferences in favor of the defendants. *See Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995); Meridien Int'l Bank Ltd. v. Government of the Republic of Liberia, 23 F. Supp. 2d 439, 445 (S.D.N.Y. 1998)* (stating that, in deciding a 12(b)(6) motion to dismiss counterclaims, the "Court must accept all well-pleaded facts as true and construe the answer and counterclaims in the light most favorable to the nonmoving party"). Defendants' counterclaims should be dismissed only if the Court determines that "it appears beyond doubt that the [non-movant] can prove no set of facts in support of his claim which would entitle him to relief." *Gant, 69 F.3d at 673* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957))*; [*11] *see Commer v. Keller, 64 F. Supp. 2d 266*, No. 98 Civ. 7808 (AGS), 1999 WL 673015, *2 (S.D.N.Y. Aug. 27, 1999) (Schwartz, J.).

However, the Court is not required to uphold the validity of a claim supported only by conclusory allegations. *See Gant, 69 F.3d at 673* ("It is well settled in this Circuit that a complaint consisting of nothing more than the naked assertions, and setting forth no facts upon which a court could find a violation . . . fails to state a claim under *Rule 12(b)(6)*."); *In re American Express Co., 39 F.3d 395, 400-01 n.3 (2d Cir. 1994)* (collecting cases) ("Conclusory allegations of the legal status of [moving party's] acts need not be accepted as true for the purposes of ruling on a motion to dismiss."); *Commer*, 1999 WL 673015, *2. "Liberal construction has its limits," and if the pleading fails to "set forth sufficient information for the court to determine whether some recognized legal theory exists," a motion under *Rule 12(b)(6)* will be granted. *Levisohn, Lerner, Berger & Langsam v. Medical Taping Systems, Inc., 10 F. Supp. 2d 334, 344 (S.D.N.Y. 1998)* (citation omitted).

### II. Contract Counterclaim

#### [*12] A. Applicable legal standard

Defendants' first counterclaim alleges a breach of contract. To state a claim for breach of contract under New York law, a party must allege: (i) the existence of an agreement between plaintiff and defendant, (ii) due performance of the contract by the party alleging the breach, (iii) a breach by the other party, and (iv) damages resulting from the breach. *See Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996); Levisohn, 10 F. Supp. 2d at 344.*

#### B. No breach by plaintiffs

Defendants' counterclaim does not satisfy the third element necessary for establishing a claim for breach of contract because defendants' conclusory assertion of breach is not supported by the facts alleged in their Second Amended Answer. Defendants predicate the allegation of breach on plaintiffs' "denying to Signature its right to sell the redesigned Starter Kits", (Second Amended Answer P 109), a right that defendants allege is guaranteed by the May Document and the December 1997 and July 1998 agreements, (Second Amended Answer PP 103, 106, 107, 109.) However, the facts, as set forth by defendants, demonstrate that the contract was terminable [*13] at will and that plaintiffs were entirely within their rights in terminating the agreement and refusing to permit defendants to sell to plaintiffs' distributors.

1999 U.S. Dist. LEXIS 18973, *13

Under New York law, a contract for services that makes no "specific provision for duration" is presumed to be terminable at will. *White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1062 (2d Cir. 1993); see Robins v. Max Mara, U.S.A., Inc., 923 F. Supp. 460, 467 n.4 (S.D.N.Y. 1996); Sabetay v. Sterling Drug, Inc., 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 211, 506 N.E.2d 919, 920 (1987); see also Arledge v. Stratmar Systems, Inc. 948 F.2d 845, 848 (2d Cir. 1991)* (finding that under New York law, "exceptions to this rule are discouraged"). An exception exists where "a plaintiff can establish the existence of an express written agreement limiting the employer's right to termination". *Kissner v. Inter-continental Hotels, 1998 U.S. Dist. LEXIS 9248,* No. 97 Civ. 8400 (SWK) 1998 WL 337067, *1 (S.D.N.Y. June 25, 1998); *see Murphy v. American Home Products Corp., 58 N.Y.2d 293, 305, 448 N.E.2d 86, 91, 461 N.Y.S.2d 232, 237 (1983).* [*14] This "express limitation" exception is a "context-sensitive exception" that relies on a consideration of "the totality of the circumstances." *Gorrill v. Icelandair/Flugleidir, 761 F.2d 847, 851-52 (2d Cir. 1985); see Archer v. Economic Opportunity Commission, 30 F. Supp. 2d 600,* (E.D.N.Y. 1998) (Gershon, J.). When considering the totality of the circumstances, "the parties' intentions and conduct are paramount." *Wright v. Cayan, 817 F.2d 999, 1005 (2d Cir. 1987).*

Here, the May Document does not contain a "specific provision of duration", nor do defendants so allege in the Second Amended Answer. Nor do defendants allege that a "specific provision of duration" is found in the December 1997 and July 1998 agreements. [4] Rather, defendants expressly concede: "it is not debated that plaintiffs had the right to terminate at will", (Defs.' Mem. Law Opp'n Pls.' Mot. Dismiss Defs.' Countercl. at 9), and, in the affidavit submitted in support of defendants' opposition to the instant motion, defendants reiterate that the May Document did "not prohibit[] Changes from terminating at will", (Beeksma Aff. P 10).

4 Even had defendants alleged such a "specific provision of duration", defendants have not asserted that these two agreements are in writing and "oral assurances alone are insufficient to establish . . . an agreement to limit the employer's right to terminate the employee". *Shafrir v. Assoc. of Reform Zionists of America, 998 F. Supp. 355, 363 (S.D.N.Y. 1998)* (citing *Fitzgibbon v. Sanyo Securities America, Inc., 1994 U.S. Dist. LEXIS*

*8386,* No. 92 Civ. 2818, 1994 WL 281928, *6 (S.D.N.Y. June 22, 1994)).

[*15] Defendants contend, however, that it was their "clear understanding" that a clause of the May Document "defined or circumscribed" termination by plaintiffs "as long as" plaintiffs continued to "use the artwork created by [Signature]". (Beeksma Aff. PP 11, 12, 18.) Defendants' contention is unpersuasive. The parties' conduct in negotiating two successive agreements in order to continue the contract, once in December 1997 and once in July 1998, militates against a finding of the express limitation that defendants allege is contained in the underlying May Document. *See Shafrir v. Assoc. of Reform Zionists, 998 F. Supp. 355, 364 (S.D.N.Y. 1998)* (holding that where defendant expressly agreed to extend plaintiff's maternity leave to May and hold her job open, defendant's right to terminate plaintiff prior to May had not been expressly limited because question of maternity leave had been raised again between parties thereafter). Further, an express limitation must delineate a definite and predictable duration. The period identified as "as long as" plaintiffs "use Signature's artwork" does not qualify as defined and predictable. *See Rovtar v. Union Bank of Switzerland, 852 F. Supp. 180, 186 (S.D.N.Y. 1994);* [*16] *see also Wright, 817 F.2d at 1002.* [5] The Court finds no evidence that plaintiffs expressly agreed to any limitation on the at-will presumption.

5 Defendants' argument is also flawed because the text of the May Document does not clearly substantiate the proviso that Signature could produce the starter kits as long as plaintiffs used Signature's artwork. First, the May Document states the reverse: plaintiffs had permission to use defendants' artwork as long as Signature had the exclusive right to produce the starter kits. Second, the permission granted to plaintiffs concerned "using a printer other than Signature to print the artwork" not "using the artwork" per se. (Exh. 1 to Second Amended Answer (language in May Document: "We [defendants] are willing to allow the *artwork that we developed to be printed through another printer* without collecting a usage royalty, for *as long as* we have the exclusive rights to produce Changes International starter kits.") (emphasis added).)

Accordingly, [*17] Changes was within its rights to terminate the relationship with Signature at any time and

did not, by so doing, "breach" the contract in the May Document and in the December 1997 and July 1998 agreements. Defendants' allegation "sets forth no facts upon which a court could find" that plaintiffs breached the contract. *See Levisohn, 10 F. Supp. 2d at 344* (holding that defendants' factual assertions in support of defendants' allegation of plaintiff's breach were insufficient to support breach of contract counterclaim in 12(b)(6) motion). Therefore, defendants have not satisfied the third element of a breach of contract claim, and the contract counterclaim is dismissed.

### III. Copyright Counterclaim

Defendants' second counterclaim asserts a cause of action for copyright infringement. A properly pled copyright infringement claim must allege: (i) which specific original works are the subject of the copyright claim; (ii) that defendants own the copyrights in those works; (iii) that the copyrights have been registered in accordance with the statute; and (iv) by what acts and during what time the plaintiffs infringed the copyright. *See Kelly v. L.L. Cool J., 145 F.R.D. 32, 36 (S.D.N.Y. 1992),* [*18] *aff'd mem. 23 F.3d 398 (2d Cir. 1994); Franklin Electronic Publishers v. Unisonic Prod. Corp., 763 F. Supp. 1, 4 (S.D.N.Y.1991); see also Jetform Corp. v. Unisys Corp., 11 F. Supp. 2d 788, 790 (E.D. Va. 1998)* (holding that moving party "meets and exceeds pleading requirements" when, "in addition to stating it owns the copyrights and qualifies for an exception to registration, [the moving party] identifies the works at issue and generally states how and when infringement occurred.").

Here defendants have set forth sufficient facts to satisfy all four elements. First, defendants have defined the specific works that are the subject of the copyright claim: (i) the 1997 and 1998 Changes' starter kits containing defendants' artwork; (ii) brochures in the 1997 kit identified by Changes via stock numbers 8020, 8030, 8040, and 8080; (iii) brochures in the 1998 kit entitled "Your Plan Your Business" (Exh. 2 to Second Amended Answer) and "Your Company Your Products" (Exh. 3 to Second Amended Answer); (iv) an audiotape in the 1998 kit entitled "You Can Do It"; and (v) a videotape in the 1998 kit entitled "New Ways to Feel Better, Work Smoother, [*19] and Dream Bigger". (Second Amended Answer PP 94, 95, 113, 114.) *See Kelly, 145 F.R.D. at 36 n.3* (finding that first element was satisfied where plaintiff "specifically alleged the two original songs which are the subjects of the claim"). Second, defendants

have asserted ownership of the relevant copyrights. (Second Amended Answer P 126.) Third, defendants have asserted that the copyrights have been properly registered. (Second Amended Answer P 99.)

Finally, defendants have identified and delineated three acts of infringement by plaintiff. First, Changes distributed "Executive Planners" in December 1998 and February 1999 that defendants allege were identical in some respects to the 1997 and 1998 starter kits. (Second Amended Answer PP 118, 121; Exhs. 4, 6 to Second Amended Answer; Beeksma Aff. PP 16, 17.) Defendants allege that the Executive Planners had not been purchased from defendants. (Beeksma Aff. P 31.) Second, Changes offered for sale, on January 7, 1999, audio-visual tapes and brochures that defendants allege had not been manufactured by or through defendants, copies of which had been included in the 1997 and 1998 starter kits. (Second Amended Answer P 119; [*20] Beeksma Aff. P 32.) Third, Changes' website contained pages that defendants allege were partially identical to pages in one of the 1998 starter kit brochures. (Second Amended Answer PP 120, 123; Exh. 5 to Second Amended Answer.) Defendants have appended exhibits to the Second Amended Answer that set out in tabular form precisely which pages and portions of the allegedly copyrighted materials have been allegedly infringed. (Exhs. 4-6 to Second Amended Answer.) *See Kelly, 145 F.R.D. at 36 n.3* (finding that fourth element of copyright claim was sufficiently supported where plaintiff "narrows the infringing act to the publishing and distribution of two songs, 'Mama Said Knock You Out' and 'Jingling Baby', in 1991").

Plaintiffs contend that defendants fail to properly plead the fourth element because, while plaintiffs did have copies of the copyrighted material, these copies were authorized, having been obtained from Signature before the cessation of the contract and not through unauthorized duplicating. However, it is premature to consider a factual dispute concerning authorization to use the copyrighted material on a motion to dismiss counterclaims because defendants' [*21] factual allegations must be accepted as true. *See Tuff-N-Rumble Management, Inc., v. Sugarhill Music Publishing, Inc., 8 F. Supp. 2d 357, 362 (S.D.N.Y. 1998)* (holding that consideration of a dispute between plaintiff and defendant concerning who owned the copyright and, therefore, was entitled to use the copyrighted material, was "premature" on a motion to dismiss counterclaims

1999 U.S. Dist. LEXIS 18973, *21

because "defendants' allegations have to be accepted as true").

Given the liberal reading of the pleadings required on a motion to dismiss, the Court finds that the Second Amended Answer alleges facts sufficient to plead a claim for copyright infringement. Accordingly, the motion to dismiss the copyright infringement counterclaim is denied.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to dismiss the counterclaims in defendants' Second Amended Answer is GRANTED in part and DENIED in part. Plaintiffs' motion is GRANTED as to defendants'

counterclaim for breach of contract and DENIED as to defendants' counterclaim for copyright infringement.

Counsel for the parties are directed to appear at a conference on January 10, 2000 at 4:15 p.m., in Courtroom 14C, for the purpose of [*22] further scheduling.

SO ORDERED.

ALLEN G. SCHWARTZ, U.S.D.J.

Dated: New York, New York

December 6, 1999

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2008, I electronically filed the foregoing Defendant Counterclaim Plaintiff Sterling Jewelers Inc.'s Memorandum of Law in Opposition to Plaintiffs' Motion to Strike Counterclaims Pursuant to Rule 12(f), or in the alternative, to Dismiss Counterclaims Pursuant to Rule 12(b)(6) and the Declaration of Gerald L. Maatman, Jr., Esq. in further support thereof with the Clerk of the United States District Court, Southern District of New York using the CM/ECF system, which sent notification of such filing to the following:

> Joseph M. Sellers
> Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
> 1100 New York Avenue, N.W.
> Suite 500, West Tower
> Washington, D.C. 20005
>
> Sam J. Smith
> Burr & Smith, LLP
> 442 West Kennedy Blvd., Suite 300
> Tampa, FL 33606
>
> Thomas A. Warren
> The Law Offices of Thomas A. Warren
> 2032-D Thomasville Road
> Tallahassee, FL 32308
> P.O. Box 1657
> Tallahassee, FL 32302
>
> Attorney for Plaintiffs And On Behalf
> Of All Counsel for Plaintiffs


                                 /s/ Gerald L. Maatman, Jr.
                                 Gerald L. Maatman, Jr.