# EXHIBIT 1

## CLASS DETERMINATION AWARD

*Jock, et al. v. Sterling Jewelers Inc.,*
AAA Case No. 11 160 00655 08

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION
## EMPLOYMENT AND CLASS ACTION TRIBUNAL

| | |
|---|---|
| **LARYSSA JOCK, CHRISTY** | : |
| **MEIERDIERCKS, MARIA HOUSE,** | : |
| **DENISE MADDOX, LISA** | : |
| **McCONNELL, GLORIA PAGAN,** | : |
| **JUDY REED, LINDA RHODES, NINA** | : |
| **SHAHMIRZADI, LEIGHLA MURPHY,** | : **AAA CASE NO. 11 20 0800 0655** |
| **DAWN SOUTO-COONS, and MARIE** | : |
| **WOLF, individually and on behalf of all** | : |
| **others similarly situated,** | : |
| | : |
| Claimants, | : Arbitrator: Kathleen A. Roberts |
| | : |
| -against- | : |
| | : |
| **STERLING JEWELERS INC.,** | : |

Respondent.

## CLASS DETERMINATION AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the

arbitration agreements entered into between the above-named parties, and having been duly

sworn, do hereby find as follows:

This Class Determination Award addresses Claimants' motion for class certification, as

well as the pending motions to exclude expert testimony filed by both parties pursuant to

*Daubert v. Merrell Dow Pharmaceuticals, Inc. (Daubert).*[1]

Claimants are current and former female employees of Respondent Sterling Jewelers, Inc.

("Respondent" or "Sterling"), who allege that Sterling has systematically paid female employees

in its stores less than their male counterparts and promoted female employees less frequently and

---

[1] 509 U.S. 579 (1993). Sterling's request for an evidentiary hearing with respect to its *Daubert* motions is denied for substantially the reasons set forth in Claimants' Opposition to Sterling's Motion for Hearings and Argument. In short, there is no need for an evidentiary hearing in light of the extensive written record pertaining to the qualifications of the experts, which includes expert reports and depositions, as well as briefing.

after a longer wait than their male counterparts.  Claimants allege discrimination under both the

pattern or practice disparate treatment and the disparate impact theories of liability under Title

VII, and under the Equal Pay Act (EPA).[2]  Claimants seek certification of a class, pursuant to

American Arbitration Association (AAA) Supplementary Rule 4 and Fed. R. Civ. P. 23,

comprised of approximately 44,000 women who have worked in Sterling's retail stores as Sales

Associates, Department Managers, or in any Assistant Manager, or Store Manager position[3]

("Retail Sales Employees" or "the putative class") for the period from June 2, 2002, to the first

day of trial.  Claimants seek declaratory and injunctive relief for the class, as well as back pay

and punitive damages; they do not seek compensatory damages or individual injunctive relief.

<div align="center">SUMMARY OF CLAIMANTS' ALLEGATIONS</div>

Claimants contend that throughout the proposed class period and across all of Sterling's

retail operations, its workforce data show disparities adverse to women in pay and promotion

decisions that cannot be attributed to legitimate, non-discriminatory factors.  Claimants contend

that there are disparities in pay at hire and for incumbent employees throughout their tenure, and

that these disparities are the product of a system that sets starting pay rates based upon factors

pertaining to prior job experience that are not job-related and which permit the intrusion of bias.

---

[2] The Named Claimants timely filed charges with the EEOC based upon Title VII and the Equal Pay Act. The EEOC issued a determination that Sterling "subjected charging parties and a class of female employees with retail sales responsibilities nationwide to a pattern or practice of sex discrimination in regard to promotion and compensation."  The EEOC found that "[s]tatistical analysis of pay and promotion data provided by Respondent reveals that Respondent promoted male employees at a statistically significant, higher rate than similarly situated female employees and that Respondent compensated male employees at a statistically significant, higher rate than similarly situated female employees."  EEOC Letter of Determination (January 3, 2008) (Claimants' Exhibit 1).
[3] In the Jared Division, Assistant Managers are called Assistant General Managers, and Store Managers are called General Managers.  In this Award, Mall Assistant Managers and Jared Assistant General Managers will be referred as "Assistant Managers."  Similarly, Mall Store Managers and Jared General Managers will be referred as "Store Managers."

According to Claimants, rather than correcting these disparities at the time of annual merit increases, Sterling applies a percentage increase to employees' base compensation, which perpetuates and magnifies disparities in the compensation of female employees. Claimants contend that Sterling's companywide policy of prohibiting employees from discussing the amount of their compensation with each other concealed these disparities and thus prevented putative class members from discovering pay inequities, insulating Sterling from challenge.

According to Claimants, promotions into and within management at Sterling's stores have been made pursuant to Sterling's "Succession Planning" system, which operates consistently throughout the Company. Claimants contend that throughout the time period covered by this case, Sterling promoted men more frequently and more quickly than similarly-situated women, meaning that fewer women are promoted than men, and that those women who are promoted work and wait longer for promotions than similarly-situated men.

Claimants contend that there is a corporate culture of gender bias at Sterling, based upon evidence of numerous instances of inappropriate sexual conduct demeaning to women by executives and managers from the CEO down, including executives and managers who were involved in decisions regarding compensation and promotion, and evidence that a number of corporate decisionmakers held and communicated negative gender stereotypes. Claimants contend that Sterling affords its managers who make pay and promotion decisions discretion in interpreting the common standards governing those decisions, creating the opportunity for this gender-negative corporate culture to influence pay and promotion decisions throughout the Company. Claimants further contend that Sterling has a "dysfunctional" Human Resources department that has failed to curb or address ongoing discrimination.

3

## CLAIMANTS' MOTION FOR CLASS CERTIFICATION

As noted above, Claimants seek certification of a single, nationwide class comprised of approximately 44,000 women who have worked in Sterling's retail stores as Sales Associates, Department Managers, or in any Assistant Manager or Store Manager position for the period from June 2, 2002, to the first day of trial.

Claimants propose a two-stage process for adjudication of their claims. In the first stage, the Arbitrator would determine "liability," *i.e.*, whether Claimants have established disparate impact or pattern and practice disparate treatment discrimination by Sterling. In this stage Claimants would present their evidence of class-wide discrimination, and Sterling would present those defenses that apply to the putative class as a whole and address Claimants' theories of class-wide discrimination. If Claimants prevail at this stage, they will have established entitlement to declaratory and injunctive relief, and will have established a rebuttable presumption that each class member was disfavored on account of her gender and therefore entitled to an award of back pay. Claimants propose that the Arbitrator also determine at this stage whether Sterling's conduct warrants an award of punitive damages. In the second stage, the Arbitrator would determine individual relief. In this stage, Sterling would have the opportunity to assert defenses with respect to individual claims, *i.e.*, demonstrate that a particular individual was not disfavored, or disfavored for a legitimate reason unrelated to her gender, as well as any defenses related to the calculation of monetary damages. The Arbitrator would then determine the amount of back pay owed to those class members found to be entitled to an award. Finally, the Arbitrator would determine the amount of punitive damages to be awarded, if any.

4

Case 1:08-cv-02875-JSR   Document 137-1   Filed 03/03/15   Page 6 of 41

## APPLICABLE RULES

Claimants' motion is governed by the AAA Supplementary Rules for Class Arbitrations,

which provide that an arbitrator must consider the criteria enumerated in AAA Supplementary

Rule 4 "and any law or agreement of the parties the arbitrator determines applies to the

arbitration."

AAA Supplementary Rule 4(a) provides that "the arbitrator shall determine whether one

or more members of a class may act in the arbitration as representative parties on behalf of all

members of the class described" and that the arbitrator shall permit a representative to do so only

if each of six conditions is met:

> (1) the class is so numerous that joinder of separate arbitrations on behalf of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;
>
> (4) the representative parties will fairly and adequately protect the interests of the class;
>
> (5) counsel selected to represent the class will fairly and adequately protect the interests of the class; and
>
> (6) each class member has entered into an agreement containing an arbitration clause which is substantially similar to that signed by the class representative(s) and each of the other class members.

AAA Supplementary Rule 4(b) provides:

> An arbitration may be maintained as a class arbitration if the prerequisites of subdivision (a) are satisfied, and in addition, the arbitrator finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class arbitration is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:
>
> (1) the interest of members of the class in individually controlling the prosecution or defense of separate arbitrations;
>
> (2) the extent and nature of any other proceedings concerning the controversy already commenced by or against members of the class;
>
> (3) the desirability or undesirability of concentrating the determination of the claims in a single arbitral forum; and

(4) the difficulties likely to be encountered in the management of a class arbitration.

AAA Supplementary Rule 4 essentially tracks the requirements of Fed. R. Civ. P. 23

(Rule 23). A class may be certified under Rule 23 only if Claimants meet the requirements of

Rule 23(a) and the requirements of one of the provisions of Rule 23(b). In this case Claimants

seek certification of their claims for declaratory and injunctive relief pursuant to Rule 23(b)(2)

and certification of their claims for monetary damages pursuant to Rule 23(b)(3).

Rule 23(a) provides:

One or members of a class may sue or be sued as representative parties on behalf of all class members only if:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

A class action may be maintained under Rule 23(b)(2) if:

the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

A class action may be maintained under Rule 23(b)(3) if:

the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.[4] The matters pertinent to these findings include:

---

[4] Although under Rule 23, the predominance and superiority requirements apply only to claims certified under Rule 23(b)(3), the predominance and superiority requirements of AAA Supplementary Rule 4(b) must be met in all cases.

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues."[5]

Because the requirements of AAA Supplementary Rule 4 are substantially identical to Rule 23, and because the vast majority of the case law on class certification applies Rule 23, this Award will analyze Claimants' motion and Sterling's opposition pursuant to the requirements of Rule 23.

## STERLING'S OPPOSITION TO CLASS CERTIFICATION

Sterling contends that Claimants have failed to meet the commonality, typicality and adequacy requirements of Rule 23(a), the "grounds that apply generally to the class" requirement of Rule 23(b)(2), as well as the predominance and superiority requirements of Rule 23(b)(3). Sterling also contends that the proposed class period is overbroad. Sterling further contends that Claimants' EPA claims may not be certified as an "opt-out" class, that Claimants have not met the "similarly situated" requirement for certification of their EPA claims as a collective action, and that a nationwide class cannot be certified under the EPA because the EPA applies only to discrimination within "establishments" that are defined as physical locations. Finally, Sterling contends that the Named Claimants have no standing to represent absent class members in this

---

[5] AAA Supplementary Rule 4 does not contain a provision comparable to Rule 23(c)(4). For the reasons set forth below at pp. 110-111, I find that certification of a class arbitration with respect to particular issues is consistent with the AAA Supplementary Rules and therefore applies to this arbitration.

proceeding because absent class members did not agree to have an arbitrator decide whether to adjudicate their cases through the vehicle of a class arbitration.

## SUMMARY OF AWARD

For the reasons set forth below, I find that the adjudication of Claimants' Title VII disparate impact claims with respect to declaratory and injunctive relief may be maintained as a class arbitration pursuant to AAA Supplementary Rule 4 and Rule 23(b)(2) and Rule 23(c)(4). Claimants' motion for class certification of their Title VII disparate impact claims with respect to monetary damages pursuant to AAA Supplementary Rule 4 and Rule 23(b)(3) is denied. Claimants' motion for class certification of their Title VII disparate treatment claims is denied. Claimant's motion for certification of a Rule 23 "opt-out" class for their EPA claims is denied. Sterling's contention that the Named Claimants lack standing to represent absent class members in this proceeding is rejected. I find that the appropriate class period for Claimants' Title VII compensation claims is July 22, 2004, to the date of trial, and that the appropriate class period for Claimants' Title VII promotion claims is December 7, 2004, to the date of trial.

## EVIDENCE PERTAINING TO CLASS CERTIFICATION

The parties have submitted voluminous evidence and legal briefs with respect to the pending motions. The evidence includes thousands of documents produced by Sterling, extensive excerpts of testimony taken at dozens of depositions, declarations of current and former Sterling employees submitted by Claimants-- including the declarations of close to 200 putative class members, declarations of Sterling executives and employees submitted by Sterling, and the reports and testimony of seven experts.

The following facts are not materially in dispute, except as specifically noted:

8

## Sterling's Corporate Structure and Field Operations

Sterling is a wholly-owned subsidiary of Signet Jewelers. Sterling currently owns nearly 1,700 stores in all 50 states, consisting of its Mall Division, which includes the national Kay Jewelers brand, and its free-standing Jared The Galleria of Jewelry ("Jared") stores.[6] Operation and oversight of these stores is known as "field operations" and is concentrated under Senior Vice President of Operations ("SVPO"), Tryna Kochanek.[7] Kochanek, who has held this position since 2000,[8] has responsibility and oversight for three divisions, each overseen by a Divisional Vice President ("DVP"): the Mall Division, the Jared Division, and Operations Administration.[9] DVPs Joseph Beck and Barry Fernholz oversee the Mall and Jared Divisions, respectively.[10] They provide functionally the same oversight and are responsible for performance and training in their divisions.[11] DVP Bill Luth currently oversees Operations Administration and has done so since 2000.[12]

As of year-end 2012, fourteen Vice Presidents of Regional Operation ("VPROs") reported to Beck and Fernholz--eleven in the Mall Division and three in the Jared Division.[13] Each Region contained between seven and nine Districts. Of these, 91 are Mall Districts,

[6] 30(b)(6) Deposition of Tryna Kochanek (Oct. 25, 2012) (Kochanek Dep.) at 12:18-13:12; 70:9 (Claimants' Exhibit 8).
[7] *Id.* at 11:18-19; 12:13-19; Organizational charts, SJI 1929-36, 1948-49 (Claimants' Exhibits 11 and 12) ("SJI" designates a document produced by Sterling, followed by the "Bates Number" assigned to an individual page); *see* Glossary of Sterling Executives (Claimants' Exhibit 13).
[8] Kochanek Dep. at 11:23-25; 15:1-16 (Claimants' Exhibit 8).
[9] *Id.* at 14:23-25.
[10] *Id.* at 52:24-53:18.
[11] *Id.* at 54:3-56:12; 67:18-68:11; Deposition of Barry Fernholz (Feb. 6, 2013) (Fernholz Dep.) at 42:2-43:8 (Claimants' Exhibit 10).
[12] Kochanek Dep. at 53:16-18; 30(b)(6) Deposition of William Luth (Nov 12, 2012) (Luth I Dep.) at 11:5-8 (Claimants' Exhibit 14). Luth was deposed twice as a 30(b)(6) witness on Sterling's compensation and promotion policies and procedures and once in his individual capacity. These depositions are referred to as Luth I, II, and III.
[13] Deposition of Joseph Beck (Beck Dep.) at 10:7-10 (Claimants' Exhibit 9); Fernholz Dep. at 27:1-6 (Claimants' Exhibit 10). Prior to February 2004, Sterling did not distinguish between Divisional and Regional Vice Presidents; instead Sterling employed ten Vice Presidents, each of whom oversaw a region and reported directly to Kochanek. Kochanek Dep. at 59:10-19 (Claimants' Exhibit 8).

containing between 11 and 15 stores, and 21 are Jared Districts, containing 10 or fewer stores.[14] District Managers ("DMs") report to the VPROs. The duties of DMs are the same across the Company.[15]

The offices of the SVPO, the three DVPs and the VPROs are all located at Sterling's headquarters in Akron, Ohio, and these executives meet regularly regarding the oversight and performance of Sterling's field operations.[16] The DMs, with VPRO oversight, are largely responsible for determining compensation of Retail Sales Employees. DMs set starting pay rates for new Retail Sales Employees, determine merit increases, and set pay rates upon promotion, with VPRO oversight. DMs and VPROs have performed these responsibilities since at least 2002.[17] In awarding promotions, DMs are charged with identifying, grooming, and recommending candidates for their VPROs' review and approval. VPROs must approve all management-level promotions, subject to the final approval of the DVPs.[18] Sterling reports that between January 1, 2002 and March 1, 2013, a total of 23 individuals have been VPROs, and 229 individuals have been DMs.[19]

---

[14] Store Lists, SJI 181771-72; 1242081-91; 1255868 (too voluminous to submit as exhibits).
[15] Luth I Dep. at 75:15-76:5 (Claimants' Exhibit 14). All DMs share a single position description. Kochanek Dep. at. 161:23-162:21; 162:22-164:5 (Claimants' Exhibit 8).
[16] Kochanek Dep. At 73:1-15; 118:16-19 (Claimants' Exhibit 8); Fernholz Dep. at 100:20-102:2, 105:2-7 (describing regular operations meetings that have taken place the entire time that Fernholz has been a DVP) (Claimants' Exhibit 10); Beck Dep. at 15:4-16:9 (describing regular one-on-one meetings with VPROs and operations meetings of VPROs and DVPs) (Claimants' Exhibit 9).
[17] Luth I Dep at 230:16-22, 235:19-236:17 (merit pay ranges set by HR; DM determines percentage given to employees), 93:8-94:11 (VPROs oversee DMs and work to determine ranges for setting starting pay) (Claimants' Exhibit 14); Kochanek Dep. at 94:22-95:6 (DMs set starting pay for sales employees), 96:23-98:2 (VPROs provide oversight for setting pay) (Claimants' Exhibit 8); *see* SJI 291798-19 (email from DM to VPRO regarding pay for potential new hires); SJI 160099; SJI 183093-94; SJI 280041-42; SJI 586813 (emails between DMs and VPROs regarding pay upon promotion) (Claimants' Exhibits 15-18).
[18] Fernholz Dep. at 139:5-7 (Claimants' Exhibit 10).
[19] Declaration of William Luth (Luth Decl.) ¶ 3 (Respondent's Exhibit 5).

In the stores, the highest-ranking employee is the Store Manager (SM); Jared GMs and Mall SMs have same duties.[20] Sterling's data reflects that between January 1, 2002 and March 1, 2013, a total of 5,150 individuals have been SMs.[21] Below the SM is an Assistant Manager, whose duties are essentially the same in Mall and Jared stores.[22] Jared stores employ a third tier of management-level employees, Diamond and Timepiece Department Managers. All Sterling stores have Sales Associates, whose duties are virtually identical in the Mall and Jared Divisions.[23] Sterling maintains uniform job descriptions for all Retail Sales Employee positions that are applicable companywide. Employees are allowed to move between stores within the same district, and across districts (movement between the Mall and Jared Divisions is permitted, but rare).[24]

Currently, 34% of VPROs are women; 43% of DMs are women; 60% of SMs are women; 72% of Assistant Managers are women; 57% of Department Managers are women, and 73% of Sales Associates are women.[25]

Human Resources

Sterling's Human Resources ("HR") department operates out of its corporate headquarters and is overseen by Steven Becker, Senior Vice President of HR.[26] HR contains a Training Division, responsible for promulgating uniform training for field operations throughout

---

[20] *See* Mall Stores Store Manager Job Description, SJI 2079 (Claimants' Exhibit 2); Jared General Store Manager Job Description, SJI 2099 (Claimants' Exhibit 3); Kochanek Dep. at 14:9-14; 168:1-178:1 (Claimants' Exhibit 8).

[21] Luth Decl. ¶ 3 (Sterling's Exhibit 5).

[22] *See* Jared Assistant General Manager Job Description, SJI 1597-98; Mall Assistant Store Manager Job Description, SJI 1614-16 (Claimants' Exhibits 24 and 25).

[23] *See* Jared Sales Associate Job Description, SJI 1606-07; Mall Sales Associate Job Description, SJI 1617-18 (Claimants' Exhibits 26 and 27).

[24] Sterling's Career Advancement Register 2009, SJI 8744-62 at 8751 ("Team members move frequently from store to store and across districts and regions") (Claimants' Exhibit 28); 30(b)(6) Deposition of William Luth (Nov. 13, 2012) (Luth II Dep.) at 213:22-218:22 (Claimants' Exhibit 29); Kochanek Dep. at 178:2-25 (Claimants' Exhibit 8).

[25] Report of Claimants' expert Dr. Louis R. Lanier (Lanier Report) at Table 2 (Claimants' Exhibit 41).

[26] 30(b)(6) Deposition of Steven Becker (Dec. 4, 2012) (Becker Dep.) at. 6:5-20 (Claimants' Exhibit 33).

11

the Company.[27]  Training is an integral part of Sterling's corporate culture and is consistent

across the nation throughout the field.[28]  HR also contains an Employee Relations Division,

overseen by Vice President of Employee Relations, Michael Lynch.  Employee Relations

"provid[es] employee relations support to the field organization," including management and

non-management employees.[29]  Maryellen Mennett is the Director of Field HR.  Under the

direction of Lynch and Mennett, Regional HR Specialists provide HR services to employees in

the field, including advice concerning personnel and HR policies, and receiving and investigating

complaints.  Each Regional HR Specialist is assigned to serve employees in one or more regions.

These Regional HR Specialists follow a common set of guidelines for responding to and

investigating employee complaints.[30]  Throughout the proposed class period, Sterling's EEO

policies, Code of Conduct and Standards of Business Ethics, and Zero Tolerance Policy have

prohibited discrimination and sexual harassment, and managers are trained at frequent intervals

on these policies.[31]  The evidence pertaining to Claimants' allegations of deficiencies in

Sterling's HR policies and practices is discussed below in the section on expert evidence.

Compensation Policies and Practices

For the entire period covered by this case, Sterling's policies and practices governing

compensation have applied companywide and uniformly to all Retail Sales Employees, including

---

[27] Kochanek Dep. 74:9-76:11 (Claimants' Exhibit 8).  Until 2012, training was housed under Luth in Operations Administration. *Id.*

[28] *Id.* at 146:21-151:8.

[29] Becker Dep. at 51:4-17 (Claimants' Exhibit 33).

[30] *See, e.g.*, Instructions for Drafting Internal Investigation Summary, SJI 238039; Guidelines for Investigation Closure, SJI 628154; Steps to a Proper and Legal Investigation, SJI 704873-78; Investigation Procedures Refresher, SJI 59056-58 (Claimants' Exhibits 34-37).

[31] Consolidated Exhibit of Equal Employment Opportunity and Human Resources Policies ("EEO and HR Policies") (Sterling's Exhibit 24); Consolidated Exhibit of Training Materials ("Training Materials") (Sterling's Exhibit 28).

12

members of the putative class, in each of Sterling's stores.[32] Under these policies and practices,

Sterling's DMs are primarily responsible for making determinations about the compensation of

Retail Sales Employees; however, DMs routinely consult with and receive input and

recommendations from SMs.[33]

Claimants challenge the following aspects of Sterling's compensation process:

- *Setting Starting Pay*: Throughout the period covered by this case, Sterling has directed DMs to set starting pay for newly hired Sales Associates using prior job experience, including prior management experience, as the touchstone. But Sterling has afforded its DMs considerable discretion in determining how to value prior job experience in setting starting pay rates. As a result, the process for setting starting pay rates is susceptible to the influence of bias. Even when Sterling identified particular types of experience to credit in setting starting pay rates, some, such as prior management experience, have no bearing on performance as a Sales Associate and should not have been considered in setting starting pay.

- *Annual Merit Increases:* Sterling's policy is to award annual merit increases based on the employee's performance. By formulating the amount of the merit increase as a percentage increase to an employee's base compensation, Sterling perpetuates, and in some cases magnifies, the prior disparities in base pay rates. Rather than correcting these disparities at the time of annual merit increases, through out-of-cycle adjustments, Sterling has consistently failed to address these wage disparities.

- *Compensation is Unrelated to Performance:* There are two measures of performance primarily used at Sterling. First, Sterling evaluates the performance of employees annually. These performance evaluations are used to set annual merit increases. Women consistently have received higher performance evaluations on average than men. Second, Sterling pays sales employees a fixed commission based on the amount of merchandise they sell. Women on average receive higher commissions than men who work in the same stores. Notwithstanding that female Retail Sales Employees outperform similarly-situated men, women have consistently received lower base rates, and accordingly lower merit increases.[34]

---

[32] *See, e.g.*, Sterling Wage and Salary Administration, SJI 10885-86 and Compensation Administration Management Guidelines, SJI 10883-84 (Claimants' Exhibits 38 and 39).

[33] *See, e.g.*, Business Process Overview, Merit Increases, SJI 1269912-17 (Claimants' Exhibit 40); Luth I Dep. at 93:8-94:11 (using wage engine, VPROs oversee DMs to set starting pay), 230:16-19 and 232:11-22 (percentages for merit pay increases signed off by DMs) (Claimants' Exhibit 14); Kochanek Dep. 89:14-92:22 (Claimants' Exhibit 8).

[34] Claimants' Memorandum in Support of Motion for Class Certification (Claimants' Memo) at 10.

13

Starting Pay

Virtually all new Retail Sales Employees are hired for the position of Sales Associate.

During the proposed class period, Sterling has implemented four major iterations of the

process for setting starting pay rates: (i) a wage engine in 2002; (ii) a wage floor and wage

ceiling in 2007; (iii) the Wage Rate Generator ("WRG") system with three pay rates in 2009; and

(iv) the WRG system with one pay rate in 2012.[35] In all four iterations, Sterling has directed

DMs to set starting pay levels for Sales Associates based on the nature and amount of prior job

experience candidates possess at the time of hire.[36]

In the two iterations before 2009, Sterling directed its DMs to set starting pay for Sales

Associates "with no applicable experience" "at the minimum rate assigned to their job."[37]

Higher starting pay rates could be awarded to new hires with prior job experience that the DMs

regarded as relevant.[38] Generally, the iterations before 2009 were designed to ensure that the

overall wages offered for starting pay fit within the budget for the district.[39]   Sterling provided

limited guidance as to what types of prior job experience warranted pay rates above the

---

[35] Specifically, the four time periods are the wage-engine only period (1/1/2003–8/29/2007), the wage-floor/wage-ceiling period (8/30/2007–7/12/2009), the WRG with three rates period (7/13/2009–1/4/2012), and the WRG with one rate period (1/5/2012–12/31/2012).  Lanier Report at Table 8a (Claimants' Exhibit 41).

[36] *See, e.g.,* Wage and Salary Administration Guidelines (Claimants' Exhibit 38); Compensation Administration Management Guidelines (Claimants' Exhibit 39); Luth I Dep. at 183:10-25 (previous experience primary driver for setting starting pay for past decade); 189:17-190:2 (prior to WRG, managers were entrusted within certain constraints to give credit to prior work experience they regarded as relevant) (Claimants' Exhibit 14).

[37] Compensation Administration Management Guidelines (Claimants' Exhibit 39).

[38] *Id.*; Luth I Dep. at 196:13-17 (certain prior job experience could justify pay adjustment above base starting pay) (Claimants' Exhibit 14).

[39] Kochanek Dep. at 94:3-95:20 (Claimants' Exhibit 8).

14

minimum level, including whether or to what extent to credit prior job experience that did not involve sales.[40]

In July 2009, Sterling instituted the third iteration: a computer-based algorithm called the Wage Rate Generator, which computed the starting pay rates that could be offered to new Sales Associates based upon the nature and amount of their prior job experience, prior sales volume, the location of the store, and the cost of living in the area.[41] With respect to prior experience, the WRG components are retail sales experience, store management experience, and "other" management experience, volume of personal retail sales (broken down by jewelry and non-jewelry) and store volume for managers (also broken down by jewelry and non-jewelry).[42] The WRG assigns weights to each of these components; prior retail sales experience, especially sales volume in jewelry, has the biggest impact on an applicant's recommended rate.[43] There is evidence that Sterling's managers had considerable discretion in determining what constituted retail sales experience.[44]

Based upon the inputs by DMs, the WRG returned three starting pay options: a "recommended rate," a "plus rate" and a "maximum rate." On rare occasions, the DM could seek VPRO approval to exceed the "maximum rate." In mid-2010, Sterling required DMs to obtain approval from their VPROs before offering either of the two higher rates. In the fourth

---

[40] *See, e.g.*, Luth I Dep. at 197:15-198:6 (prior to WRG a school teacher might get some credit for prior job experience based on discretion of manager) (Claimants' Exhibit 14).

[41] Luth I Dep. at 154:18-155:17 (WRG provided a more sophisticated analysis of experience, store and geographic area, and store volume) (Claimants' Exhibit 14); Beck Dep. at 33:15-24 (WRG is "same process" as prior iterations) (Claimants' Exhibit 9).

[42] The WRG does not distinguish between jewelry and non-jewelry prior experience unless the applicant provides verifiable information regarding sales volume.

[43] Report of Sterling's expert Dr.Michael P.Ward (Ward Report) at Appendix A1-2 to A1-4.

[44] Deposition of William Frank Luth (Apr. 4, 2013) (Luth III Dep.) at 52:6-54:17; 57:22-64:4 (Claimants' Exhibit 44); Claimants' Exhibit 45.

15

iteration, the WRG was revised in January 2012 to return a single pay rate.[45] The inputs into the WRG formula and the weights associated with those inputs have remained unchanged.[46]

At no time did Sterling conduct a job analysis of the Sales Associate position to determine and weight professionally and systematically the types of prior job experience that correlate most closely with successful performance.[47]

Claimants' evidence of gender-based disparities in compensation is discussed below in the section on expert evidence.

## Merit Increase Policies and Practices

Sterling's policy governing merit raises provides that pay adjustments may be made once each year based upon the results of documented performance in a written performance appraisal.[48] Sterling's merit increase process requires that DMs propose a merit increase based upon the employee's aggregate performance appraisal score.[49] The proposed merit increase must be approved by top executives at the Company before it becomes final.[50] Merit increases are computed by application of a companywide formula, increasing the base wage of employees by a percentage determined by the level of each employee's performance. Sterling generally does not use the merit increase process or any other established process to correct pay disparities between

---

[45] DMs may still request an exception from the VPRO, but these requests are rare. *See* Kochanek Dep. at 97:12-22 (Sterling Exhibit 2); Luth Dep. I at 155:18-158:15 (Sterling Exhibit 6) (beginning in second half of 2010, DMs had to confer with a VPRO to offer the "plus" or "max" rate provided by the WRG; in Fall 2011, DMs were no longer given this option).

[46] Ward Report at Appendix A1-1.

[47] Luth II Dep. at 45:19-24, 170:2-171:12 (Claimants' Exhibit 29); Becker Dep. 19:3-6 (Claimants' Exhibit 33); Deposition of Sterling's Vice President of Employee Relations Michael Lynch (Jan. 23, 2013) (Lynch Dep.) at 44:17-25 (no knowledge of Uniform Guidelines) (Claimants' Exhibit 72).

[48] Business Process Overview, Merit Increases (all full-time and part-time employees, with at least 10 months of service at Sterling, are eligible to receive an increase once a year) (Claimants' Exhibit 40).

[49] *Id.* at SJI 1269914 (DMs propose merit increases; VPROs review and "appropriate changes are made.").

[50] Luth I Dep. at 232:11-234:3, 233:18-234:3, 234:25-235:7 (executive management team approves budgetary determinations, including aggregate merit increase amount) (Claimants' Exhibit 14).

16

comparably performing employees that are attributable to differences in starting pay.[51]

Accordingly, Sterling's policy for awarding annual merit increases can perpetuate any disparities

adverse to women in starting pay rates.  The statistical evidence with respect to merit pay is

discussed below in the section on expert evidence.

<u>Promotion Policies and Practices</u>

Throughout the proposed class period, Sterling has used an approach known as

"Succession Planning" or "Succession Management,"[52] to make all promotions into and within

management positions in its stores.  "Succession Management is the ongoing, dynamic process

of identifying talented employees then training and coaching them in order to prepare them for

future, higher-level positions."[53]  Sterling has consistently followed a policy of promoting

internal candidates into and within management, rather than hiring candidates for management

positions from outside the Company.[54]

Sterling's promotion process begins with the DMs, who, with the assistance of SMs, are

directed to identify, groom and recommend candidates for promotion, subject to approval by the

VPROs and DVPs.[55]  DMs identify candidates for promotion by meeting regularly with Retail

---

[51] *See* Claimants' Memo at 14-16.

[52] Luth II Dep. at 69:3-70:18 (Succession Planning is "is a strategy to understand candidates that would be considered promotion ready for any open vacancies in my market as a district manager") (Claimants' Exhibit 29).

[53] Succession Management District Manager Lesson Plan at SJI 32427 (Claimants' Exhibit 53).

[54] Luth II Dep. at 41:17-22, 70:16-18 ("Sterling strongly believes in promotion from within whenever appropriate," and this policy has been consistently in place for the past decade) (Claimants' Exhibit 29); Succession Management District Manager Lesson Plan, SJI 32416-67 at SJI 32421-22 (describing promote-from-within culture of Sterling as "corporate strategy") (Claimants' Exhibit 53).

[55] *See* Luth II Dep. 35:3-37:23 (VPRO approval of all promotions of Retail Sales Associates has been in place for at least the last decade); 142:18-145:1 (VPROs "partner with the district manager to have a firsthand understanding of the district manager's market and attempt to mentor, guide, manage, oversee the district manager's performance and how they're managing their own district and market"), 189:12-17 (DVPs finalize promotions "to ensure that the [regional] vice president and the district manager have taken the proper steps to validate the candidate and have verified from the procedural standpoint that all looks in order") (Claimants' Exhibit 29); Kochanek Dep. at 103 (describing SM participation in Succession Planning) (Claimants' Exhibit 8).

17

Sales Employees on a one-one basis, where they are expected initiate conversations about career paths and interest in promotion.[56] Under this policy it is a core responsibility of a DM to develop a succession plan, which DMs are required to regularly update and submit to VPROs, and which are monitored by DVPs.[57] This process results in the establishment of a ready stable of "promotables" who can fill current and future management needs. As vacancies arise, the DMs select and recommend a preferred candidate, subject to review and approval by the VPROs and DVPs. [58]

Sterling provides training in Succession Planning that describes the process of identifying promotable candidates and grooming them for promotion.[59] Sterling directs the DMs to consider "Performance Standards" as well as seven "Mission Statement/Leadership Behaviors" in identifying the candidates groomed for promotion. Performance Standards pertain to sales metrics, which are also used in annual performance evaluations. Candidates for promotion must be performing at or above expectations in sales.[60] The seven Mission Statement/Leadership Behaviors are 1) customer 1st perspective; 2) rewards; 3) return on assets; 4) continuous improvement; 5) teamwork; 6) integrity; and 7) communication. In order to be considered

---

[56] Luth II Dep.at 59:23-61:10 (Sterling Exhibit 4); The Source Promotion/Transfer Policy (Sterling Exhibit 9).

[57] *See* Claimants' Exhibits 56-60, 70. DMs also track candidates being groomed on centrally-developed forms. Luth II Dep. at 127:19-128:20, 129:19-130:12 (describing Career Path Summary form) (Claimants' Exhibit 29); Deposition of VPRO David Everton (February 8, 2013) at 74:21-76:7 (as VPRO, he received regular "Projected and Potential" charts to track potential candidates for promotion into management) (Claimants' Exhibit 62).

[58] *Id.* at 78:9-80:13 (DMs make recommendation of candidate to VPRO when vacancy arises).

[59] *E.g.*, Module 4, at SJI 28894 (Claimants' Exhibit 55); Phase 2 DM Development Program Succession Management Leader's Guide, SJI 35478-530 (Claimants' Exhibit 67).

[60] Module 4 at SJI 28900 (Claimants' Exhibit 55); Succession Management Lesson Plan, at SJI 32438 ("**The sales standard is a must-have**") (emphasis in original) (Claimants' Exhibit 53); Luth II Dep. at 154:3-6 (sales performance is "at the heart and is the cornerstone of whether someone should be qualified to more forward or not"), 154:20-155:2 (meeting daily sales goal is "cornerstone" of whether you are a suitable candidate for Succession Planning) (Claimants' Exhibit 29).

18

promotable a manager must demonstrate five out of seven of these characteristics.[61] Sterling has

not conducted any studies to determine whether the Performance Standards or Mission

Statement/Leadership /Behaviors correlate with successful performance in the jobs being filled.[62]

It is Sterling's corporate policy not to post vacancies for management positions. Until

2007, Sterling had no formal mechanism for offering candidates for promotion formal notice and

an opportunity to apply or register their interest in promotion. Before 2007, employees were

expected to express their interest in promotion to their managers, which expression of interest

may or may not have been recorded or communicated to other managers when vacancies arose.[63]

In 2007, Sterling created a system for the registration of interest known as the Career

Advancement Register ("CAR").[64] CAR allows employees to register interest, change their

expression of interest, indicate to what extent they are available for relocation, and review

minimum job requirements for various managerial positions.[65] Sterling requires that DMs or

SMs meet one-on-one with each employee who registers in CAR to discuss his or her career

development. Since January 1, 2008, Sterling has required registration in CAR for an employee

to receive a promotion.[66] Based upon the CAR data, women are proportionally less interested in

[61] Module 4, at SJI 28909 (Claimants' Exhibit 55); Phase 2 DM Development Program Succession
Management Leader's Guide, SJI 35478-530 at 35496 (Claimants' Exhibit 67).
[62] Luth II Dep. at 220:19-23 (Claimants' Exhibit 29).
[63] *See* Luth II Dep. at 64:6-65:13 (describing process for tracking employees' interest in promotion before
2007) (Claimants' Exhibit 29); Promotion/Transfer Policy (Claimants' Exhibit 54) at SJI 10882 ("In the
field, employees should make their Store/Shop Manager and District or Regional Management aware of
their desire to be considered for future vacancies/promotional opportunities").
[64] *See* CAR Powerpoint Presentation, SJI 723150-193 at SJI 723153-54 (describing the new CAR as a
"uniform and consistent system for all Associates that wish to advance within the Company" and
explaining that it is "[b]eing implemented to ensure all Associates are given fair, equitable, and objective
consideration for advancement within the organization") (Claimants' Exhibit 71). *see also* Lynch Dep. at
212:18-215:16 ("It was my opinion that promoting individuals who had not registered could be
discriminatory in nature and should not be tolerated.") (Claimants' Exhibit 72); Email from Lynch to field
operations (Dec. 13, 2007) at SJI 286305 (failure to use CAR gives rise to liability risk) (Claimants'
Exhibit 73).
[65] Luth Decl. ¶ 6 (Sterling Exhibit 5).
[66] *Id.*

19

promotion than men. Claimants' evidence that CAR is not a reliable indicator of women's interest in promotion because registration in CAR has been "manipulated," as well as Claimants' statistical evidence of gender-based disparities in promotions, is discussed below in the section on expert evidence.

### Policy Against Discussing Compensation

Claimants contend that throughout the period covered by this case, Sterling has had a practice or unwritten policy prohibiting its employees from discussing their compensation with other employees. Although Sterling disavows such a policy,[67] Claimants have submitted numerous declarations reporting instances in which Sterling managers communicated to employees that it was Sterling's practice to prohibit discussion of pay throughout the Company and that discussing pay could lead to disciplinary action.[68]

### Sterling's Knowledge of Pay Disparities

Claimants have submitted several documents reflecting internal workforce analyses conducted by Sterling with respect to its compensation policies and practices.

In July 2006, Sterling Vice President of Employee relations Michael Lynch reported:

A comprehensive analysis by two consulting expert groups to assess our data and determine if we have any systemic issues is ongoing. The analysis of payroll data shows that female hourly sales employees on average are paid approximately .[]40 [cents] per hour less than male employees. **This equates to over 7 million annual affected hours.** Numerous models which looked at a spectrum of variables failed to alter the forty cent factor. The disparity begins at the time of hire and generally continues throughout the employee lifecycle.[69]

---

[67] Kochanek Dep. at 194:6-195:2 (Claimants' Exhibit 8); Deposition of Maryellen Mennett (March 21, 2013) at 218:21-219:17 (Claimants' Exhibit 49).

[68] Claimants' Memo at 16-19.

[69] Compliance Management (July 2006) at SJI 1050046 (Claimants' Exhibit 209) (emphasis in original).

This document further notes that "Sterling will need to undertake a review of its compensation and promotional practices and make necessary adjustments to avoid sustained issues."[70]

An internal memo from 2007 entitled "Post-Merit Field Operations EEOC Analysis," reports that "Male manager populations, on average earn * * * higher base salaries than female * * *. Both DM and SMGR populations show that Females scored higher performance scores, yet received lower dollar increases than males * * *. At the store level (excluding DMs), males earn, on average, 12.5% higher base pay wages. In addition this merit cycle shows that males will be increasing $0.05/hour more than women."[71]

Finally, Claimants contend that a 2010 "Merit Payout Alternative" spreadsheet reflects Sterling's knowledge that although women generally received higher performance appraisals ("Merit Scores"), Sterling's policy of setting merit pay increases as a percentage of base pay perpetuated disparities in compensation adverse to women.[72]   Sterling apparently disputes Claimants' interpretation of this document, but has not offered any alternative explanation of the data.[73]

Evidence of Behavior Demeaning to Women and Gender Stereotypes

Claimants have submitted extensive evidence of alleged improper sexual conduct and comments reflecting gender stereotypes by numerous executives and senior managers (including

---

[70] *Id.*, at SJI 1050048.

[71] Claimants' Exhibit 211 at SJI 1285226.

[72] Claimants' Exhibit 212 at SJI 01046514.

[73] Sterling Jewelers Inc.'s Memorandum of Law in Opposition to Claimants' Motion for Class Certification (Sterling Opposition Memo) at 26 ("Claimants have offered no analysis of these worksheets or the purported qualifications of anyone interpreting them as experts.  It is nothing more than counsel's biased interpretation of a singular communication, lacking any factual context or explanation of the figures contained therein").

21

Sterling's CEO and all three of the DVPs who have overseen store operations for most of the last decade) throughout the Company beginning in the early 1990s and continuing to the present. This evidence consists primarily of declarations and testimony by current and former male and female Sterling employees, as well as testimony from Sterling executives and senior managers. The conduct described in the declarations and testimony has occurred in settings that are public and private, ranging from banter in hallways and elevators to interactions within Sterling stores and at the mandatory annual meeting of all Sterling managers held in Orlando, Florida. It includes references to women in sexual and vulgar ways, groping and grabbing women, soliciting sexual relations with women (sometimes as a *quid pro quo* for employment benefits), and creating an environment at often-mandatory Company events in which women are expected to undress publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected. In addition, the testimony and declarations submitted by Claimants describe numerous instances in which managers at all levels of the company and throughout the entire period covered by this action have made comments reflecting negative gender stereotypes, and have relied upon such stereotypes to justify biased pay and promotion decisions.[74] For the most part Sterling has not sought to refute this evidence; rather Sterling argues that it is inadmissible, irrelevant and insufficient to establish a corporate culture that demeans women.

Claimants' expert evidence regarding the existence at Sterling of a corporate culture that demeans women, and the effect of that culture on pay and promotion decisions, is discussed below.

---

[74] *See* Claimants' Memo at 33-43 (detailing evidence).

## EXPERT REPORTS AND TESTIMONY

In support of the motion for class certification, Claimants have offered the reports and testimony of proposed experts Drs. Louis R. Lanier, Kathleen Lundquist and James Outtz. In opposition to the motion, Sterling has offered the reports and testimony of proposed experts Drs. Michael P. Ward, Eric M. Dunleavy and Kayo Sady, and Margaret S. Stockdale. Sterling has filed *Daubert* motions to exclude the reports and testimony of each of Claimants' experts. Claimants have filed *Daubert* motions to exclude the reports and testimony of Drs. Dunleavy and Sady and Dr. Stockdale.

The presentation of the expert evidence is somewhat complicated by the fact that the parties' respective experts often rely upon each other's analysis and findings, and by the sequential development of the expert evidence. Claimants' three proposed expert witnesses submitted initial reports, setting forth opinions that are in some respects based upon each other's analysis and findings. Sterling submitted three expert reports. In addition, in response to the reports of Sterling's experts, Claimants' experts submitted rebuttal reports that respond to and critique Sterling's experts. Significantly, the rebuttal reports of Drs. Lanier and Lundquist reflect further empirical and statistical analysis and contain additional findings that are addressed to Sterling's critique of their initial reports. All of the experts except Dr. Sady were deposed.[75] Finally, Dr. Ward has submitted a declaration that addresses Dr. Lundquist's rebuttal report and new analyses.

As a result of this sequential development of the record, the expert evidence is best understood and appreciated by first setting forth the initial analysis and opinions of Claimants' experts, followed by the critique by Sterling's experts, the rebuttal of Claimants' experts, and Dr.

---

[75] Dr. Sady was not deposed because Dr. Dunleavy had equal responsibility for writing the opinions in the report and because Sterling's counsel stipulated that Dr. Sady would not provide any additional opinions or materially different responses in a deposition than Dr. Dunleavy.

23

Ward's declaration.

## Initial Reports of Claimants' Experts

### Dr. Lanier's Initial Report

Dr. Lanier performed a statistical investigation into whether gender is related to the compensation and promotion practices at Sterling.[76] Dr. Lanier is a Senior Economist and Managing Director at Econ One Research, Inc., an economic consulting firm.[77] He holds a Ph.D. in Applied Economics and has significant experience in the area of labor economics.[78] Dr. Lanier has provided expert testimony in several class and collective actions.[79]

### Analysis of Compensation Disparities

Dr. Lanier conducted a detailed multiple regression analysis that isolated gender differences in regular base pay from the effects of other employee characteristics.[80] Dr. Lanier found that females who have worked as part-time and full-time Sales Associates, Department Managers, Assistant Managers, and Store Managers at Sterling during the years 2003 to 2012 received less regular base pay than male employees working in the same jobs and in the same stores, who had the same amounts of company and job tenure, same potential years spent at other companies after age 18, and the same levels of performance as measured by sales commissions and performance reviews.[81] Gender-related pay disparities range from $488 per year to $1,308 per year and are all statistically significant at standard deviations ranging from 4.7 to 9.8.[82] In

---

[76] Lanier Report ¶4 (Claimants' Exhibit 41).
[77] *Id.* ¶ 1.
[78] *Id.* ¶¶1-2.
[79] *Id.* ¶2.
[80] *Id.* ¶27 and Table 7.
[81] *Id.*
[82] *Id.*, Table 7. Roughly two or more standard deviations (a 0.5 level of statistical significance) are considered statistically and legally significant and may be sufficient to establish a *prima facie* case of

this analysis, Dr. Lanier allowed his control variables to interact in each Sterling District to control for the fact that DMs are responsible for setting pay rates in the Sterling stores.[83]

Dr. Lanier examined whether male employees outperform female employees at Sterling, which might provide some justification for the pay disparities. Dr. Lanier found that female employees were more likely than male employees to receive higher performance ratings, a finding that is statistically significant at 15.6 standard deviations (meaning the probability that this relationship between gender and performance ratings occurred by chance is effectively zero).[84] Dr. Lanier also performed a multiple regression analysis to determine whether female employees in the same store and same jobs earned sales commissions that were greater on average than similarly-situated male employees.[85] Dr. Lanier found that women in full-time Sales Associate positions earned higher sales commissions than men on average (a statistically significant finding at 2.2 standard deviations) and that in other positions women performed equally well or better than men.[86]

Dr. Lanier examined whether differences in the prior job experience of male and female employees could explain the disparities he observed at Sterling. To do so, Dr. Lanier worked with Dr. Lundquist and APTMetrics to analyze a random sample of the applications of over 5,000 male and female employees at Sterling during the years 2003 to 2012.[87] APT Metrics determined the amount of prior experience that each employee had in the six categories that Sterling currently uses in its WRG: jewelry sales, jewelry store management, jewelry other

---

discrimination. *See, e.g., Hazelwood School Dist. v. United States*, 433 U.S. 299, 301-11 & nn.14, 17 (1977).
[83] *Id.* ¶28.
[84] *Id.* ¶23.
[85] *Id.* ¶25 and Table 5.
[86] *Id.*
[87] *Id.* ¶30; Report of Claimants' Expert Dr. Kathleen Lundquist (Lundquist Report) at 30 (Claimants' Exhibit 46).

25

management, non-jewelry sales, non-jewelry store management, and non-jewelry other management.[88] Dr. Lanier then performed multiple regression analyses during the four different time frames when Sterling used different methodologies for setting starting pay for Sales Associates designed to measure whether differences in prior experience could explain the initial pay disparities between male and female Sales Associates at Sterling.[89] Controlling for the same job, same hire year, same district, and the same amounts and types of prior job experience as Sterling uses in its WRG, Dr. Lanier found that in the period January 1, 2003 to July 12, 2009, female employees are initially paid less than male employees on average at statistically significant levels and that these disparities cannot be explained by including the same types of experience that Sterling currently uses in its WRG.[90] In the period during which the WRG has been in use, July 13, 2009 to the present, Dr. Lanier found that female Sales Associates were paid lower starting pay than male Sales Associates, but that these disparities were not statistically significant.[91]

Dr. Lanier also considered whether Sterling's use of prior management experience in setting the pay of Sales Associates adversely affected female employees. In Tables 8b and 8c, Dr. Lanier shows that the statistical disparities increase in each of the four timeframes when prior non-jewelry management experience is removed from the regression analysis (Table 8b), and when all prior management experience is removed from the regression analysis (Table 8c).[92]

---

[88] Lanier Report ¶¶30-33 and Table 8a (Claimants' Exhibit 41). In this analysis, neither Dr. Lundquist nor Dr. Lanier used actual data from the WRG, which Dr. Lundquist found unreliable, and which is limited to hires after July 2009.
[89] Lanier Report ¶31 and Table 8a.
[90] *Id.* ¶33 and Table 8a.
[91] *Id.*
[92] *Id.* ¶¶33-36 and Tables 8b and 8c.

26

Dr. Lanier also analyzed whether the recommended rate established by Sterling's WRG is an accurate predictor of an employee's first year sales productivity.[93] Using two separate measures of productivity, Dr. Lanier showed that the WRG is a poor predictor of an employee's first-year sales productivity. In fact, the WRG assigned a lower annual pay rate of between $779 and $1,172 to female employees, which are statistically significant at 5.2 and 6.6 standard deviations.[94]

Having determined that Sterling sets initial pay rates for female Retail Sales Employees at rates that are statistically significantly lower than similarly situated males, Dr. Lanier analyzed whether Sterling used its merit review process to correct the initial pay disparities or whether the merit review process results in a continuation of the disparate pay of female employees.[95] Dr. Lanier found that the merit review process used by Sterling did not correct initial pay disparities; instead, the merit review process resulted in female associates who worked in the same job, same store, and with the same performance rating as male associates getting lower raises in pay compared to similarly-situated males working in Sales Associate and Store Manager positions and slightly larger raises than males in Department Managers and Assistant Manager positions.[96] Merit raises did not correct the pay disparities found in each of these positions.[97]

Analysis of Promotion Disparities

Dr. Lanier analyzed whether Sterling's promotion practices have an adverse impact on female Retails Sales Employees. Dr. Lanier conducted a regression analysis designed to isolate the extent to which the likelihood of promotion correlates with gender.[98] In the regression, Dr.

---

[93] *Id.* ¶¶37-40 and Table 9.
[94] *Id.* ¶39.
[95] *Id.* ¶¶42-45.
[96] *Id.* ¶¶42-43.
[97] *Id.* ¶¶43-45.
[98] *Id.* ¶47 and Table 12a.

Lanier controlled for length of tenure within the Company and within a particular job; potential

years spent not employed by Sterling after the age of 18; employee performance, as shown by

commissions and performance review ratings; and store and year of employment. Controlling

for these factors, Dr. Lanier determined that gender correlates with the probability of promotion

at all levels within Sterling stores.[99] The likelihood of promotion from Sales Associate, Assistant

Manager, and to a larger store for Store Managers, each show statistically significant disparities

adverse to women, while the Department Manager to Assistant Manager and Store Manager to

District Manager disparities are shy of statistical significance, though also negative.[100] In

conducting this analysis, Dr. Lanier assumed that all male and female employees with a defined

tenure were equally available and interested in promotion. Dr. Lanier chose not to use the

available CAR data to define the pool of interested candidates, based upon evidence that the

CAR system may have been manipulated in favor of pre-selected candidates. Specifically, Drs.

Lanier and Lundquist noted that with respect to a large number of promotions made after CAR

was implemented, employees had been registered in CAR for only a short amount of time,[101]

and that Sterling employees were directed to back-date CAR registrations to ensure they pre-

dated the date of their promotion, or to alter the promotion date in order to ensure it followed the

date of registration in CAR.[102] Nevertheless, Dr. Lanier also performed an analysis that found

similar statistical disparities in the rate of promotion from Sales Associate and Assistant

---

[99] *Id.* ¶¶47-49.

[100] *Id.* ¶49 and Table 12a.

[101] More than forty percent of the promoted employees in the CAR first registered less than a month before their promotion was dated. Lanier Report ¶52, Table 13 (Claimants' Exhibit 41).

[102] *See* Divisional VP Administrative Asst. Manual, SJI 189687-95 at 189690-91 (Claimants' Exhibit 74); SJI 76416, 82175, 90858, 91681, 103755, 69115, 72859 (emails from DVPs' administrative assistant instructing VPRO that candidate must post in CAR before promotion can be finalized) (claimants' Exhibits 75-81); SJI 77464, 91618, 66234 (emails stating effective date of promotion must be changed such that it falls after date on which candidate posted in CAR) (Claimants' Exhibits 82-84); SJI 104915; 93094 (emails addressing need for candidate to post in CAR and subsequent adjustment to effective date) (Claimants' Exhibits 85-86).

28

Manager among employees who expressed interest in being promoted using the CAR data; the results for promotions from Store Manager to larger store and from Store Manager to District Manager were statistically insignificant.[103]

Dr. Lanier also analyzed whether any disparity existed in the time it took for male and female employees to get promoted at Sterling.[104]  Dr. Lanier found that female employees were employed with the Company longer than similarly-situated male employees when they received promotions and that female employees also spent more time in the job prior to promotion than similarly situated males.[105]  In his promotion regressions, Dr. Lanier allowed his control variables to interact at the Region level to isolate the effects of these controls in each Region of Sterling because promotion decisions are controlled at the Region level by VPROs.[106]

Extent of Disparities

Finally, Dr. Lanier also conducted a statistical analysis to determine whether the pay and promotion disparities that he observed were widespread in terms of the number of districts and regions where disparities were adverse to female employees and whether they occurred in each year in the 2003 to 2012 time period of his statistical study.  Dr. Lanier found that the pay and promotion disparities are widespread.[107]  For example, with respect to base pay for full-time Sales Associates, 71% of all Districts show adverse impacts on females, while 100% of the ten years of the available pay data show adverse impacts on females.[108]  With respect to annual promotion rates for full-time Sales Associates, 89.5% of all Regions show adverse impacts on females, while 100% of the nine years of the available promotion data show adverse impacts on

---

[103] Lanier Report ¶50 and Table 12b (Claimants' Exhibit 41).
[104] *Id.* ¶¶54-56 and Tables 14a and 14b.
[105] *Id.*
[106] *Id.* ¶48.
[107] *Id.* ¶¶57-62 and Table 15.
[108] *Id.* ¶59.

29

females.[109]

## Dr. Lundquist's Initial Report

Dr. Lundquist is an Industrial/Organizational (IO) psychologist who, over more than 30 years, has advised employers, both private and governmental, on matters related to the selection, evaluation and compensation of employees, including the design of related human resource processes, the analysis of job contents and job requirements, and the validation of employee selections and compensation procedures.[110] During her professional career she has performed consulting work for companies in many areas, including retail, has served as an expert witness on behalf of both plaintiffs and defendants in numerous cases and also as a court-appointed expert in several cases where she was charged with assuring that provisions of Consent Decrees were properly implemented.[111]

Dr. Lundquist submitted a report that "analyzes the policies, procedures and decision-making processes relevant to compensation and promotion decisions at Sterling Jewelers in January 2003 through the present time frame."[112] Specifically, Dr. Lundquist was "asked to examine the job-relatedness of the policies and procedures Sterling uses to assess and promote job candidates, and evaluate employees for compensation purposes; and to determine if the manner in which those policies are implemented permits biases to affect employment decision-making at Sterling."[113]

Dr. Lundquist observed that "[n]o job analysis or other formal study was ever performed to identify the knowledge, skills, abilities and experiences relevant to successful job performance

---

[109] *Id.* ¶61.
[110] Lundquist Report at 5; Attachment A (Curriculum Vitae) (Claimants' Exhibit 46).
[111] *Id.* at 5-6.
[112] *Id.* at 2.
[113] *Id.*

30

at Sterling. Consequently, Sterling has not demonstrated the job relatedness of the factors it considered in setting starting salaries that resulted in pay discrepancies between men and women at the time of hire, which continued over the course of their employment. Nor has Sterling demonstrated the job-relatedness of the factors it considered in making promotion decisions, which resulted in women receiving proportionally fewer promotions."[114]

Dr. Lundquist further concluded that "Sterling's processes were executed in a manner that was unstructured and inconsistent, leading to unreliable and inconsistent evaluation of candidates. Managers were permitted to make decisions about compensation and promotion with insufficient guidance, ambiguous criteria, and without adequate oversight and monitoring to ensure the fairness of the decision making process. In essence, there was a centrally-mandated process that was poorly executed."[115]  Dr. Lundquist specifically noted that internal Sterling documents reflect uncertainty and lack of consistency in the definition of what constitutes prior retail sales experience.[116]

Dr. Lundquist concluded that "the promotion and compensation decisions made for the retail jobs at Sterling lack sufficient reliability and validity to be considered job-related. Moreover, the lack of consistency and structure permitted measurement error to occur, including intentional and unintentional biases."[117]

Dr. Lundquist opined that Sterling's selection and compensation practices failed to meet basic professionally accepted standards. Sterling prepared no job analysis, did not conduct any validity study, and did no evaluation of whether its compensation system resulted in women

---

[114] *Id.* at 3.
[115] *Id.*
[116] *Id.* at 25-26.
[117] *Id.* at 5.

31

receiving unequal pay or whether its promotion process had an adverse impact on women.[118]

Starting Pay

Dr. Lundquist conducted an evaluation of Sterling's compensation practices focusing on Sterling's use of prior work experience in setting starting salaries for Sales Associates. Dr. Lundquist analyzed and "coded" over 5,000 randomly-selected job applications for Sales Associates hired in the 2003-2012 time frame to investigate "gender differences in the types of job experience judged relevant to performance in the retail sales jobs at Sterling. The goal was to determine if gender differences in starting salary were a function of Sterling's failure to credit relevant job experience and/or the crediting of non-job-related experience such as management experience."[119] For purposes of this analysis, Dr. Lundquist looked at categories of prior experience credited by the WRG, as well as other types of job experience she found relevant based upon Sterling's job descriptions, the Department of Labor's O*NET data and other research literature, including non-sales Direct Customer Service experience.[120]

Dr. Lundquist observed that the WRG credits retail sales experience, store manager experience and other management experience in setting starting pay rates. Based upon an examination of the company job description for Sales Associate, the O*NET description for the job of Retail Salesperson, and other academic literature, Dr. Lundquist found that in the absence of a validation study, the decision to credit prior management experience and the decision to

---

[118] *Id.* at 16-18.

[119] *Id.* at 30-31.

[120] *Id.* at 31-32. As noted above, Dr. Lundquist relied on coding of applications for the entire proposed class period. She did not use or analyze the prior experience factors actually recorded in the WRG, in light of her finding that Sterling does not give DMs clear and consistent direction regarding how to evaluate and categorize prior experience, and that the evaluation and categorization of prior experience by DMs is "vulnerable" to the discriminatory exercise of discretion. *See id.* at 22-25. Dr. Lundquist also observed that that reported store volume was not consistently verified, and that the option to offer Plus and Maximum rates allowed DMs to set starting wages inconsistently or according to their biases. *Id.* at 23-24.

place a 5-year cap on the crediting of experience was "both arbitrary and not job-related."[121] Dr. Lundquist noted that an internal analysis conducted by Sterling in 2012 concluded that management experience did not translate into better job performance as a Sales Associate.[122] Dr. Lundquist found that female applicants hired by Sterling were significantly less likely to have experience as store managers and had significantly fewer years of experience in store management than their male counterparts.[123] Dr. Lundquist found that because Sterling gave "strong consideration of management experience" when setting staring salaries of Sales Associates, the difference in prior management experience "undoubtedly had a negative impact on female employees' initial pay rates."[124] In addition, Dr. Lundquist opined that women were disadvantaged by the WRG because even though females had either similar or greater jewelry-specific sales experience than males, Sterling failed to capture jewelry-specific sales experience in its WRG algorithm unless documentation of the volume of such sales was provided.[125] Dr. Lundquist further reported that "[w]hile Males have significantly more experience in Active Selling in all time frames, Females have significantly more experience in Direct Customer Service than males in all time frames, a job-related factor that wasn't credited by the WRG."[126]

Because the coding of applications requires interpretation and "judgment" as to the nature of an applicant's prior experience, Dr. Lundquist conducted a "coder reliability" evaluation to verify that coders were consistently applying her rules for classification of 18 experience categories.[127] Dr. Lundquist selected 50 applications for review by ten coders each, randomly

---

[121] *Id.* at 25.
[122] *Id.* at 29.
[123] *Id.* at 36-37.
[124] *Id.*
[125] *Id.*
[126] *Id.* at 37.
[127] See Ward Report at 18, n. 27 (setting forth the 18 categories)

chosen by "manually picking a few applications from each year."[128]  Dr. Lundquist used an

intraclass correlation coefficient (ICC) "employing the one-way analysis of variance model for

average measurements" to assess coder reliability, which showed consistent application of the

rules by coders.[129]

As noted above, Dr. Lundquist's application coding data was provided to Dr. Lanier, who

performed a statistical analysis with respect to the impact of consideration of prior management

experience on female starting pay.[130]

## Merit Increases

With respect to merit increases, Dr. Lundquist noted that Sterling's approach is

"problematic because gender differences in starting salary tend to be perpetuated, and

exacerbated, over time when increases are based exclusively on a percentage of base pay."[131]

She observed that "[a] common organizational practice to maintain pay equity is to grant a high-

performing employee with a relatively low salary a larger merit increase than a high performing

employee with a relatively high salary."[132]

## Promotions

With respect to promotions, Dr. Lundquist observed:

"While Sterling's promotion procedures may seem reasonable on their face, to the extent

that they have adverse impact, the characteristics evaluated would have to be shown to be job-

related.  In this case, the suitability of the characteristics assessed was never confirmed using a

professionally-acceptable job analysis and validation process.  Despite their impact on

---

[128] *Id.* at 18 and nn. 25 and 26.

[129] Lundquist Report at 32-33.

[130] Neither Dr. Lanier nor Dr. Lundquist performed any statistical analyses with respect to her other conclusions, such as the 5-year experience cap or failure to credit Direct Customer Service.

[131] *Id.* at 38.

[132] *Id.*

34

succession planning and promotion the rating factors included in Sterling's performance management system have never been validated."[133]   In particular, Dr. Lundquist found that the "heavier emphasis on sales performance in comparison with other attributes makes the job-relatedness of the promotion criteria questionable when applied to the work performed in the managerial job."[134]   Dr. Lundquist also found that the promotion decision-making process at Sterling is "highly subjective.  No guidance is provided to decision makers to structure their final evaluation of candidates; in other words, no criteria are provided on how to evaluate candidate information in a job-related fashion, nor were decision makers instructed on what weight to give the various sources of information (e.g., performance appraisal, interviews, assessment results) provided about the candidates.  Furthermore, monitoring of decision making for consistency and fairness is virtually non-existent.  For these reasons the decision making process is unreliable and therefore vulnerable to non-job-related errors including both intentional and unintentional biases and manipulation."[135]

Dr. Lundquist criticized the absence of posting of promotional opportunities, and opined that the CAR as a prerequisite for promotion is a "pretense," based upon the evidence described above that some employees did not register in CAR until after they had already been selected for promotion.[136]

Dr. Lundquist concluded that:

> "It is my professional opinion that the promotion and compensation decisions made for the retail sales and management jobs at Sterling lack sufficient reliability and validity to be considered job-related.  Moreover, the lack of consistency and structure permitted measurement error to occur, including intentional or unintentional biases.  Additionally, barriers to the

---

[133] *Id.* at 41-42.
[134] *Id.* at 42.
[135] *Id.* at 42-43.
[136] *Id.* at 43-44.

> advancement and equitable compensation of female employees
> increased the likelihood of gender discrimination in promotions
> and compensation at Sterling."[137]

## Human Resources Deficiencies

Dr. Lundquist found that Sterling's HR managers lacked knowledge concerning professional standards and legal requirements.[138] In addition, Sterling's HR managers did not undertake basic tasks routinely performed by HR managers at other companies and that are essential for assuring the fair and non-discriminatory application of personnel practices. For example, Sterling's HR department failed to conduct comprehensive pay equity studies or an assessment of the job-relatedness of Sterling's pay and promotion criteria—notwithstanding complaints of gender-based pay disparities. Dr. Lundquist also found that Sterling's HR Department has failed to conduct adequate oversight with respect to the application of Sterling's promotion and compensation practices, and has done nothing to ensure their consistent implementation.[139] Lastly, the HR Department failed to assure the application of minimum standards required for the operation of an effective system for the resolution of harassment and discrimination complaints, including the failure to ensure the confidentiality of the names of complainants, and the absence of any role for HR in determining disciplinary actions for issues such as harassment beyond making recommendations to the field, which can be freely ignored.[140]

---

[137] *Id.* at 44.
[138] *Id.* at 17-18 (noting that Sterling's senior HR managers testified that they had little or no familiarity with the Uniform Guidelines on Employee Selection Procedures).
[139] *Id.* at 15-18.
[140] *Id.* at 14-20.

36

Dr. Outtz's Initial Report

Dr. Outtz has worked as an I/O Psychologist for over 30 years.  During that time he has served in a number of professional and governmental positions including several committees of the National Academy of Sciences.[141]  Recently, Dr. Outtz edited a volume on the measurement and minimization of the adverse impact of employment measures upon women and minorities.[142]  Throughout his professional career Dr. Outtz has consulted with private and governmental employers in the development of personnel practices.[143]  On numerous occasions, Dr. Outtz has served as an expert witness for both plaintiffs and defendants.[144]

Dr. Outtz's report addresses (a) whether the behavior and comments of Sterling executives and senior managers can establish workplace norms that guide the behavior of managers elsewhere in the organizational hierarchy;[145]  (b) whether the record evidence describing the behavior of Sterling's executives and senior managers is sufficient to have established workplace norms guiding the behavior of managers elsewhere in the organizational hierarchy;[146] and (c) whether the record evidence indicates that the behavior and comments of senior managers toward women were capable of influencing the exercise of discretion adversely to women regarding compensation and promotion decisions made by managers, even though women held managerial positions at various levels, and even though Sterling had in place a written policy prohibiting sex discrimination and prohibiting managers from "fraternizing" with employees under their direct or indirect supervision.[147]

[141] Report of Claimants' expert Dr. James Outtz (Outtz Report) at Appendix 2 (Curriculum Vitae) (Claimants' Exhibit 103).
[142] *Id.* at 2-3.
[143] *Id.* at 3.
[144] *Id.* at 4.
[145] *Id.*
[146] *Id.* at 10.
[147] *Id.* at 18.

37

Dr. Outtz's report is based on his review of the depositions of Sterling executives and managers, internal Sterling documents, and the declarations of over 200 current and former male and female Sterling employees, as well as his professional experience and relevant professional research.  Dr. Outtz also interviewed ten of Claimants' declarants.

Dr. Outtz's report relies on research on "modeling" (the extent and manner in which subordinates imitate supervisor behavior), which Dr. Outtz contends demonstrates that that negative behavior of leaders of an organization will "trickle down" to influence lower-level managers to engage in similar behavior.[148]  Dr. Outtz observes that Sterling has an explicit practice of "leading by example" that reinforces the pattern of lower-level managers modeling their actions upon the conduct of Sterling executives and senior managers.[149]  Dr. Outtz finds that the conduct demeaning to women that is reflected in the record, including unwanted sex-related behavior engaged in by its CEO and other high-level managers, has been emulated by subordinates resulting in a "climate and culture at Sterling in which female employees and their work are devalued when compared to male employees."[150]  Dr. Outtz opines that the devaluation of women resulting from the conduct of executives and senior managers can influence their value, as perceived by lower-level managers, both at the time of hire and as employees, and can adversely affect the way that these managers exercise their discretion in making compensation and promotion decisions.[151]

Dr. Outtz further concludes that the presence of women in managerial ranks cannot by itself overcome the discriminatory consequences of the devaluation of women resulting from the conduct of Sterling executives and senior managers.  He notes that the failure of a company to

---

[148] *Id.* at 4-10.

[149] *Id.* at 12-13.

[150] *Id.* at 18.  Dr. Outtz identifies sixteen VPROs alleged to have engaged in inappropriate sexual behavior.

[151] *Id.* at 29.

take harassment and discrimination complaints seriously by investigating those complaints and disciplining offenders, has been shown by research to have substantially more of an impact on whether there is a non-discriminatory workplace than whether or not women occupy some managerial positions.[152] Dr. Outtz acknowledges that Sterling has a policy prohibiting sex discrimination and prohibiting managers from fraternizing with employees under their direct or indirect supervision, but identifies several factors that undermine Sterling's official policies-- including fear of retaliation, failure to maintain the confidentiality of complaints and failure to discipline managers, as reported in Claimants' declarations, and inadequate resources to handle complaints.[153]

Dr. Outtz observes that Sterling senior managers and executives have significant discretion in setting compensation, and that certain factors used in selecting candidates for promotion are highly subjective, introducing opportunities for managers to exercise bias.[154]   He concludes that the demeaning and devaluing comments and behavior of Sterling executives and senior managers "have influenced the exercise of discretion in pay and promotions."[155]

---

[152] *Id.* at 21-29.

[153] *Id.* at 24-28. Dr. Outtz's stated in his initial report that Sterling reported that only 8% percent of sexual harassment complaints received in 2006 were investigated. *Id.* at 28. However, the document cited by Dr. Outtz reflects that 8% is the percentage of all investigations conducted in 2006 that involved allegations of sexual harassment. Sterling Jewelers Inc.'s Reply in Support of its Motion to Exclude the Report and Testimony of Dr. James Outtz (Sterling's Outtz *Daubert* Reply) at 15. Dr. Outtz also based his opinion on the fact that Sterling employed only five Regional HR Specialists to handle thousands of calls each year. Outtz Report at 27.

[154] *Id.* at 29-38.

[155] *Id.* at 39.

39

## Critique and Expert Evidence Presented by Sterling
## and Claimants' Response

Compensation

Sterling's critique of Claimants' expert evidence pertaining to compensation is contained in the reports of Dr. Ward, Drs. Dunleavy and Sady, and Dr. Stockdale.

Dr. Lanier's statistical analysis and the conclusions of Dr. Lundquist are addressed by Dr. Ward. Dr. Ward has a Ph.D. in economics and works as a consultant specializing in economic and statistical research, including statistical studies of hiring, pay, promotion and termination practices. He has testified as an expert on economics and statistics in federal and state courts.[156]

Dr. Ward conducted a number of statistical and other analyses of the work performed and conclusions reached by Drs. Lanier and Lundquist regarding compensation. He challenges their opinions regarding the job-relatedness of prior experience criteria used by Sterling in setting starting pay, including the validity of the WRG factors, on multiple grounds.

Dr. Ward acknowledges that the WRG leads to lower starting pay for women than for men.[157] Dr. Ward attributes this to the fact that women have less experience—including management experience, which Dr. Ward finds to be job-related—and lower pre-hire sales volume than men (a factor Claimants' experts did not consider).[158] He concludes that when these factors are fully accounted for, men and women receive the same initial pay.[159] Similarly, Dr. Ward concludes that men and women earn the same regular base pay "after adjusting for differences in pre-hire experience."[160]

---

[156] Ward Report at 1-2.
[157] *Id.* at 7-8
[158] *Id.* at 4.
[159] *Id.*
[160] *Id.*

40