entitled to individual relief unless the employer in turn can establish by a preponderance of the evidence that a legitimate non-discriminatory reason existed for the particular adverse action.

Disparate Treatment

Disparate treatment occurs "when an individual alleges that an employer has treated that particular person less favorably than others because of the plaintiff's race, color, religion, sex, or national origin."[344]  In a disparate treatment case, "the plaintiff is required to prove that the defendant had a discriminatory intent or motive."[345]  One method of proving disparate treatment is to show that an employer engaged in a pattern and practice of discrimination.  Pattern-or-practice disparate treatment claims focus on allegations of widespread acts of intentional discrimination against individuals.  To succeed on a pattern-or-practice claim, plaintiffs must prove more than sporadic acts of discrimination; rather, they must establish that intentional discrimination was the defendant's "standard operating procedure."[346]

The following description of the proof typically presented in disparate treatment cases is closely adapted from the decision of the Second Circuit in *Robinson*.[347]

Generally, a pattern-or-practice suit is divided into two phases: liability and remedial.  At the liability stage, the plaintiffs must produce sufficient evidence to establish a *prima facie* case of a policy, pattern, or practice of intentional discrimination against the protected group.  Plaintiffs have typically depended upon two kinds of circumstantial evidence to establish the existence of a policy, pattern, or practice of intentional discrimination: (1) statistical evidence aimed at establishing the defendant's past treatment of the protected group, and (2) testimony

---

[344] *Watson*, 487 U.S. at 985–86.

[345] *Id.* at 986.

[346] *Teamsters*, 431 U.S. at 336.

[347] 267 F.3d 147 (2d Cir. 2001) (internal citations omitted).

from protected class members detailing specific instances of discrimination. If the plaintiffs satisfy this *prima facie* requirement, the burden of production then shifts to the employer to defeat plaintiffs' *prima facie* case by demonstrating that the plaintiffs' proof is either inaccurate or insignificant.

Three basic avenues of attack are open to the defendant challenging the plaintiffs' statistics, namely assault on the source, accuracy, or probative force. The defendant can present its own statistical summary treatment of the protected class and try to convince the fact finder that these numbers present a more accurate, complete, or relevant picture than the plaintiffs' statistical showing. Or the defendant can present anecdotal and other non-statistical evidence tending to rebut the inference of discrimination.

Once the defendant introduces evidence satisfying this burden of production, the trier of fact then must consider the evidence introduced by both sides to determine whether the plaintiffs have established by a preponderance of the evidence that the defendant engaged in a pattern or practice of intentional discrimination. Should the plaintiffs prove a pattern or practice of discrimination, the court may proceed to fashion class-wide declaratory and/or injunctive relief. If individual relief such as back pay, front pay, or compensatory recovery is sought in addition to class-wide equitable relief, the court must conduct a "remedial" phase. Class members enter this second phase with a presumption in their favor that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The effect of the presumption from the liability stage is to substantially lessen each class member's evidentiary burden relative to that which would be required if the employee were proceeding separately with an individual disparate treatment claim under the framework

84

established in *McDonnell Douglas Corp. v. Green*.[348] Rather than having to make out a *prima facie* case of discrimination and prove that the employer's asserted business justification is merely a pretext for discrimination, a class member at the remedial stage of a pattern-or-practice claim need only show that he or she suffered an adverse employment decision and therefore was a potential victim of the proved class-wide discrimination. The burden of persuasion then shifts to the employer to demonstrate that the individual was subjected to the adverse employment decision for lawful reasons. If the employer is unable to establish a lawful reason for an adverse employment action, the employee is entitled to individualized equitable relief, which may include back pay and front pay. Class members who seek compensatory damages in addition to individualized equitable relief must then prove that the discrimination caused them emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, or other nonpecuniary losses.

## Requirements of Rule 23 and Supplementary Rules 4(a) and 4(b)

### Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable; AAA Supplementary Rule 4(a)(1) requires that "the class is so numerous that joinder of separate arbitrations on behalf of all members is impracticable." Sterling acknowledges that Claimants have met the requirement of numerosity.

### Commonality

Rule 23(a)(2) and AAA Supplementary Rule 4(a)(2) require that "there are questions of law or fact common to the class."

---

[348] 411 U.S. 792 (1973).

The Supreme Court's recent decision in *Wal-Mart*[349] sets forth the standards for proof of commonality in employment discrimination cases.

In *Wal-Mart*, plaintiffs sought certification of a class comprising a million and a half current and former female employees of Wal-Mart, asserting violation of Title VII with respect to pay and promotion, based upon disparate impact and disparate treatment, seeking injunctive and declaratory relief, back pay and punitive damages. The Court held that because plaintiffs had failed to provide "convincing proof of a companywide discriminatory pay and promotion policy," they had not established the existence of any common question.[350] As set forth in the Court's opinion, the *Wal-Mart* plaintiffs alleged that local managers exercised discretion over pay and promotions "disproportionately in favor of men, leading to an unlawful disparate impact on female employees," and that "because Wal-Mart is aware of this effect, its refusal to cabin its manager's authority amounts to disparate treatment."[351] According to the Court, plaintiffs claimed that "the discrimination to which they have been subjected is common to *all* Wal-Mart's female employees," and that the basic theory of plaintiffs' case is that "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers—thereby making every woman at the company the victim of one common discriminatory practice."[352] The Court described pay and promotion decisionmaking at Wal-Mart as follows:

> Pay and promotion decisions at Wal-Mart are generally committed to local managers' broad discretion, which is exercised "in a largely subjective manner." Local store managers may increase the wages of hourly employees (within limits) with only limited corporate oversight. As for salaried employees, such as store managers and their deputies, higher corporate authorities have discretion to set their pay within preestablished ranges.

---

[349] 131 S.Ct. 2541 (2011).

[350] *Id.* at 2556-2557.

[351] *Id.* at 2548.

[352] *Id.* (*emphasis in original*).

Promotions work in a similar fashion. Wal-Mart permits store managers to apply their own subjective criteria when selecting candidates as "support managers," which is the first step on the path to management. Admission to Wal-Mart's management training program, however, does require that a candidate meet certain objective criteria, including an above-average performance rating, at least one year's tenure in the applicant's current position and a willingness to relocate. But except for those requirements, regional and district managers have discretion to use their own judgment when selecting candidates for management training. Promotion to higher office—*e.g.*, assistant manager, co-manager, or store manager—is similarly at the discretion of the employee's superiors after prescribed objective factors are satisfied.[353]

According to the Court, with respect to the commonality requirement, plaintiffs "relied chiefly on three forms of proof:  statistical evidence about pay and promotion disparities between men and women at the company, anecdotal reports of discrimination from about 120 of Wal-Mart's female employees, and the testimony of a sociologist, Dr. William Bielby, who conducted a "social framework analysis" of Wal-Mart's "culture" and personnel practices, and concluded that the company was "vulnerable" to gender discrimination.[354]  The Court noted that plaintiffs "do not allege that Wal-Mart has any express corporate policy against the advancement of women."[355]  The Court held that commonality requires plaintiffs to demonstrate that class members have "suffered the same injury."[356]  "Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke. 'What matters to class certification * * * is not the raising of common "questions"—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.

---

[353] *Id.* at 2547 (internal citations omitted).

[354] *Id.* at 2549.

[355] *Id.* at 2548.

[356] *Id.* at 2551 (*quoting General Telephone Co. of Southwest v. Falcon* (*Falcon*), 457 U.S. 147, 157 (1982)).

Dissimilarities within the proposed class are what have the potential to impede the generation of common answers'."[357]    The Court noted that in resolving an individual's Title VII claim, "the crux of the inquiry is 'the reason for a particular employment decision'."[358]  The Court therefore held that in order to meet the commonality requirement, plaintiffs must provide some "glue" holding together the reasons for the multiple employment decisions at issue, so that an "examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*."[359]

The Court held that its opinion in *General Telephone Co. of Southwest v. Falcon* (*Falcon*)[360] "describes how the commonality issue must be approached,"[361]  noting

> the conceptually "wide gap" between an individual claim and the existence of a class of persons who have suffered the same injury as that individual. The *Falcon* Court suggested two ways in which that conceptual gap might be bridged. First, if the employer "used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a)." Second, "[s]ignificant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes."

*Id.* (internal citations omitted).[362]

In *Wal-Mart*, the Court found that "[t]he first manner of bridging the gap obviously has no application here; Wal-Mart has no testing procedure or other companywide evaluation method that can be charged with bias. The whole point of permitting discretionary

---

[357] *Id.* (*quoting* Nagreda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.Rev. 97, 131-132 (2009)).

[358] *Id.* at 2552 (*quoting Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984)).

[359] *Id.* at 2552, 2556 (internal quotation marks omitted) (emphasis in original).

[360] 457 U.S. 147 (1982).

[361] *Id.* at 2553.

[362] *Id.*

decisionmaking is to avoid evaluating employees under a common standard."[363]  With respect to the second manner of bridging the gap, the Court held that significant proof that Wal-Mart operated under a general policy of discrimination "is entirely absent."[364]  Noting that Wal-Mart's announced policy forbids sex discrimination, and that "the company imposes penalties for denials of equal employment opportunity," the Court found that the only evidence of a "general policy of discrimination" produced by plaintiffs was the testimony of their sociological expert, Dr. Bielby.[365]  The Court found Dr. Bielby's testimony "worlds away" from "significant proof" that Wal-Mart "operated under a general policy of discrimination."[366]  The Court observed that Dr. Bielby could not "determine with any specificity how regularly stereotypes play a meaningful role in employment decisions at Wal-Mart," and "could not calculate whether 0.5 percent or 95 percent of the employment decisions at Wal-Mart might be determined by stereotyped thinking"—which the Court found to be "the essential question on which [plaintiffs'] theory of commonality depends."[367]  The Court concluded that "[t]he only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's 'policy' of allowing discretion by local supervisors over employment matters," which "on its face" is "just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy against having uniform employment practices. It is also a very common and presumptively reasonable way of doing business—on that we have said 'should itself raise no inference of discriminatory conduct'."[368]  The Court acknowledged that "in appropriate cases,"

---

[363] *Id.*
[364] *Id.*
[365] *Id.*
[366] *Id.* at 2554.
[367] *Id.* at 2553-2554.
[368] *Id.* at 2554 (*quoting Watson*, 487 U.S. at 990).

giving discretion to lower-level supervisors can be the basis of Title VII liability under a

disparate-impact theory.[369]   The Court noted, however, that:

> [T]he recognition that this type of Title VII claim "can" exist does not lead to the
> conclusion that every employee in a company using a system of discretion has such a
> claim in common. To the contrary, left to their own devices most managers in any
> corporation—and surely most managers in a corporation that forbids sex
> discrimination—would select sex-neutral, performance-based criteria for hiring and
> promotion that produce no actionable disparity at all. Others may choose to reward
> various attributes that produce disparate impact—such as scores on general aptitude tests
> or educational achievements * * *. And still other managers may be guilty of intentional
> discrimination that produces a sex-based disparity. In such a company, demonstrating the
> invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity
> of another's. A party seeking to certify a nationwide class will be unable to show that all
> the employees' Title VII claims will in fact depend on the answers to common
> questions.[370]

The Court held that the *Wal-Mart* plaintiffs "have not identified a common mode of

exercising discretion that pervades the entire company—aside from their reliance on Dr. Bielby's

social frameworks analysis that we have rejected."[371]   The Court observed that "[i]t is quite

unbelievable that all managers would exercise their discretion in a common way without some

common direction."[372]   The Court held that plaintiffs' statistical and anecdotal evidence "falls

well short" of showing a common mode of exercising discretion.[373]

With respect to plaintiffs' statistical evidence, the Court observed that:

> "[I]information about disparities at the regional and national level does not
> establish the existence of disparities at individual stores, let alone raise the inference that
> a company-wide policy of discrimination is implemented by discretionary decisions at
> the store and district level." A regional pay disparity, for example, may be attributable to
> only a small set of Wal-Mart stores, and cannot by itself establish the uniform store-by-
> store disparity upon which the plaintiffs' theory of commonality depends.[374]

---

[369] *Id. (citing Watson*, 487 U.S. at 990-991).

[370] *Id.* (internal citations omitted).

[371] *Id.* at 2554-2555.

[372] *Id.* at 2555.

[373] *Id.*

[374] *Id.* (internal citations omitted).

The Court further held that even if plaintiffs' statistical proof established a pay or

promotion disparity in all of Wal-Mart's stores, "that would still not demonstrate that

commonality of issue exists."[375]   The Court observed that "[s]ome managers will claim that the

availability of women, or qualified women, or interested women, in their stores' area does not

mirror the national or regional statistics. And almost all of them will claim to have been

applying some sex neutral, performance-based criteria—whose nature and effects will differ

from store to store."[376]   The Court noted that in *Watson*, "the plurality opinion conditioned its

holding on the corollary that merely proving that the discretionary system has produced a racial

or sexual disparity is *not enough*," and that the plaintiff "must begin by identifying the specific

employment practice that is challenged."[377]   The Court held that "other than the bare existence of

delegated discretion," the *Wal-Mart* plaintiffs had "identified no 'specific employment

practice'—much less one that ties all their 1.5 million claims together.  Merely showing that

Wal-Mart's policy of discretion has produced an overall sex-based disparity does not suffice."[378]

Finally, the Court held that plaintiffs' anecdotal evidence "suffers from the same defects, and in

addition is too weak to raise any inference that all the individual, discretionary personnel

decisions are discriminatory."  The Court noted that plaintiffs filed just one affidavit for every

12,500 class members—relating to only some 235 out of Wal-Mart's 3,400 stores.  "More than

half of these reports are concentrated in only six States * * *; half of all States have only one or

two anecdotes; and 14 States have no anecdotes about Wal-Mart's operations at all."[379]   In sum,

the Court concluded that because plaintiffs provided "no convincing proof of a companywide

---

[375] *Id.*

[376] *Id.* at 2555.

[377] *Id.* (*quoting Watson*, 487 U.S. at 994 and *citing Wards Cove Packing Co. v. Atonio*, 490 U.S. 645, 656 (1989)).

[378] *Id.* at 2555-2556.

[379] *Id.* at 2556.

discriminatory pay and promotion policy, * * * they have not established the existence of any common question."[380]

### Application of *Wal-Mart* to This Case

Sterling argues that "Claimants' Motion contains all of the deficiencies identified by the Supreme Court in *Wal-Mart*, and thus fails to demonstrate the requisite commonality to bind this proposed class together."[381] I disagree.

This case may be distinguished from *Wal-Mart* in several significant respects. Most importantly, as opposed to alleging the "bare existence of delegated discretion," Claimants have identified specific uniform companywide pay and promotion policies and procedures, for each of which Claimants have proffered expert testimony that, if persuasive, demonstrates a statistically significant adverse impact on women. All of the pay and promotion decisions at issue in this arbitration were made pursuant to these specified policies and procedures. In addition, Claimants' statistical evidence shows disparities at the district or regional level at which pay and promotion decisions are made, as opposed to reliance on national statistics.

At the same time, to the extent Claimants allege a general policy of discrimination or contend that pay and promotion disparities were caused by a the exercise of discretion "tainted" by a "corporate culture" of gender bias, Claimants' proof suffers from several of the deficiencies identified in *Wal-Mart*.

Specifically, with respect to individual instances of alleged discrimination, Claimants have submitted statements from less than one-half of 1% of the proposed class. Over half of Claimants' declarations are clustered in eight states; there are five or fewer declarants in thirteen

---

[380] *Id.* at 2556-2557.

[381] Sterling Opp. Memo at 7 and Sterling Exhibit 1 (Chart Comparing Allegations and Class Theories between *Wal-Mart Stores, Inc. v. Dukes* and *Jock, et al. v. Sterling Jewelers Inc.*).

92

states and no declarants in fifteen states.  Moreover, like Dr. Bielby, Claimants' expert Dr. Outtz could not quantify the causal effect of a gender-biased corporate culture on pay and promotion decisions at Sterling.

For the reasons set forth below, I find that Claimants' have demonstrated commonality with respect to their claims for declaratory and injunctive relief based upon a theory of disparate impact, but have failed to demonstrate commonality with respect to their claims of disparate treatment.

Disparate Impact

With respect to disparate impact, the central questions are whether the specific policies and procedures identified by Claimants have a significant disparate impact, *i.e.*, whether there are significant disparities that have been caused by the challenged policies and procedures, and if so, whether the challenged policies and procedures are job-related for the position in question and consistent with business necessity.  Classwide adjudication of these questions will produce answers common to the class that are "apt to drive the resolution of the litigation" with respect to all class members, even though individual issues may remain to be resolved in "remedial" proceedings.

Following *Wal-Mart*, courts have grappled with satisfaction of the commonality requirement in the context of employment policies and practices that permit or delegate the exercise of discretion in employment decisions, several of which have found requisite commonality in the context of a claim of disparate impact.

In *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (McReynolds)*,[382] the Seventh Circuit reversed an order denying class certification with respect to certain employment

---

[382] 672 F.3d 482 (7th Cir. 2011), *cert. denied*, 133 S. Ct. 338 (2012).

practices alleged to have an adverse impact on 700 African-American brokers.[383]  In that case the Court found that Merrill Lynch employs 15,000 brokers working in 600 branch offices, supervised by branch managers and 135 "Complex Directors."  The company has a "teaming" policy that permits brokers in the same office to form teams.  The teams are formed by brokers, and once formed a team decides whom to admit as a new member.  Complex Directors and branch-office managers do not select the team's members.  The company also has a policy regarding "account distributions," which are transfers of customers' accounts when a broker leaves Merrill Lynch and his clients' accounts must be transferred to other brokers.  Accounts are transferred within a branch office, and the brokers in that office compete for the accounts.  The company establishes criteria for deciding who will win the competition, including the competing brokers' records of revenue generated for the company and of the number and investments of clients retained.

The Court noted that Complex Directors and branch managers have a measure of discretion to veto teams and to supplement the company's criteria for distributions, and that "to the extent these regional and local managers exercise discretion regarding the compensation of the brokers whom they supervise, the case is indeed like Wal-Mart.  But the exercise of that discretion is influenced by the two company-wide policies at issue: authorization to brokers, rather than managers to form and staff teams; and basing account distributions on the past success of the brokers who are competing for the transfers."  The Court observed that "team participation and account distribution can affect a broker's compensation, as well as a broker's

---

[383]The plaintiffs in *McReynolds* initially sought class certification pursuant to Rule 23(b)(3) based upon both disparate impact and disparate treatment.  The district court denied certification on both theories prior to the decision in *Wal-Mart*.  Following *Wal-Mart*, plaintiffs renewed their request for class certification based solely upon disparate impact, which was again denied.  Plaintiffs appealed this denial to the Seventh Circuit, and in oral argument effectively withdrew their request for class certification pursuant to Rule 26(b)(3), and sought certification based upon Rule 26(b)(2) and Rule 23(c)(4). *McReynolds*, 672 F.3d at 483-484.

performance evaluation, which under company policy influences the broker's pay and promotion. The plaintiffs argue that these company-wide policies exacerbate racial discrimination by brokers."[384]

The Court held that whether the teaming policy and its "spiral effect" on account distribution causes racial discrimination and is not justified by business necessity are issues common to the entire class and therefore appropriate for class-wide determination.[385] The Court observed that in the absence of a company-wide policy on teaming and account distribution but "instead delegation to local management of the decision whether to allow teaming and the criteria for account distribution, there would be racial discrimination by brokers or local managers like the discrimination alleged in *Wal-Mart*. But assume further that company-wide policies authorizing broker-initiated teaming, and basing account distributions on past success, increase the amount of discrimination. The incremental causal effect * * * of those company-wide policies—which is the alleged disparate impact—could be most efficiently determined on a class-wide basis."[386]

Notably, while the policies at issue in *McReynolds* permitted the exercise of discretion, which plaintiffs contended contributed to discrimination, the Seventh Circuit found dispositive that the discretion was exercised "within a framework established by the company."[387] This framework distinguished the case from the delegation of discretion challenged in *Wal-Mart*. The policies at issue in *McReynolds*, one which permitted brokers to form teams pursuant to criteria of their choice and the other which permitted the allocation of departing brokers' accounts pursuant to criteria of the remaining brokers' choice, constituted discrete personnel policies that

---

[384] *McReynolds*, 672 F.3d at 489.
[385] *Id.* at 489-490.
[386] *Id.* at 490.
[387] *Id.* at 488.

95

permitted those administering them broad discretion in how to implement them.[388]  The Seventh

Circuit concluded that challenges to these policies presented questions about their adverse effect

that could generate answers common to the class.[389]   The Court therefore found that "[t]he

practices challenged in this case present a pair of issues that can most efficiently be determined

on a class-wide basis" and certified a class pursuant to Rule 23(b)(2) and Rule 24(c), which

provides that "when appropriate, an action may be brought or maintained as a class action with

respect to particular issues."[390]

The Court observed that:

> "Obviously a single proceeding, while it might result in an injunction, could not
> resolve class members' claims. Each class member would have to prove that his
> compensation had been adversely affected by the corporate policies, and by how much.
> So should the claim of disparate impact prevail in the class-wide proceeding, hundreds of
> separate trials may be necessary to determine which class members were actually
> adversely affected by one or both of the practices and if so what loss he sustained—and
> remember that the class has 700 members. But at least it wouldn't be necessary in each of
> those trials to determine whether the challenged practices were unlawful."[391]

In *Ellis v. Costco (Costco)*,[392]  the U.S. District Court for the Northern District of

California certified a class of 700 employees challenging certain policies and practices with

respect to promotion, finding that plaintiffs had satisfied the commonality requirement under

both pattern or practice and disparate impact theories of liability.  The challenged promotion

policies in *Costco* included a promotion-from-within preference, a practice against posting

management job vacancies, and the absence of a formal application process for promotions to

assistant general manager and general manager positions. [393]  Importantly, with respect to

---

[388] *Id.* at 488-489.

[389] *Id.* at 490-491.

[390] *Id.* at 491.

[391] *Id.* at 490-491.

[392] *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012), *appeal dismissed,* 657 F.3d 970
(9th Cir. 2013).

[393] *See id.* at 511.

disparate impact, the *Costco* court noted that "[b]ecause the question under this theory is whether [d]efendant's policies and practices have a discriminatory impact on the [c]lass as a whole without regard to intent, the *Dukes*-identified problem of decentralized and discretionary individual managers' decisions presents less of a hurdle to certification if the plaintiffs identify *specific companywide employment practices* responsible for the disparate impact."[394]   Like *McReynolds*, the *Costco* court found that the exercise of discretion in decisions made pursuant to discrete company policies satisfied the commonality requirement of Rule 23.[395]

I find that Claimants have satisfied the commonality requirement for their Title VII claims challenging Sterling's compensation and promotion policies under a disparate impact theory of liability with respect to declaratory and injunctive relief. Claimants challenge discrete employment policies to which all members of the proposed class have been subject, and which Claimants' expert evidence demonstrates have resulted in significant pay and promotion disparities adverse to women. Claimants challenge: 1) the use of certain prior experience criteria, including prior management experience and non-jewelry sales volume, in setting starting pay rates for Sales Associates; 2) Sterling's policy for awarding merit increases as a percentage of base pay; and 3) Sterling's Succession Planning process. As in *McReynolds*, to the extent decisionmakers exercise some discretion in the implementation of these policies, they do so "within a framework established by the company."[396] And like the plaintiffs in *McReynolds*, Claimants' challenge presents questions regarding adverse effect that will be addressed by class-wide proof regarding the lawfulness of the identified policies and procedures which could generate answers common to the class. Specifically, both Claimants and Sterling will offer

---

[394] *Id.* at 531 (*citing Wal-Mart*, 131 S. Ct. at 2554) (emphasis in original).

[395] *Id.* at 518; *See also Moore v. Napolitano*, No. 00-953(RWR/DAR), 2013 WL 659111, at *14-15 (D.D.C. Feb. 25, 2013); *Calibuso v. Bank of America, Corp.*, 893 F. Supp.2d 374, 390 (E.D.N.Y. 2012).
[396] *McReynolds*, 672 F.3d at 488.

97

statistical evidence regarding whether the challenged policies and procedures have an adverse effect on women—including whether CAR is the appropriate labor pool with respect to promotion-- and statistical and other expert evidence regarding whether the prior experience factors and promotional system challenged by Claimants are job-related. The answers to these questions will determine whether Claimants are entitled to class-wide declaratory and injunctive relief "in one stroke"—notwithstanding the need for further proceedings to adjudicate individual claims for monetary damages.

It is unnecessary to address the commonality requirement with respect to monetary relief, because, for the reasons set forth below, Claimants cannot meet the predominance, superiority and manageability requirements of AAA Supplementary Rule 4(b) or Rule 23(b)(3).

Disparate Treatment

The requirement of proof of intent and problem of decentralized and individualized exercise of discretion identified in *Wal-Mart* present substantial hurdles for the establishment of commonality for a large nationwide class based upon disparate treatment. As noted above, in order to meet the commonality requirement for their Title VII claims alleging a pattern or practice of discrimination in the compensation and promotion decisions, Claimants must provide "significant proof" that Sterling "operated under a general policy of discrimination."[397]

The *Wal-Mart* Court provided scant guidance as to what constitutes "significant proof," apart from its apparent acknowledgment that the evidence adduced in *Teamsters* satisfied this standard. It did, however, state definitively what was *not* sufficient.

With respect to statistical evidence, the Court held that even if plaintiffs' statistical proof established a pay or promotion disparity in *all* of Wal-Mart's stores, "that would still not

---

[397] *Wal-Mart*, 131 S.Ct. at 2553.

demonstrate that commonality of issue exists."[398]  With respect to anecdotal evidence of

discrimination, the Court held that one affidavit for every 12,500 class members, relating to only

some 235 out of Wal-Mart's 3,400 stores, and concentrated in only six states was insufficient "to

raise any inference that all the individual, discretionary personnel decisions are

discriminatory."[399]  With respect to evidence of a corporate culture that rendered the exercise of

discretion "vulnerable" to gender discrimination, the Court held that Dr. Bielby's testimony was

insufficient to prove that Wal-Mart "operated under a general policy of discrimination,"[400]

because he was unable to answer the "essential question" of causation, *i.e.*, to provide the

necessary "glue" to establish that the common reason for pay and promotion disparities was

intentional gender discrimination.[401]

      Claimants contend that the evidence in this case may be distinguished from that offered

in *Wal-Mart* in several respects.

      First, in contrast to the nation-wide statistics offered in *Wal-Mart*, Claimants' statistical

evidence of the widespread nature of the disparities in compensation and promotion is provided

at levels of the Company consistent with the levels at which the decisions were made.

      Second, Claimants have offered evidence that bias, stereotyping and sexually demeaning

conduct occurs among those managers and executives responsible for setting pay and making

promotions, including examples of bias and stereotyping in the highest ranks of the company.

Claimants note that the *Costco* court found this type of evidence sufficient to support a finding of

commonality for the pattern or practice claims in that case, based in part on expert testimony that

---

[398] *Id.*

[399] *Id.* at 2556.

[400] *Id.* at 2554.

[401] *Id.* at 2553-2554.; *see EEOC v. Bloomberg L.P.*, No. 07 Civ. 8383 (LAP), 2010 U.S. Dist. LEXIS 92511, at *53-54 (S.D.N.Y. Aug. 31, 2010) (where expert was unable to conclude that employer's managers were intentionally stereotyping female employees, testimony would not support EEOC's allegations that intentional discrimination had occurred).

"Costco's culture fosters and reinforces stereotyped thinking, which allows gender bias to infuse from the top down."[402]

Third, Claimants' have offered evidence that Sterling continued to use employment practices that it knew had a disparate impact on women,[403] as well as evidence of deficiencies in Sterling's HR function.

I find that while the evidence in this case may be in some respects stronger that the evidence presented in *Wal-Mart*, it fails to provide significant proof that Sterling operated under a general policy of discrimination.

The critical element in Claimants' claim of intentional discrimination is the existence and influence of a corporate culture demeaning to women. The lynchpin in Claimants' proof of this element is the proposed expert testimony of Dr. Outtz. Simply put, without this testimony, Claimants cannot provide the necessary "glue" to establish that the common reason for pay and promotion disparities is intentional gender discrimination.

As noted above, Dr. Outtz cannot answer the "essential question" of what percent of the employment decisions at Sterling are determined by a gender-discriminatory corporate culture. At best, Dr. Outtz demonstrates that the sexual misbehavior and biased remarks by Sterling's executives is *capable* of influencing the managers who make the compensation and promotion decisions challenged by Claimants. More importantly, however, I find that Dr. Outtz's conclusions are not supported by a reliable methodology that is recognized and accepted in the scientific or professional literature in his field, and therefore lack sufficient probative value to establish commonality.

---

[402] *Costco*, 285 F.R.D. at 520.

[403] *See United States v. City of New York*, 2013 WL 1955782, *14 (2d Cir. May 14, 2013) (intent can be inferred from continued use of employment practices known to have a disparate impact).

As set forth above, Dr. Outtz's opinion that there is a corporate culture at Sterling that is demeaning to women is based in significant part on his review of declarations provided by Claimants' counsel. Dr. Outtz did not utilize any recognized methodology to determine whether these declarants constituted a representative sample of current and former Sterling employees. Dr. Outtz apparently read approximately 600 declarations provided by Sterling that reflect a very different view of Sterling's corporate culture with respect to the treatment of women. His decision to disregard this evidence, without any explanation, at a minimum calls his objectivity into question. None of the professional literature relied upon by Dr. Outtz supports his conclusion that "modelling" of improper sexual behavior by male corporate executives caused hundreds of lower level managers to intentionally discriminate against women in thousands of pay and promotion decisions. Moreover, Dr. Outtz's opinion that corporate culture at Sterling influenced pay and promotion decisions despite significant representation of women in management positions, which is based on a handful of declarations regarding alleged tolerance of sexual misconduct by Sterling's HR department, and unsupported conclusions regarding enforcement of Sterling's sex discrimination and harassment policies, is neither scientific nor credible.

For the above reasons, I find that Claimants have failed to provide "convincing proof of a companywide discriminatory pay and promotion policy" and have therefore not established the existence of any common question" with respect to their claims of disparate treatment.[404]

Typicality

Rule 23(a)(3) and AAA Supplementary Rule 4(a)(3) require that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."

---

[404] *Wal-Mart,* 131 S.Ct. at 2556-2557.

"The commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)."[405] The typicality requirement is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."[406] Typicality is not defeated by "minor variations in the fact patterns underlying individual claims," as long as the wrong is alleged to have occurred in the same general-fashion.[407] The purpose of the typicality requirement is "to ensure that a class representative has 'the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions.'"[408] "The primary criterion for determining typicality is the forthrightness and vigor with which the representative party can be expected to assert the interests of the members of the class."[409] A claim may be asserted on behalf of a class as long as at least one of the named claimants has been subject to each of the practices from which the proposed class seeks relief.[410]

Sterling asserts that Claimants cannot satisfy the typicality requirement because their claims are subject to "unique" defenses. Essentially, Sterling argues that it will show that the Named Claimants were not disfavored or were disfavored for individual reasons unrelated to gender, such as job performance and individual prior experience. It is well-established that

---

[405] *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (*citing Falcon*, 457 U.S. at 157 n. 13).
[406] *Robinson*, 267 F.3d at 155 (internal citation omitted).
[407] *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993); *see also Caridad*, 191 F.3d at 293 (the typicality requirement "does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather, it requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class").
[408] *In re NYSE*, 260 F.R.D. 55, 2009 WL 1683349, at *15 (*quoting In re NASDAQ Market-Makers Antitrust Litig.*, 172 F.R.D. 119, 126 (S.D.N.Y. 1997)).
[409] *Latino Officers Ass'n v. City of New York*, 209 F.R.D. 79, 89-90 (S.D.N.Y. 2002) (internal citation and quotation marks omitted).
[410] *Charrons v. Pinnacle Group NY LLC*, 269 F.R.D.221, 233 (S.D.N.Y. 2010).

typicality is absent where the named plaintiffs are "'subject to unique defenses which threaten to become the focus of the litigation.'"[411] However, the unique defenses doctrine is limited to cases in which a full defense is available against an individual plaintiff's action and "those unique defenses threaten to become focus of the litigation."[412] A class representative need not prove that "she is immune from any possible defense."[413] Instead, she must establish "that she is not subject to a defense that is not "typical" of the defenses defendant may raise against other members of the proposed class.[414]

As set forth above, and explained in more detail below, I have determined that this case may proceed as a class action solely with respect to Claimants' disparate impact claims for declaratory and injunctive relief, based upon Rule 23(b)(2) and Rule 23(c)(4).

The well-established principle that "[t]ypicality is determined by the nature of the claims brought by the class representatives, not by the particular fact patterns from which they arose," is "particularly true with respect to * * * (b)(2) certification."[415] This is because "where plaintiffs request declaratory and injunctive relief against a defendant engaging in a common course of conduct toward them * * * [there is] no need for *individualized* determinations of the propriety of injunctive relief."[416]

Here, there can be no question that the Named Claimants' claims of disparate impact

---

[411] *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000).

[412] *Id.* at 59 (*citing Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)).

[413] *See Casida v. Sears Holding Corp.*, 2012 U.S. Dist. LEXIS 111599 (E.D. Cal. August 8,, 2012), at *38 (*quoting Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

[414] *See id.* at *39-40 (*quoting Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992), and *citing Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984-85 (9th Cir. 2011)).

[415] *Brown v. Kelly*, 244 F.R.D. 222, 232 (S.D.N.Y. 2007).

[416] *Id.* (emphasis in original; internal quotations and citation omitted); *accord Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) (noting that "cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims," and that "[a]ctions requesting declaratory and injunctive relief to remedy conduct directed at the class clearly fit this mold").

arise from the same course of conduct as the claims of the class: Sterling's companywide pay

and promotion policies. Sterling's defenses to the issues certified will be common to all

members of the proposed class, *i.e.*, that the challenged policies and procedures do not have an

adverse impact and/or are job-related. If Claimants succeed with respect to the certified claims,

the "unique defenses" identified by Sterling will be litigated in subsequent proceedings. There is

therefore no danger that individual defenses will become the focus of this class arbitration.[417]

I therefore find that Claimants have met the typicality requirements of Rule 23(a)(3)and

AAA Supplementary Rule 4(a)(3) with respect to their disparate impact claims for declaratory

and injunctive relief.

Adequacy

Rule 23(a)(4) and AAA Supplementary Rule 4(a)(4) require that the named

representatives "will fairly and adequately protect the interests of the class." Rule 23(a)(4) is

satisfied where the proposed class representatives (1) have an interest in "vigorously pursuing

the claims of the class," and (2) do not have interests "antagonistic to the interests of other class

members."[418]

---

[417] In any event, courts have held that employers cannot defeat typicality by asserting fact-specific defenses that discrimination did not cause an adverse employment action. *See, e.g.*, *Duling v. Gristede's Operating Corp.*, 267 F.R.D. 86, 97 (S.D.N.Y. 2010) (defendants in Title VII cases cannot defeat typicality by claiming that unique factors other than discrimination explain the experiences of named plaintiffs); *Velez v. Novartis Pharm. Corp.*, 244 F.R.D. 243, 267-68 (S.D.N.Y. 2007) (claiming that something other than discrimination explains the named plaintiffs' experience" cannot defeat typicality because "[t]he question presented by each plaintiff's claim is undoubtedly typical of the class, whether or not defendants are eventually able to prove that the answer to that question is unique to each plaintiff"); *Costco*, 285 F.R.D. at 534-35 (unique defenses did not defeat typicality because they were either specific examples of defenses typical to the entire class or "merely alternative explanations for alleged discrimination" and not likely to become a "major focus" of the litigation, especially when compared to the common and typical class-wide issues.).

[418] *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006); *Baffa*, 222 F.3d at 60.

104

Sterling asserts that Claimants have not satisfied the adequacy requirement because there are conflicts between Named Claimants and absent class members, and because Claimants have abandoned class claims for compensatory damages.

Sterling points out that the Named Claimants include individuals who supervised other putative class members. Specifically, Sterling asserts that decisions on pay and promotions are made on a collaborative basis between SMs and DMs, and that female SMs therefore played a role in the pay and promotion decisions challenged by Claimants. Sterling contends that supervisors cannot adequately represent those they supervise.[419] Sterling further observes that some Named Claimants no longer work for Sterling and that former employees cannot adequately represent current employees because they have no (or a lessened) interest in injunctive relief for the class.[420]

Neither of these objections has merit. In this case, Claimants contend that all of the members of putative class have been similarly harmed by Sterling's compensation and promotion systems. Both current and former employees have an interest in establishing the unlawfulness of Sterling's practices, which is a necessary predicate for injunctive relief as well as back pay. The fact that some class members hold different positions within a company does not create a class conflict,[421] and in any event the record reflects that only DMs, VPROs, and

---

[419] *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) (inadequate class representatives found where the named plaintiffs "have authority within the company with regard to the compensation of some, and maybe many, of the unnamed class members and, as worrisome, over male employees in the same job categories as the class members").

[420] *See Slader v. Pearle Vision, Inc.*, No. 00 Civ. 2797 (JSR), 2000 U.S. Dist. LEXIS 16453, at *2 (S.D.N.Y. Nov. 14, 2000) (class representatives inadequate where the relief they seek conflicts with relief sought by others in the class because "a former employee's primary interest necessarily centers on recovering back pay, while a current employee may well be far more interested in obtaining injunctive relief").

[421] *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 958-59 (9th Cir. 2003) (explaining that there was no "substantive issue" for a conflict of interest where several members of the class were supervised by other employee class members because the mere fact that the employees could have "potentially conflicting interests" was not sufficient to deny class certification); *Latino Officers Ass'n City of N.Y. v. City of New*

DVPs had the actual authority to make the pay and promotion decisions at issue in this case. The interests of the Named Claimants are therefore not antagonistic to those of absent class members.

Claimants' First Amended Complaint expressly sought an award of compensatory damages for the class. However during the deposition of Claimant Dawn Souto-Coons, Claimants entered into a stipulation on the record (which the parties formalized in a signed Stipulation) stating that that none of the Named Claimants is seeking an award of compensatory damages in this Arbitration. Sterling suggests that the abandonment of their compensatory damages claims was a strategic decision to avoid cross-examination on these claims and/or to enhance the chances of certification of a nationwide class, which was made more difficult by the intervening *Wal-Mart* decision, especially with respect to monetary relief. Sterling argues that the failure to seek compensatory damages renders the Named Claimants inadequate representatives. As discussed below, I find that Claimants have not met the requirements for class certification with respect to monetary relief. It is therefore unnecessary to address Sterling's contention that Claimants have failed to satisfy the requirements of Rule 26(a)(4) based upon their failure to seek compensatory damages.

---

*York,* 209 F.R.D. 79, 90 (S.D.N.Y. 2002) (finding no fundamental conflict in a class of police officers that had class representatives who were in supervisory and non-supervisory positions); *M.O.C.H.A. Soc'y, Inc. v. City of Buffalo,* No. 98-CV-99C, 2008 WL 343011, at *5 (W.D.N.Y. Feb. 6, 2008) (holding that it was not necessary for each class member or representative to hold "identical" positions to be adequate class representatives). The adequacy requirement merely requires a showing that the class representatives were employees who suffered the same alleged discrimination as suffered by other class members. *See Velez,* 244 F.R.D. at 269 (quoting *Hnot v. Willis Grp. Holdings Ltd,* 228 F.R.D. 476, 485 (S.D.N.Y. 2005) ("Even if one female officer supervised another, it is still possible, as plaintiffs allege, that they all suffered from gender discrimination by the key decisionmakers."); *Hnot,* 228 F.R.D. at 486 ("If supervisory employees and supervisees all are subject to discrimination, all have an equal interest in remedying the discrimination, and the named plaintiffs can still be expected to litigate the case with ardor. A potential for conflict need not defeat class certification.").

For the above reasons, I find that Claimants have satisfied the adequacy requirement of Rule 23(a)(4) and AAA Supplementary Rule 4(a)(4) with respect to their claims for declaratory and injunctive relief based upon disparate impact.

Adequacy of Counsel

AAA Supplementary Rule 4(a)(5) requires that "counsel selected to represent the class will fairly and adequately protect the interests of the class." Sterling does not challenge the adequacy of class counsel, which is a prominent, highly-experienced employment discrimination law firm that I find will fairly and adequately protect the interests of the class. I therefore find that Claimants have met the requirement of adequacy of counsel.

Similar Arbitration Clause

AAA Supplementary Rule 4(a)(6) requires that "each class member has entered into an agreement containing an arbitration clause which is substantially similar to that signed by the class representative(s) and each of the other class members." The parties have stipulated to satisfaction of this requirement.[422]

AAA Supplementary Rule 4(b)

AAA Supplementary Rule 4(b) provides that "[a]n arbitration may be maintained as a class arbitration if the prerequisites of subdivision (a) are satisfied, and in addition, the arbitrator finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class arbitration is superior to other available methods for the fair and efficient adjudication of the controversy."

Because I have determined that Claimants have not met the commonality requirement of AAA Supplementary Rule 4(a) or Rule 23(a) with respect to their pattern and practice disparate

---

[422] *See* Stipulation Regarding Versions of RESOLVE Program Agreement (Feb. 14, 2013) (Claimants' Exhibit 104).

treatment claim, I address the requirements of AAA Supplementary Rule 4(b) solely with respect to Claimants' disparate impact claim.

The predominance requirement is meant to "tes[t] whether proposed classes are sufficiently cohesive to warrant adjudication by representation,"[423] and is intended to "ensure[] that the class will be certified only when it would 'achieve economies of time, effort and expense, and promote * * * uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'"[424]

I find that questions of law or fact common to class members predominate over any questions affecting only individual members with respect to those "Stage I" issues that pertain to Claimants' request for declaratory and injunctive relief. The proof pertaining to disparate impact—primarily expert statistical evidence, as well as fact and expert evidence pertaining to Sterling's operations and the job-relatedness of Sterling's pay and promotion criteria and practices--will indisputably be common to the class. Indeed, Sterling has not identified any individual issues with respect to the lawfulness of Sterling's compensation and promotion practices challenged by Claimants.

I find, however, that common questions do not predominate with respect to those "Stage II" issues that pertain to monetary relief. The facts pertaining to each Claimant's eligibility will vary depending on their individual employment history, and the facts pertaining to similarly-situated males during their employment. These issues cannot be fairly adjudicated on a representative basis.[425]

---

[423] *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

[424] *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007) (*quoting Amchem*, 521 U.S at 615).

[425] Nor can Claimants meet the other requirements of AAA Supplementary Rule 4(b) and Rule 23(b)(3) with respect to monetary relief. Of course, in the event Claimants prevail in Stage I, it remains open to

With respect to the superiority requirement, the alternative method of adjudicating Claimants' disparate impact claims is through individual, single-Claimant arbitrations. With respect to Claimants' request for declaratory and injunctive relief, each arbitrator would be required to hear evidence and determine whether Sterling's compensation and promotion practices are lawful. The determination of this issue in a single proceeding is clearly more efficient. Moreover, a class arbitration will promote uniformity in decisions. A class arbitration is also superior because it provides for inclusion of members who would otherwise be unable to afford independent representation.[426] In addition, broad systemic remedies are generally not available in non-class cases.[427] I also note that traditional limitations on discovery in arbitration could preclude the development of company-wide evidence necessary to prove systemic discrimination. Finally, a class arbitration is superior to individual proceedings because without a class proceeding and the attendant class-wide notice, many putative class members would never know that Sterling may have engaged in unlawful employment practices.[428] I therefore find that the adjudication of Claimants' disparate impact claims with respect to declaratory and injunctive relief in a single arbitration is superior to individual arbitrations.

With respect to the specific matters set forth in AAA Supplementary Rule 4(b)(1)-(4), I find:

(1) The members of the proposed class are unlikely to have any interest in individually controlling the prosecution of Claimants' claims for declaratory and injunctive relief. To the

---

the Arbitrator to employ appropriate case management techniques to reduce the number of individualized hearings that may be required.

[426] *Amchem*, 521 U.S. at 617; *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013); *United States v. City of New York*, 276 F.R.D 22, 49 (E.D.N.Y 2011).

[427] *See, e.g., Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003).

[428] *See, e.g., In re Nassau County Strip Search Cases (Nassau)*, 461 F.3d 219, 229 (2d Cir. 2006).

extent a putative class member wishes to do so, she will be afforded an opportunity to opt out of the class arbitration.

(2) Apart from the EEOC action, there appear to be no other proceedings concerning this controversy already commenced by members of the class.

(3) No negative consequences to class members in concentrating the determination of Claimants' disparate impact claims for declaratory and injunctive relief in a single arbitral forum have been identified by counsel.

(4) There are no difficulties likely to be encountered in the management of a class arbitration of Claimants' disparate impact claims for declaratory and injunctive relief. Sterling's expressed concerns regarding manageability pertain solely to the adjudication of Claimants' entitlement to monetary relief; Sterling has not identified any difficulties that could be encountered in a class arbitration of Claimants' disparate impact claims for declaratory and injunctive relief.

### Rule 23(c)(4)

As set forth above, Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." AAA Supplementary Rule 4 does not contain a provision comparable to Rule 23(c)(4). However, Supplementary Rule 4(a) provides that the arbitrator must consider not only the criteria enumerated in Supplementary Rule 4, but also, "any law or agreement of the parties the arbitrator determines applies to the arbitration." The AAA has stated that it intended its formulation of the Supplementary Rules to "hew closely to Federal Rule 23."[429] I therefore find that certification of a class arbitration with respect to particular issues is consistent with the AAA Supplementary

---

[429]Brief for Am. Arbitration Ass'n as *Amicus Curiae* for Neither Party in *Stolt-Nielsen*, 129 S.Ct. 2703, 2009 WL 2896309, at *17-18 (September 4, 2009).

Rules and applicable in this arbitration, as long as the requirements of Supplementary Rules 4(a) and 4(b) are satisfied.

Courts in the Second Circuit and elsewhere have used Rule 23(c)(4) to certify class claims for declaratory and injunctive relief in employment discrimination cases before and after the *Wal-Mart* decision, in order to efficiently manage complex litigation and narrow issues for adjudication.[430]

Sterling argues that issue certification "would not meaningfully advance any substantive outcome" and should be denied because an injunction would not provide "final relief" to all class members. I disagree. If Claimants are successful, a declaratory judgment will relieve all class members of the obligation to prove the unlawfulness of the challenged pay and promotion practices in individual arbitrations and current employees will benefit from the elimination of unlawful practices.[431]

As the Seventh Circuit observed in *McReynolds*,

> Obviously a single proceeding, while it might result in an injunction, could not resolve class members' claims. Each class member would have to prove that his compensation had been adversely affected by the corporate policies, and by how much. So should the claim of disparate impact prevail in the class-wide proceeding, hundreds of separate trials may be necessary to determine which class members were actually adversely affected by one or both of the practices and if so what loss he sustained—and remember that the class has 700 members. *But at least it wouldn't be necessary in each of those trials to determine whether the challenged practices were unlawful.*"[432]

---

[430] *See, e.g., Gulino v. Board of Education*, 555 Fed. Appx. 37 (2d Cir. 2014); *McReynolds*, 672 F.3d 482 (7th Cir. 2012); *Robinson*, 267 F.3d 147 (2d Cir. 2001); *Houser v. Pritzker*, No. 10 CV 3105-FM, 2014 WL 2967446 (S.D.N.Y. July 1, 2014); *see also Nassau*, 461 F.3d at 226-227 ("courts may use subsection (c)(4) to single out issues for class treatment when the action as a whole does not satisfy Rule 23(b)(3)").
[431] Because of the potentially limited applicability of *res judicata* and collateral estoppel in arbitration, it is possible that every Claimant would be required to prove this element of liability in individual arbitrations. Of course, if Sterling successfully defends the challenged pay and promotion practices, thousands of individual arbitrations may be avoided.
[432] *McReynolds*, 672 F.3d at 490-491 (emphasis added).

For the reasons set forth above, I find that Claimants' have satisfied the requirements of Supplementary Rules 4(a) and 4(b) with respect to their Title VII claims based upon a disparate impact theory of liability for purposes of declaratory and injunctive relief, and find that this arbitration may be appropriately maintained as a class arbitration with respect to the following issues:

(1) Whether Sterling's compensation practices have a disparate impact on women;

(2) Whether Sterling's promotion practices have a disparate impact on women, including whether CAR is an appropriate and reliable indicator of interest in promotion;

(3) If Sterling's compensation practices have a disparate impact on women, whether Sterling can establish that one of the statutory affirmative defenses justifies the disparity in pay; and

(4) If Sterling's promotional practices have a disparate impact on women, whether Sterling's practices were job-related for the position in question and justified by business necessity.

## TITLE VII CLASS PERIOD

Title VII sets a 300-day limitation period for discrimination claims filed with a local agency. 42 U.S.C. § 2000e-5. For the claims alleging discrimination in compensation brought under Title VII, the class relies upon the EEOC charge of Named Claimant Laryssa Jock filed on May 18, 2005. Therefore, the starting point for class membership of women asserting compensation claims under Title VII begins July 22, 2004. For the claims alleging discrimination in promotions brought under Title VII, the class relies upon the EEOC charge of Named Claimant Dawn Souto-Coons, filed on October 3, 2005. The commencement of the class period for the promotion claims is therefore December 7, 2004.

As noted above, Claimants propose of a class period beginning on June 2, 2002. This proposal is based upon their claims under the EPA, which provides for a three-year statute of limitations for willful violations. *See* 29 U.S.C. § 255(a). Claimants contend that Jock's EEOC charge, which Sterling received on June 2, 2005, tolls the statute of limitations for the claims of the putative class under the EPA. Claimants further contend that because the EPA limitations period is broader the Title VII limitations period, the "appropriate" class period for both Title VII and EPA compensation claims is June 2, 2002 to the present.

For the reasons set forth below in the discussion of Claimants' EPA claims, I find that Jock's EEOC charge does not toll the statute of limitations for claims of the putative EPA class, and that Claimants' collective claims under the EPA must proceed on an "opt-in" basis. Moreover, Claimants have provided no authority for broadening the Title VII class period based upon the simultaneous assertion of EPA claims. I therefore find that the starting point of the class period for women asserting compensation claims under Title VII is July 22, 2004, and that the starting point of the class period for women asserting promotion claims under Title VII is December 7, 2004.

EQUAL PAY ACT

The EPA incorporates the enforcement provisions of the Fair Labor Standards Act ("FLSA") found in 29 U.S.C. § 216(b).[433] Accordingly, the EPA permits representative

---

[433] *See* Equal Pay Act of 1963, Pub. L. No. 88-38, § 3, 77 Stat. 56-57 (codified as amended at 29 U.S.C. § 206(d)). The EPA provides: "An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly-situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b).

claimants to bring claims on behalf of similarly-situated persons. Section 216(b) requires that each potential plaintiff file a written consent to "opt in" to the action.[434]

In this case, Claimants have not sought to proceed in accordance with Section 216(b). Rather, they seek certification of an "opt-out" class in accordance with Fed. R. Civ. P 23 and AAA Supplementary Rules for Class Arbitrations. In addition, Claimants contend that Jock's EEOC charge tolls the statute of limitations for the claims of the putative class under the EPA. Claimants acknowledge that this approach has been uniformly rejected by the courts. They argue, however, that an opt-out EPA class and tolling is permitted here because this case is proceeding in arbitration under the AAA Supplementary Rules for class Arbitrations, which only provide for certification of an opt-out class.

Claimants rely on *Long John Silver's Rests., Inc. v. Cole* (*Long John Silver's*), in which the arbitrator permitted FLSA claims to proceed as an opt-out class, based upon his finding the by agreeing to arbitrate pursuant to the AAA rules, "the parties' contract * * * superseded the FLSA's procedural requirements."[435] The district court declined to vacate the arbitrator's decision. On appeal, the Fourth Circuit held that Congress intended that "the 'opt-in' procedure should apply in arbitration as in court proceedings," but did not expressly preclude waiver in the parties' agreement by adoption of an alternate procedure.[436] Because the arbitrator's interpretation of the arbitration agreement was subject to "extremely limited" judicial review, the Fourth Circuit affirmed the district court.[437] The decision in *Long John Silver's* is therefore

---

[434] *Id.*; *see also Moore v. Publicis Groupe SA*, No. 11 Civ. 1279, 2012 WL 2574742, at *8-9 (S.D.N.Y. June 29, 2012).

[435] 514 F.3d 345, 352-53 (4th Cir.), *cert. denied*, 555 U.S. 815 (2008). *See also Johnson v. Morton's Rest. Group, Inc.*, AAA No. 111600153105 (AAA 2007, Golick, Roberta, Arb.), at 19, n.28 (Claimants' Exhibit 5); *Bryant v. Joel Antunes, LLC*, AAA No. 1116001178305 (AAA 2007, Pratt, George C., Arb.), at 2 (Claimants' Exhibit 6).

[436] *Long John Silver's*, 514 F.3d at 351 (emphasis added).

[437] *Id.* at 349-52.

limited to the arbitrator's interpretation of the parties' arbitration agreement in that case. The question presented here is whether Sterling, by electing AAA arbitration and the application of the AAA Rules, effectively waived its right to insist upon compliance with the "opt-in" requirement of Section 216(b).

All versions of the RESOLVE Arbitration Agreements provide that the "agreement shall be governed by and interpreted in accordance with the laws of Ohio." Ohio law generally provides that waiver is a voluntary relinquishment of a known right.[438] "As a general rule, the doctrine of waiver is applicable to all personal rights and privileges, whether secured by contract, conferred by statute, or guaranteed by the Constitution, provided that the waiver does not violate public policy."[439] The party asserting a waiver must prove a clear, unequivocal, decisive act by the other party demonstrating a purpose to waive the known right.[440]

Notably, nothing in the AAA Supplemental Rules suggests that its procedures were intended to effect a waiver of statutory opt-in requirements. Under these circumstances, I find that Sterling's incorporation of the AAA Rules cannot constitute a voluntary and intentional waiver of the EPA requirement. Claimants' motion for certification of an opt-out EPA class is therefore denied, without prejudice to their right to seek certification of an opt-in EPA class.

## STANDING

Sterling asserts that Claimants' motion for class certification must be denied on the ground that the Named Claimants have "no standing" to represent absent class members, who,

---

[438] *State ex rel. Board of County Commissioners of Athens County v. Board of Directors of the Gallia*, 75 Ohio St. 3d 611, 616 (1996); *see also Miller v. Lindsay-Green, Inc.*, 2005 Ohio 6366, 2005 Ohio App. LEXIS 5696 (Ohio Court of Appeals) (waiver is defined as a voluntary relinquishment of a known right with the intent to do so with full knowledge of all the facts).
[439] *Id.* (citations omitted.)
[440] *Miller v. Lindsay-Green, Inc.*, at P70.

according to Sterling, have not consented to allow the arbitrator to determine whether the
RESOLVE arbitration agreement authorizes class arbitration.

This argument is based solely upon the concurring opinion of Justice Alito in the
Supreme Court's ruling in *Oxford Health Plans LLC v. Sutter*.[441] In *Sutter*, the parties agreed
that the arbitrator should decide whether their contract authorized class arbitration, and he
concluded that the arbitration clause unambiguously evinced an intention to allow class
arbitration. Oxford moved to vacate the arbitrator's decision, on the ground that the arbitrator
"exceeded his powers," relying upon the Supreme Court's decision in *Stolt-Nielsen S.A. v.
Animal Feeds Int'l Corp.*[442] Oxford's motion was denied by the District Court, which was
affirmed by the Third Circuit. The Supreme Court affirmed the decision of the Third Circuit,
holding that because the parties bargained for the arbitrator's construction of their agreement, the
arbitral decision construing the contract must be upheld, regardless of whether the court
disagreed with the arbitrator's contract interpretation.[443]

In his concurring opinion, Justice Alito noted that "absent members of the plaintiff class
never conceded that the contract authorizes the arbitrator to decide whether to conduct class
arbitration. It doesn't."[444] Justice Alito opined that "an arbitrator's erroneous interpretation of
contracts that do not authorize class arbitration cannot bind someone who has not authorized the
arbitrator to make that determination,"[445] and that "[c]lass arbitrations that are vulnerable to
collateral attack allow absent class members to unfairly claim the 'benefit from a favorable
judgment without subjecting themselves to the binding effect of an unfavorable one.'"[446] Justice

---

[441] 133 S. Ct. 2064, 2071 (2013) (Alito, J., concurring).

[442] 130 S. Ct. 1758 (2010).

[443] 133 S.Ct. at 2066.

[444] *Id.* at 2071

[445] *Id.*

[446] *Id.* at 2072 (*quoting American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 546-547 (1974)).

Alito concluded that the distribution of opt-out notices "does not cure this fundamental flaw in the class arbitration proceeding in this case," and that "at least where absent class members have not been required to opt *in*, it is difficult to see how an arbitrator's decision to conduct class proceedings could bind absent class members who have not authorized the arbitrator to decide on a classwide basis which arbitration procedures are to be used."[447]

I find that the consent/collateral attack concern expressed by Justice Alito (and by Sterling) has no application in this case because here the absent class members have clearly consented to the authority of the arbitrator to determine whether the RESOLVE arbitration agreement permits class arbitration. It is undisputed that each of the absent class members signed the RESOLVE arbitration agreement, which clearly provides for the application of the AAA Rules. The AAA Supplementary Rules for Class Arbitrations, which "apply to any dispute arising out of an agreement that provides for arbitration pursuant to any of the rules of the American Arbitration Association ('AAA') where a party submits a dispute to arbitration on behalf of or against a class or purported class,"[448] provide that the arbitrator shall determine "whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class."[449] Accordingly, by signing the RESOLVE arbitration agreement, each of the absent class members agreed that the arbitrator would determine whether the RESOLVE arbitration agreement permits class arbitration.[450] Sterling's "standing" objection is therefore rejected.

---

[447] *Id.* at 2071-2072 (emphasis in original).

[448] AAA Supplementary Rule 1.

[449] AAA Supplementary Rule 3.

[450] *See, e.g., Reed v. Fla. Metro. Univ.*, 681 F.3d 630, 635-636 (5th Cir. 2012).

## SUMMARY OF AWARD

For the reasons set forth above, I find that the adjudication of Claimants' Title VII disparate impact claims with respect to declaratory and injunctive relief may be maintained as a class action pursuant to AAA Supplementary Rule 4 and Rules 23(b)(2) and 23(c)(4). Claimants' motion for class certification of their Title VII disparate impact claims with respect to monetary damages pursuant to AAA Supplementary Rule 4 and Rule 23(b)(3) is denied. Claimants' motion for class certification of their Title VII disparate treatment claims is denied. Claimant's motion for certification of a Rule 23 "opt-out" class for their EPA claims is denied. Sterling's contention that the Named Claimants lack standing to represent absent class members in this proceeding is rejected. I find that the appropriate class period for Claimants' Title VII compensation claims is July 22, 2004, to the date of trial, and that the appropriate class period for Claimants' Title VII promotion claims is December 7, 2004, to the date of trial.

## NOTICE

Counsel are requested to submit a proposed form of opt-out notice consistent with this Class Certification Award pursuant to AAA Supplementary Rules 5 and 6.

SO ORDERED:

Kathleen G. Roberts

KATHLEEN A. ROBERTS
ARBITRATOR
February 2, 2015

118